# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MELVERT WASHINGTON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-320 (SLR) |
| | ) | |
| | ) | |
| AUTOZONERS, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

_____

## <u>OPENING BRIEF IN SUPPORT OF DEFENDANT AUTOZONE'S MOTION FOR SUMMARY JUDGMENT</u>

Matthew F. Boyer, Esq. (Del. Bar No. 2564)
Timothy Holly, Esq. (Del. Bar No. 4106)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Tel: (302)-884-6585

Tracy K. Hidalgo, Esq. (admitted *Pro Hac Vice*)
James P. Waldron, Esq. (admitted *Pro Hac Vice*)
Frilot, Partridge, Kohnke, & Clements
1100 Poydras St.
3600 Energy Centre
New Orleans, La 70163
Tel: (504)-599-8358
Fax: (504)-599-8100

*Attorneys for Defendant, AutoZone, Inc.*

DATED:     December 21, 2005

## TABLE OF CONTENTS

PAGE

NATURE AND STAGE OF PROCEEDINGS ................................................................ 1

SUMMARY OF ARGUMENT ................................................................................. 2

STATEMENT OF FACTS ..................................................................................... 3

A.    AutoZone Policies and Procedures. .................................................................. 3

B.    Plaintiff's Work History. ............................................................................... 6

C.    Plaintiff's Allegations. ................................................................................ 19

ARGUMENT ...................................................................................................... 22

A.    Standards for Summary Judgment. ................................................................. 22

B.    AutoZone is Entitled to Summary Judgment on Plaintiff's
      Hostile Work Environment Claim. ................................................................. 23

      1.    Totality of Circumstances Does Not Constitute a Hostile
            Work Environment. ............................................................................. 25

            a.    Alleged Comments. ................................................................... 25
            b.    Unprofessional Treatment. ......................................................... 26
            c.    Discipline and Scrutiny. ............................................................ 27

C.    AutoZone is Entitled to Summary Judgment on Plaintiff's
      Retaliation Claim. ....................................................................................... 30

      1.    Plaintiff Cannot Establish a Prima Facie Case of Retaliation. ................. 30

            a.    Plaintiff's Claim of Constructive Discharge Does
                  Not Establish an Adverse Employment Action. ........................... 31
            b.    Plaintiff Has No Evidence Establishing a Causal
                  Connection. ............................................................................. 34

D.    Plaintiff is Unable to Prove that AutoZone's Non-Discriminatory
      Reasons Give Rise to Pretext. ........................................................................ 34

CONCLUSION ................................................................................................... 37

i

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                              <u>PAGE</u>

*Aman v. Cort Furniture Rental Corp.*,
    85 F.3d 1074 (3d Cir. 1996) .................................................................................. 24

*Anderson v. Liberty Lobby Inc.*,
    477 U.S. 242 (1986) ........................................................................................... 22

*Andrews v. City of Philadelphia*,
    895 F.2d 1469 (3d Cir. 1990) ................................................................................ 24

*Boyd v. State Farm Ins. Co.*,
    158 F.3d 326 (5th Cir. 1998) ............................................................................... 26

*Brennan v. City of White Plains*,
    67 F.Supp. 2d 362 (S.D.N.Y. 1999) ....................................................................... 27

*Carver v. City of Trenton*,
    420 F.3d 243 (3d Cir. 2005) ................................................................................. 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................................... 22

*Connors v. Chrysler Fin. Corp.*,
    160 F.3d 971 (3d Cir. 1998). .................................................................................. 32

*Duffy v. Paper Magic Group, Inc.*,
    265 F.3d 163 (3d Cir. 2001) ....................................................................31, 32, 33

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998) ........................................................................................... 25

*Fuentes v. Periske*,
    32 F.3d 759 (3d Cir. 1994) ................................................................................... 35

*Goss v. Exxon Office Sys. Co.*,
    747 F.2d 885 (3d Cir. 1984) ................................................................................. 31

*Gray v. York Newspapers, Inc.*,
    957 F.2d 1070 (3d Cir. 1992) ............................................................................... 32

*Harris v. Forklift Systems, Inc.*,
    510 U.S. 17  (1993)............................................................................................. 24

CASES                                                                                              PAGE

*Keller v. Orix Credit Alliance, Inc.,*
    130 F.3d 1101 (3d Cir. 1997) ............................................................................ 36

*Lexington Ins. Co. v. Western Pennsylvania Hosp.,*
    423 F.3d 318 (3d Cir. 2005) ............................................................................ 30

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ........................................................................................ 22

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ........................................................................................ 30

*Olson v. General Elec. Aerospace,*
    101 F.3d 947 (3d Cir. 1996) ............................................................................ 23

*Robinson v. City of Pittsburgh,*
    120 F.3d 1286 (3d Cir. 1997) .......................................................................30, 33

*Russ v. Van Scoyoc Assoc., Inc.,*
    122 F.Supp. 2d 29 (D.D.C. 2000) ................................................................... 26

*Saxe v. State College Area School Dist.,*
    240 F.3d 200 (3d Cir. 2001) ............................................................................ 30

*Sheridan v. E.I. Dupont de Nemours and Co.,*
    100 F.3d 1061 (3d Cir. 1996) .......................................................................... 35

*Smith v. Leggett Wire Co.,*
    220 F.3d 752 (6th Cir. 2000) ......................................................................... 26

*Vance v. Southern Bell Tel. and Tel. Co.,*
    863 F.2d 1503 (11th Cir. 1989) ..................................................................... 24

*Weston v. Commonwealth of Pennsylvania,*
    251 F.3d 420 (3d Cir. 2001) ............................................................................ 31

*Woodland v. Joseph T. Ryerson & Son, Inc.,*
    302 F.3d 839 (8th Cir.2002) .......................................................................... 25

OTHER AUTHORITIES

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-et seq. ...................1, 25, 26

Federal Rules of Civil Procedure 56 ............................................................................ 22

## NATURE AND STAGE OF PROCEEDINGS

Mr. Washington, an African-American male, filed a three count race-based Complaint against AutoZone pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-et seq., claiming failure to promote, constructive discharge, and retaliation.

Mr. Washington worked for AutoZone as a part time employee for approximately three years. Up until approximately the final month of his employment, he held a full time job at Delaware State University. In connection with his full time employment, Washington admitted severe limitations on his availability to work for AutoZone. Upon Washington's resignation from Delaware State University, AutoZone offered Plaintiff a full time position; however, he turned down the offer since it did not include increased compensation or a managerial position. After refusing AutoZone's full time offer, Plaintiff resigned.

Despite the language of his Complaint, Plaintiff admits his claim is not about racial discrimination; rather, it is strictly rooted in retaliation. Plaintiff admits he was able to do his job throughout his employment at AutoZone. Plaintiff also admits he has no evidence indicating that <u>any</u> of the individuals who allegedly received a promotion over him were more or less qualified than he. Moreover, plaintiff has no evidence tending to reflect he was subject to stricter scrutiny or discipline than employees of different race. Further, plaintiff concedes his supervisor, Ralph Findle, treated white and black employees in a rude and unprofessional manner. Simply put, plaintiff's concessions establish the lack of any discriminatory animus on the part of AutoZone.

## <u>SUMMARY OF ARGUMENT</u>

AutoZone's motion for summary judgment should be granted for at least four reasons.

First, Mr. Washington's apparent race discrimination claim is ripe for dismissal since he testified he is not making a claim for discrimination.

Second, Mr. Washington cannot establish a hostile work environment since he cannot prove that any alleged comments or discipline rise to the level of severe or pervasive or that the conditions of his employment were altered in any way.

Third, Mr. Washington cannot establish a claim of constructive discharge since he cannot establish that he suffered a serious and substantial tangible harm, which altered his compensation, terms, conditions, compensation or privileges of employment, and made his working conditions so unpleasant or intolerable that a reasonable person in his shoes would resign.

Fourth, Mr. Washington cannot establish a *prima facie* case of retaliation because he cannot establish that he suffered an adverse employment action nor can he prove a causal connection between any protected conduct and an adverse employment action.

## STATEMENT OF FACTS

**A.**   **AutoZone Policies and Procedures.**

1.   AutoZone is a discount auto parts retailer with stores across the State of Delaware and the United States.

2.   On August 30, 1999, AutoZone hired Plaintiff as a part-time sales person at store 1157 in Smyrna, Delaware.  (A005/Washington 62[1]; AutoZone New Employee Setup Document at A051.)

3.   At the time Plaintiff was hired, he was issued a company handbook which fully described AutoZone's policies and procedures.  (A005/Washington 63.)

4.   Plaintiff understood it was his responsibility to read the handbook and he was bound by its policies.  (A005/Washington 64.)  Further, if Plaintiff had any questions about the contents of the handbook, he could contact management.  (A005/Washington 65.)

5.   Plaintiff signed a diversity mission statement on two occasions, acknowledging he understanding of AutoZone's diversity policy.   (A008/Washington 73-74; A052/Washington Dep. Exh. 2; A053/Washington Dep. Exh. 3.[2])  The diversity policy states:

> AutoZone strives to create an environment in which every AutoZoner and every customer is treated with dignity and respect – regardless of race, gender, age, physical ability, sexual orientation or any other perceived difference.  We are committed to seeking out talented, diverse people, encouraging them to work to their full potential and valuing their contributions.  These AutoZoners will help us remain number one with our customers and in our communities.

(A054/Washington Dep. Exh. 1.)

---

[1] "A[pg.]" refers to the page number in the Appendix to AutoZone's Opening Brief; "Washington [pg]" refers to the corresponding page of the transcript of Mr. Washington's deposition.
[2]  Washington Dep. Exh. [number] refers to document(s) introduced as exhibits during the course of plaintiff's deposition.

6.    Plaintiff was aware AutoZone's handbook contains a Harassment Policy which plainly

states:

> We want you to know that AutoZone is committed to having a
> cooperative and harassment-free work environment.  If you believe
> you have been harassed, tell your manager at once, or report the
> situation directly to your Area Advisor.  You may also contact the
> Vice President of Human Resources, the Director of AutoZoner
> Services or the AutoZoner Relations Manager at 1-800-510-1033.
> If the company determines that an AutoZoner has engaged in
> harassment, that AutoZoner will be subject to corrective action, up
> to and including termination.

(A007/Washington 72; A055/Washington Dep. Exh. 1.)

7.    The AutoZone handbook also contains an equal employment opportunity provision,

which states:

> AutoZone obeys all applicable laws pertaining to federal, state and
> local equal employment practices and complies with all applicable
> orders and regulations.  This means there is equal opportunity for
> all AutoZoners without regard to race, color, religion, sex, national
> origin, age, physical or mental disability, military veteran status,
> citizenship status or sexual orientation.
>
> The policy pertains to recruiting, hiring, training, promotions,
> compensation, benefits, transfers, education and all other aspects
> of employment with the company. All employment decisions are
> based on job-related requirements.

(A054/Washington Dep. Exh. 1.)

8.    At the time of his hire, Plaintiff was employed full time as a janitor at Delaware State

University ("DSU") and was thus only interested in working part time for AutoZone.

(A005/Washington 61-62.)   As a janitor, Plaintiff worked from 11:00 p.m. until 7:00

a.m., Monday through Friday.  (A005/Washington 62; A009/Washington 79.)

9.      As a result of his full-time employment, Plaintiff acknowledged he was limited in the amount of hours he could work at AutoZone.  (A008/Washington 74.)  For instance, he was unable to close the store.  (A008/Washington 74-75.)

10.     Plaintiff understood AutoZone employees worked rotating schedules and that it was a manager's responsibility to create the weekly work schedules.  (A008/Washington 75.) In terms of schedule making, Plaintiff acknowledged available hours were first given to full timers and management.  (A032/Washington 173-174.)  Moreover, in connection with AutoZone policy, Plaintiff understood arriving late to work may result in an employee's receiving a written warning (corrective action review) from a member of management.  (A008/Washington 76.)  AutoZone's "work schedule" policy states:

> Customers and their needs control our business.  Your store scheduling has been carefully planned – we know exactly how many AutoZoners are needed to keep our customers happy and to get the job done.
>
> For these reasons, you may be asked to work nights, weekends, holidays and extra hours to meet business needs.
>
> Your manager will explain the weekly store schedule to you and make every effort to announce any changes in your hours as far in advance as possible.  However, the hours, shifts and days of your normal work schedule may not always be the same due to changing business conditions.
>
> Unless otherwise directed by your manager, follow the schedule. Your absence or tardiness can mean heavier workloads for other AutoZoners and may result in corrective action.

(A056/Washington Dep. Exh. 1.)

11.     Although Plaintiff testified part timers were guaranteed 15 hours a week, he acknowledged he never saw this policy in writing.  (A032/Washington 174.)  No

evidence supports plaintiff's claim that such a policy existed. In fact, plaintiff concedes he often worked less than 15 hours a week at his own request. (A032/Washington 174.)

12.    If an AutoZone employee was scheduled to open the store, he/she was required to arrive at the store at 7:30 a.m. (A008/Washington 75.) Moreover, if the employee was scheduled to open the store, it was imperative for him to arrive at work on time so customer service would not suffer. (A008/Washington 76.)

**B.    Plaintiff's Work History.**

13.    On February 2, 2000, Plaintiff received a corrective action review ("CAR") after the cash register he was working on had a ten dollar overage. (A015/Washington 102; A057/Washinton Dep. Exh. 7.)

14.    Plaintiff does not dispute the register had a ten dollar overage, but he disputes the overage being his fault. (A015/Washington 103.) Specifically, Plaintiff testified Franklin Wilson, an African American male, was also working on the register, and Plaintiff believes Wilson caused the overage. (A015/Washington 102-103.) Plaintiff is unaware if Wilson received a CAR. (A015/Washington 103.)

15.    When Plaintiff began working at store 1157, he testified there were only three other employees at the store: Ralph Findle ("Findle"), who was the store manager, Frank Wilson ("Wilson"), who was the assistant store manager, and Jimmy Beavers ("Beavers"), who was a parts counter clerk. (A009/Washington 77.)

16.    In Plaintiff's opinion, he was treated unprofessionally by Findle. (A010/Washington 81.)

17.    After seven months of Findle's "unprofessional behavior," Plaintiff wrote a letter to AutoZone District Manager, Dennis Carruth ("Carruth"), explaining a litany of issues he

encountered since beginning his part-time employment with AutoZone.    (A010-A011/Washington Dep. 84-85; A058/Washington Dep. Exh. 5.)

18.    Plaintiff handed this letter to Carruth in the back of the Smyrna store on May 5, 2000. (A015/Washington 101.)  Plaintiff had no problem with Carruth at the time he presented Carruth with his letter.  (A015/Washington 101.)

19.    In his letter, Plaintiff detailed the circumstances behind why he believed Findle disliked him.  (A011/Washington 85-86; A058/Washington Dep. Exh. 5.)   More particularly, Plaintiff explained he and Findle were scheduled to open the store together one morning; however, when Findle failed to arrive at 7:30 a.m., Plaintiff contacted AutoZone District Manager, Antonio Farley, to advise him of the situation.   (A011/Washington 85-86; A058/Washington Dep. Exh. 5.)   Plaintiff does not think his contacting Findle's boss went over well with Findle.  (A011/Washington 85-86; A058/Washington Dep. Exh. 5.)

20.    In his letter, Plaintiff also accused Findle of slandering his name by making unprofessional comments about Plaintiff's ability in front of AutoZone customers. (A011/Washington 85-86; A058/Washington Dep. Exh. 5.)

21.    Plaintiff further described an incident in which he confronted Findle and asked him, "Why are you always messing with me?"  (A011/Washington 85-86; A058/Washington Dep. Exh. 5.)  In response, according to Plaintiff, Findle responded, "Because I like it." (A011/Washington 85-86; A058/Washington Dep. Exh. 5.)

22.    Plaintiff went on to explain that one day Findle refused to allow Plaintiff to use the AutoZone telephone for personal use and the two got into an argument over this. (A012/Washington 90-91).   During this argument, Plaintiff contends Findle told him

"you're acting like a little boy."  (A012/Washington 91; A058/Washington Dep. Exh. 5.)

At his deposition, Plaintiff stated:

> Q.    He said little boy didn't he?
> A.    He said you are **acting like a little boy** and a boy, is what he said, little boy.
> Q.    Well, I'm just asking you, because your letter very clearly states he referred to you as a little boy.  Not a boy, a little boy.
> A.    That's right, a little boy.
> Q.    Did he say, are you going to act like a little boy and pout all day?
> A.    I recall him saying, **you are acting like a little boy**, exactly what I wrote here.

(A012/Washington 91.)

23.    Plaintiff considered Findle's comment to be racial in nature.  (A012/Washington 92.)

Specifically, Plaintiff testified:

> Q.    And did you take this reference as little boy to be racist?
> A.    Yes.
> Q.    And why is that?
> A.    Because I'm an African American male, and historically black men have been referred to as boy or little boy in past history.

(A012/Washington 92.)

24.    Plaintiff acknowledged he was not the only employee in the store whom Findle treated disrespectfully or unprofessionally.  (A013/Washington 96.)

25.    Plaintiff testified that Findle showed disrespect to Thomas Shehorn, a Caucasian Parts Service Manager ("PSM") at store 1157, by referring to him as goofy. (A012/Washington 89.)  Indeed, Plaintiff stated:

> Q.    All right.  Well you indicate that he also showed some disrespect to Mr. Shehorn referring to him as goofy?
> A.    Yeah.  He would do that.  He would do that.  He would call Mr. Shehorn goofy in front of other co-workers.  And whenever he referred to him, he didn't refer to him by name, he would call him as goofy.

> Q.    You consider that as disrespectful?
> A.    The man was a manager.
> Q.    Do you consider that disrespectful?
> A.    Yes, I do.
> Q.    Was Mr. Shehorn white or black?
> A.    He was white.

(A012/Washington 89.)

26.    Plaintiff also testified Findle's mistreatment of Jimmy Beavers caused Beavers, a Caucasian, to resign.  (A012/Washington 89-90.)  Specifically, Plaintiff recalled:

> Q.    You believe that Jimmy left because of Ralph [Findle]?
> A.    Yes.
> Q.    Did he tell you that?
> A.    Yes.
> Q.    Did he tell you why he was leaving because of Ralph [Findle]?  Had Ralph [Findle] done something?
> A.    He said Ralph [Findle] was messing with his hours or his money or something.
> Q.    And what race was Jimmy?
> A.    He was white.

(A012/Washington 90.)

27.    In addition to voicing his displeasure about Findle's treatment of himself and other co-workers, Plaintiff's letter documented various issues he had with a performance evaluation Findle gave him on March 11, 2000.  (A014/Washington 97; Washington 058/Washington Dep. Exh. 5; A063/Washington Dep. Exh. 6.)

28.    As a result of Plaintiff's meeting with Carruth, substantive changes were made to Plaintiff's performance evaluation, and these changes were to Plaintiff's satisfaction. (A014/Washington 98.)

29.    After turning his letter over to Carruth, Plaintiff did not encounter any further problems with Findle.  (A017/Wshington 115.)

30. Aside from voicing complaints about Findle in his April 29th letter, Plaintiff also expressed a desire to be transferred to the Bear, Delaware store. (A014/Washington 99; A061/Washington Dep. Exh. 5.)

31. In response to Plaintiff's transfer request, Carruth said it was okay, if the manager of the Bear store, Frank Wilson, would agree. (A014/Washington 99-100.) Plaintiff does not know if Wilson ever agreed to the transfer. (A014/Washington 100.)

32. At the time Plaintiff composed this letter, he was still employed as a full-time janitor at Delaware State University, and he continued to work the 11:00 p.m. until 7:00 a.m. shift. (A014-A015/Washington 100-101.)

33. In addition to giving the letter to Carruth, Plaintiff testified he mailed it to AutoZone's headquarters in Memphis via certified mail, but he cannot confirm that the letter ever made it to AutoZone in Memphis. (A016-A017/Washington 112-113; A062/Washington Dep. Exh. 11.)

34. On August 1, 2000, Plaintiff had an attorney by the name of John Mulford send a letter via facsimile to AutoZoner Relations in Memphis, Tennessee, advising that AutoZoner Relations apparently failed to receive Plaintiff's April 29, 2000 grievance letter. (A017/Washington; A065-A067/Washington Dep. Exh. 12.)

35. One day later, on August 2, 2000, Plaintiff received a letter from Tim Harrison, staff attorney with AutoZoner Relations Department, indicating that AutoZone received Plaintiff's August 1 letter and an investigation would follow. (A017/Washington 116; A068/Washington Dep. Exh. 13.)

36. On or about August 4, 2000, an investigation was initiated by AutoZone Regional Loss Prevention Manager, Ron Wertz ("Wertz"). (A018/Washington 117-118.)

37.    In conducting his investigation, Wertz took statements from Plaintiff; Ralph Findle; Thomas Shehorn; Brandon Diaz; Frank Wilson; and Dennis Carruth, AutoZone District Manager.  (A018/Washington 118-119; A069-A072/Washington Dep. Exh. 19; A073-A077/Washington Dep. Exh. 14; A078-A079/Washington Dep. Exh. 16; A080-A082/Washington Dep. Exh. 17; A083-A085/Washington Dep. Exh. 18; A086-A088/Washington Dep. Exh. 15; A045/Wertz 31-32.[3])

38.    In his statement, Plaintiff informed Wertz of the circumstances leading to his April 29, 2000 letter.  Additionally, Plaintiff told Wertz that on several occasions, Carruth assured him he forwarded the April 29, 2000, letter to AutoZone's Human Resources Department.  (A069-A072; Washington Dep. Exh. 19.)

39.    When asked how he would like to see the investigation conclude, Plaintiff answered he would like to be transferred to the Dover store, as opposed to the Bear store, and he would like to see Findle's employment terminated for his behavior.  (A021/Washington 129-130; A069-A072/Washington Dep. Exh. 19.)

40.    At the time of his statement, Plaintiff was unaware if a part-time position was available at the Dover store for him to be transferred into.  (A018/Washington 122.)

41.    Finally, Plaintiff informed Wertz that he could not work full time for AutoZone because he already had another full-time job.  (A021/Washington 130; A072/Washington Dep. Exh. 19.)  Specifically, Plaintiff testified:

> Q.    Mr. Wertz asked you, "Do you have anything else to add?" And you responded, "Yes, I do.  At all times I have always tried to do my best, and if I could I would work full time, but I already have a full time job."  Do you see that?
> A.    Yes, I do.

---

[3]  Wertz [pg.] refers to deposition of Ronald Wertz.

> Q.    So at that point what you are telling Mr. Wertz is that you couldn't work full time for AutoZone, correct, because you already had another full time job?
> A.    That is correct.

(A021/Washington 130.)

42.    After concluding his investigation, Wertz forwarded his investigative materials to Tim Harrison with AutoZoner Relations in Memphis. (A045/Wertz 33.)

43.    Upon reviewing Wertz's investigation, Harrison recommended Findle be discharged for unprofessional behavior and conduct unbecoming to AutoZone and fellow AutoZoners. (See Declaration of Tim Harrison at A137-A138.)

44.    Harrison further recommended Carruth be terminated for poor job performance, conduct detrimental to AutoZone, and loss of confidence. (See Declaration of Tim Harrison at A137-A138.)

45.    On August 12, 2000, AutoZone Regional Manager, Adam Hartford, terminated Carruth and Findle. (See Declaration of Tim Harrison at A137-A138.)

46.    Plaintiff was satisfied with AutoZone's decision to terminate Findle; however, he felt sorry for Carruth because he had no problems with Carruth. (A022/Washington 135.)

47.    Following Findle's termination, Richard Robinson ("Robinson") became the new manager of store 1157, and Emmanuel Kitchen ("Kitchen") replaced Carruth as the District Manager. (A023/Washington 139.)

48.    Plaintiff had no problems with Kitchen. (A023/Washington 140.)

49.    On or about September 8, 2000, Plaintiff gave Robinson a memo outlining his work availability. (A022-A023/Washington 136-137; A089/Washington Dep. Exh. 21.) Plaintiff informed Robinson he was available to open the store Monday through Sunday,

but he was not available to close the store.  (A023/Washington 137; A089/Washington Dep. Exh. 21.)

50.    After receiving Plaintiff's memo, Robinson asked Plaintiff to reconsider his transfer request since Findle no longer was employed at the store.  (A023/Washington 137-138; A089/Washington Dep. Exh. 21.)  Upon speaking with Robinson, Plaintiff agreed to stay at store 1157.  (A023/Washington 138; A089/Washington Dep. Exh. 21.)

51.    On or about September 25, 2000, Plaintiff forwarded the same memo to Brian Paduano ("Paduano") following his introduction as the new manager of store 1157. (A023/Washington 138-139; A090/Washington Dep. Exh. 22.)  Plaintiff had no problems with Paduano.  (A023/Washington 140.)

52.    On October 13, 2000, Plaintiff gave another statement to Wertz in connection with an investigation concerning Plaintiff's alleged discussion of the circumstances leading to Findle's termination.  (A023-A024/Washington 140-141; A091-A092/Washington Dep. Exh. 23.)

53.    During his investigation, Wertz also questioned Plaintiff about allegations that Plaintiff told fellow employees he could have them fired simply by talking to management. (A024/Washington 142; A091/Washington Dep. Exh. 23.)

54.    While Plaintiff denied these allegations, he admitted that if true they would have been inappropriate and would be grounds for AutoZone to be concerned.  (A024/Washington 144.)

55.    Wertz treated Plaintiff with respect during this investigation, and Plaintiff never had any problems with Wertz.  (A024/Washington 142.)

56. Plaintiff did not receive any discipline as a result of his October 13, 2000, statement, despite the fact that six employees who gave statements in connection with Wertz's investigation stated that Plaintiff was acting in an unprofessional and threatening manner towards them. (A027/Washington 155; A093-A097.)

57. On October 16, 2000, Plaintiff faxed a letter to Azeem Sikandar, AutoZone's Regional Human Resources Manager, advising that, although he previously declined to exercise an option to be transferred to the Dover store (No. 1152), he now desired a transfer. (A029/Washington 161; A112-A113/Washington Dep. Exh. 25.)

58. Plaintiff is unaware if an opening for a part-time position was available at the time of his letter to Sikandar. (A029/Washington 161; A112-A113/Washington Dep. Exh. 25.)

59. Plaintiff desired a transfer because he felt as if his co-employees did not have a professional attitude and he was upset by a comment which a fellow employee, Shaun Permilia ("Permilia"), made in his presence. (A029/Washington 160-162.)

60. Specifically, Plaintiff testified Permilia told a customer over the phone, "Your boy has your part for you." After Permilia said this, Plaintiff recalled him turning around and staring directly at Plaintiff. (A025/Washington 148.)

61. Plaintiff told Permilia he did not appreciate his using the word "boy," and Permilia never said it again. (A026/Washington 149-150.)

62. Although Plaintiff was unaware, Wertz investigated Plaintiff's allegation regarding Permilia's use of the word "boy." (A029/Washington 162; A114/Washington Dep. Exh. 27.)

63. In his statement, Permilia explained his use of the word "boy" was not meant in a racial nature. (A029/Washington 162; A114/Washington Dep. Exh. 27.) Rather, Permilia

opined he used the word because he thought Plaintiff and the customer were friends. (A114/Washington Dep. Exh. 27.)

64.    While Plaintiff acknowledged he has heard the term "boy" used in the context of friends, he did not believe Permilia intended to use the word in that context. (A029/Washington 163-164.)

65.    In November 2000, Leon Bynum ("Bynum"), an African American male, took over as manager of store 1157. (A029/Washington 164.)

66.    On February 26, 2001, Plaintiff wrote a letter to Bynum and Aleong Kelston (District Manager) entitled "Availability and AutoZone Flexibility." (A031/Washington 172; A115-A117/Washington Dep. Exh. 30.) In this letter, Plaintiff provided a summary of numerous events which transpired over the previous month. (A115-A117/Washington Dep. Exh. 30.)

67.    In this letter, Plaintiff first explained he missed work from January 20 until January 23, due to his father's becoming seriously ill. ((A115-A117/Washington Dep. Exh. 30.)

68.    Plaintiff then recalled the details surrounding a conversation with Bynum and Kitchen on February 1, wherein Plaintiff requested a 5 p.m. to 8:30 p.m. shift since his hours at DSU had been changed to 7 a.m. to 4:30 p.m. (A033/Washington 177; A116-A117/Washington Dep. Exh. 30.) Plaintiff also informed Kitchen that he was unable to work on Sundays, Mondays, Tuesdays or Wednesdays. (A033/Washington 177; A116-A117/Washington Dep. Exh. 30.)

69.    Plaintiff then detailed the circumstances which led to his missing work on February 8, 2001. (A115/Washington Dep. Exh. 30.) Specifically, Plaintiff recounted speaking to Kitchen and informing him that although he was working his full-time shift at the

15

University, he would not be coming to AutoZone, but instead he was "going home to get some rest and take medication." (A115/Washington Dep. Exh. 30.)

70.  Plaintiff testified that during this February 8th conversation, Kitchen told him AutoZone could accommodate a 5 p.m. to 8:30 p.m. schedule for him on Thursdays, Fridays and Saturdays. (A033/Washington 177; A116-A117/Washington Dep. Exh. 30.)

71.  As a result of his absence from work on February 8, Plaintiff received a CAR. (A031/Washington 171; A118/Washington Dep. Exh. 29.)

72.  Plaintiff disputes this CAR on the grounds that he doesn't believe missing work is grounds for discipline. (A031/Washington 171.) However, Plaintiff doesn't know of anyone who called in sick and didn't get written up. (A031/Washington 171.)

73.  Despite Plaintiff's belief that missing work does not constitute grounds for discipline, his chief witness, Shane Treesh ("Treesh"), a former member of AutoZone management, conceded that arriving late to work was grounds for an employee to receive a CAR. (A050/Treesh 67[4]). Treesh testified:

> Q.  All right. So if an employee was scheduled to work, say, four p.m., and they didn't show up for work until 4:20, 4:30 p.m., that would warrant a Corrective Action Review, wouldn't it?
> A.  It should.

(Treesh, p. 67.)

74.  Plaintiff's letter next described a February 23rd meeting between Plaintiff and Kelston during which Plaintiff allegedly explained to Kelston the reasons for his change of schedule request. (A115/Washington Dep. Exh. 30.)

75.  During this meeting, Kelston also asked Plaintiff if he liked working for AutoZone, to which Plaintiff replied, "Yes, I do." (A115/Washington Dep. Exh. 30.)

---

[4] Treesh [pg] refers to deposition of Shane Treesh.

76.     Specifically, Plaintiff testified:

> Q.     Did you consider yourself to be a good employee?
> A.     Yes.
> Q.     Did you consider yourself to be good with sales initiatives?
> A.     Yes.
>
>                    *     *     *     *     *
>
> Q.     Did you consider yourself an average employee, above average employee, below average employee?
> A.     Above average.
> Q.     Above average?
> A.     Yes.
> **Q.     Okay.  And were you able to do your job throughout your employment at AutoZone in an above average rate?**
> **A.     Yes.**

(A040-041/Washington 228-229.) (emphasis added).

77.     Plaintiff then explained to Kelston that he would love to work additional hours, but at the present time he was only available to work 5 p.m. to 8:30 p.m., on Thursdays, Fridays and Saturdays.  (A115/Washington Dep. Exh. 30.)

78.     Finally, in his February 26th letter, Plaintiff explained that on February 24th, his supervisor at DSU informed him that he may be required to work unannounced overtime.  (A115/Washington Dep. Exh. 30.)  As a result, Plaintiff requested his shift be changed to 5:30 p.m. to 8:30 p.m., Thursdays, Fridays and Saturdays, rather than 5 p.m. to 8:30 p.m.  (A115/Washington Dep. Exh. 30.)

79.     Plaintiff opined he was making this request to avoid incurring a penalty or write-up due to arriving late to work.  (A115/Washington Dep. Exh. 30.)  Moreover, he conceded he was **only available to work nine hours a week**.  (A034/Washington 182.)

80.     In reviewing this letter, Plaintiff acknowledged his schedule was pretty limited when it came to working for AutoZone.  (A032/Washington Dep. Exh. 177.)

81.    On April 20, 2001, Plaintiff received a performance review from Bynum; however, he disagrees with the evaluation because he is of the opinion he should have received "achieves requirements" in all categories.    (A034/Washington 182; A119-120/Washington Dep. Exh. 31.)

82.    Plaintiff has no idea why Bynum didn't evaluate him properly.  (A035/Washington 183.)

83.    On August 31, 2001, Plaintiff received a CAR as a result of his not showing up for work until 6:40 p.m.  (A034/Washington 184; A121/Washington Dep. Exh. 33.)

84.    On October 6, 2001, Plaintiff received a CAR as a result of his failure to show up for work.  (A034/Washington 184; A122/Washington Dep. Exh. 34.)

85.    On January 28, 2002, Plaintiff sent a letter to Bynum capturing a conversation he had with Bynum and Kelston in the back of store 1157 pertaining to full-time status. (A035/Washington 190; A123-A124/Washington Dep. Exh. 34.)   At the time of the letter, Plaintiff acknowledged there were no full time positions open at store 1157. (A035/Washington 191-192.)  Moreover, Plaintiff was still a full time employee at DSU. (A035/Washington 191.)

86.    In terms of his conversation with Bynum and Kelston, Plaintiff testified that they promised he would be hired full time when the next position became available. (A002/Washington 48.)  At his deposition, Plaintiff recalled:

> Q.    So Kelston told you that you were going to get the next full time position that became available?
> A.    And Leon Bynum.
> Q.    **All right.   So they said next full-time position that becomes available you're going to get it?**
> A.    **That's right.**

(A002/Washington 50.)

87. In February 2002, Plaintiff was involved in a serious car accident. (A036/Washington 195.) As a result, Plaintiff testified he was out of work until late April or early May. (A076/Washington 197.)

88. On May 14, 2002 Plaintiff received a CAR from Bynum after he let a customer take a part outside the store and install it on his vehicle without paying for it. (A030/Washington 165; A125/Washington Dep. Exh. 28.) Plaintiff admits allowing a customer to install a part on a vehicle without paying for it is a violation of AutoZone policy. (A031/Washington 169.)

89. Plaintiff received another CAR from Bynum in June 2002 in connection with his accepting a check from a customer for the wrong amount as well as registering the warranty information incorrectly. (A038/Washington 212; A126/Washington Dep. Exh. 38.) Plaintiff does not dispute his accepting the check or his improper registering of the warranty information. (A038/Washington 212.)

C. **Plaintiff's Allegations.**

90. On May 9, 2002, Plaintiff filed a charge of discrimination against AutoZone with the Delaware Department of Labor. (A037/Washington 198; See plaintiff's charge of discrimination ("Charge") at A127.)

91. In his Charge, Plaintiff alleged AutoZone refused to promote him and created a hostile work environment in retaliation for his April 2000 complaint against Findle. (Charge/A127.)

92. Plaintiff made no claim for racial discrimination in this matter; rather his Charge are strictly rooted in retaliatory conduct. (A042/Washington 235.) To this end, Plaintiff specifically testified:

> Q.    Is there any particular reason – well, are you making a claim for racial discrimination in this case?
> A.    Retaliation.
> Q.    Just retaliation?
> A.    Yes.

(A042/Washington 235.)

93.    Despite Plaintiff's claim that AutoZone retaliated against him, Plaintiff concedes he has no idea who took retaliatory action against him:

> Q.    So who is it that you think retaliated against you?
> A.    I don't know.

(A036/Washington 195.)

94.    In connection with his Complaint, Plaintiff alleges that Robert Baker ("Baker"), Treesh, and Deanna Brown ("Brown") received promotions over him. (A035/Washington 192.) Nevertheless, Plaintiff conceded he is not in a position to say if <u>any</u> of these individuals were more or less qualified than him. (A036/Washington 193-194.) Moreover, Plaintiff is unaware as to who made the decision to promote these individuals. (A036/Washington 194.)

95.    While Plaintiff has no idea regarding whether Baker, Treesh or Brown were more or less qualified than him, Plaintiff's chief witness, Treesh, testified that both he and Baker possessed greater automotive knowledge than Plaintiff. (A048-A049/Treesh 61-62.) Treesh testified:

> Q.    Now, are you aware that he is claiming in this lawsuit that less qualified employees at AutoZone were promoted to a PSM position over him; are you aware of that?
> A.    Yeah.
> Q.    Okay. In fact, he contends that he should have gotten a PSM position over you because he was more qualified than you. Did you know that?
> A.    No.
> Q.    All right. You don't agree with that, do you?

A.    No.

Q.    In fact, your automotive knowledge was superior to Mr. Washington's, wasn't it?

A.    Yes.

Q.    You would come over and help him work on his own car?

A.    Correct.

Q.    Okay. Now, Mr. Washington also claims in this suit that he was more qualified for the PSM position than Robert Baker. Were you aware of that claim?

A.    No. Probably because he had been at the store longer and had more knowledge of the store, is probably what he is referring to as far as more knowledge.

Q.    Okay. Well, you would agree, though, that Mr. Baker's automotive knowledge was superior even to yours, wasn't it?

A.    In some areas.

Q.    He knew more about parts than you did, Mr. Baker, didn't he?

A.    More about parts?

Q.    Yes.

A.    It depends on the parts and what they are used for. Like I said, nobody is an expert in everything.

Q.    Okay.

A.    Rob would ask me questions about things, I would ask him questions about things.

Q.    Okay. But in certain respects, his parts knowledge was superior to yours, correct?

A.    In certain areas, yes.

Q.    Okay. Which would mean at least in those aspects they were superior to Mr. Washington's, weren't they?

A.    Yes.

(A048-A049/Treesh 61-62.)

96.    Plaintiff testified he believes he left his job at DSU sometime around July 2002. (A002/Washington 48.) At this time, Plaintiff did not have an offer for full-time employment with AutoZone. (A002/Washington 48.) Moreover, Plaintiff acknowledged that at the time he left DSU, there were no available full-time positions at AutoZone. (A002/Washington 48.)

97.    Nevertheless, on July 10, 2002, Billy Britt offered Plaintiff a full-time position with AutoZone. (A039/Washington 224.) However, Plaintiff turned down this offer, because it was not for a PSM. (A039/Washington 224.)

98.    On July 15, 2002, Britt prepared a memorandum advising Plaintiff that a PSM position was not available at store 1152 since it did less than $25,000 in sales per week. (A039/Washington 224; A135/Washington Dep. Exh. 42.)

99.    On July 29, 2002, Plaintiff submitted a letter advising AutoZone of his resignation. (A040/Washington 225; A136/Washington Dep. Exh. 43.)

100.    In his resignation letter, Plaintiff informed AutoZone he was giving his two weeks notice, but he would only be available to open the store and work until 1:00 p.m. during the week of August 4, 2002. (A136/Washington Dep. Exh. 43.) Moreover, he would be unable to work on July 30th, August 6th, or August 7th. (A136/Washington Dep. Exh. 43.)

101.    Plaintiff testified that he decided to resign based on the fact that Britt only offered him a full time position and did not offer him additional compensation or a PSM position. (A040/Washington 225-227.)

102.    Plaintiff filed suit in this action alleging retaliation, constructive discharge and differential treatment. (See plaintiff's amended complaint at A128-A134.)

## ARGUMENT

### A.    Standards for Summary Judgment.

Under Fed. R. Civ. P. 56, the moving party is entitled to summary judgment if it can demonstrate that: (1) there is no genuine dispute as to any material fact; and (2) summary judgment is appropriate as a matter of law. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Under Third Circuit precedent, "[a] disputed fact

is 'material' if it would affect the outcome of the suit as determined by the substantive law. . . .

Thus, while the facts must be viewed in the light most favorable to the nonmoving party and all

inferences must be drawn in that party's favor, there is no issue for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the

evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be

granted."  *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (citations and

internal quotations omitted).  Moreover, the evidence supplied by the nonmoving party must be

more than "mere allegations."  *Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.

1996).

**B.     AutoZone is Entitled to Summary Judgment on Plaintiff's Hostile Work Environment Claim.**

Although Count I of Plaintiff's Complaint which is termed "42 U.S.C. §2000e-2

Differential Treatment" implies that he is making a claim for racial discrimination, Plaintiff's

own testimony bars him from asserting any such claim.  Specifically, Plaintiff testified he is not

bringing a claim for racial discrimination; rather, his claims are rooted in retaliation.

(A042/Washington 235).

Although Plaintiff concedes his claims are purely rooted in retaliation, AutoZone, out of

an abundance of caution, will address additional reasons why Plaintiff's hostile work

environment claim fails as a matter of law.  In terms of racial harassment, Plaintiff's claim of

harassment, as stated in his Complaint, is based upon the following acts:"

> a)      being disciplined for actions that Defendant did not discipline Caucasian employees for;
>
> b)      being referred to as a "boy;"
>
> c)      being more closely scrutinized and disciplined than other employees;

d)    comments by Defendant's store manager to other employees that the manager would like to get rid of Washington.

(See DI6; Plaintiff's Complaint at A131-A132. )

In order to establish a claim for employment discrimination due to a hostile work environment, a plaintiff must establish, "by totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir. 1990) (quoting *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir. 1989)). Specifically, the plaintiff must show: (1) he suffered intentional discrimination; (2) that the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1083. (3d Cir. 1996.) However, not all inappropriate conduct or treatment in the workplace is actionable. Rather, an actionable hostile work environment exists only where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993).

In determining whether the harassment is sufficiently severe or pervasive, courts must consider the frequency of the conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Aman,* 85 F.3d at 1083.

1.      **Totality of Circumstances Does Not Constitute a Hostile Work Environment.**

a.      **Alleged Comments.**

Plaintiff alleges that on two occasions the word "boy" or "little boy" was used in his presence in a racial manner.  First, he alleges that during an argument with Ralph Findle over personal telephone use, Findle told him "you are acting like a little boy."  (A012/Washington 91.)  On another occasion, Plaintiff testified that co-employee, Shawn Permilia, told a customer over the phone, "Your boy has your part for you."  (A025/Washington 148).  Plaintiff then testified that after Permilia said this to the customer he turned around and stared directly at him.  (A025/Washington 148.)

The uttering of the word "boy" in the manner alleged by Plaintiff does not constitute the sort of "racial epithet" which Title VII is designed to root out as racial harassment.  First, Permilia's use of the word "boy" to a customer is an ideal example of the sort of "offhanded comments and isolated incidents" that the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), cautioned should not be considered severe or pervasive enough to constitute a hostile work environment.  *Carver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005).  Additionally, case law dictates that Findle's asking Plaintiff to "quit acting like a little boy" is far from indicative of racial harassment under Title VII.  For example, in *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839 (8th Cir.2002) the Eighth Circuit held that no racial harassment had occurred where there was evidence that over a four year period, the plaintiff was the target of several racial epithets, that a poem with racist messages was circulated among the plant employees, and that drawings of "KKK," a swastika, and a hooded figure appeared on the walls of the men's restrooms.  In *Elmahdi v. Marriott Hotel Services, Inc.,* 339, F.3d 645 (8th Cir. 2003), the Eighth Circuit held that a supervisor's alleged comments toward native of Sudan,

including calling him "boy," and "black boy" on a few occasions over a period of years, once referring to Africans as having big penises, and saying that Muslims liked men, not women, if proven to have been made by supervisor, did not create race-based hostile work environment under § 1981. Similarly, the Sixth Circuit in *Smith v. Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000) held no racial harassment occurred when plaintiff's supervisor referred to him as a "gorilla", as such conduct is simply not severe or pervasive enough to create a hostile work environment. Finally, in *Boyd v. State Farm Ins. Co.,* 158 F.3d 326 (5th Cir. 1998), the Fifth Circuit held that the mere utterance of racial epithets such as "Buckwheat" and "Porch Monkey" not indicative of discrimination under Title VII, and as such, they could not support a verdict of race discrimination. As such, the offhanded comments uttered by Findle and Permilia cannot be classified as the sort of severe or pervasive conduct tending to offer support to a hostile work environment claim.

###### b.    Unprofessional Treatment.

In addition to the comments, Plaintiff asserts Findle constantly treated him in a rude and unprofessional manner. Specifically, Plaintiff claims Findle slandered his name in front of AutoZone customers and admitted that he "liked messing with Plaintiff." (A011/Washington 88.) However, Plaintiff acknowledged Findle treated two other employees, Thomas Shehorn and Jimmy Beavers, both white males, in the same unprofessional, rude manner. (A012/Washington 89-90.) The fact that Findle's ire was directed to all employees, including white ones, undermines any suggestion that Findle's treatment of Plaintiff was racially motivated. Moreover, courts have repeated that being yelled at does not amount to a material alteration in the terms and conditions of employment for purposes of Title VII liability. *Russ v. Van Scoyoc Assoc., Inc.,* 122 F.Supp. 2d 29, 33 (D.D.C. 2000) ("it is clear that being yelled at by your

supervisor does not rise to the level of an adverse employment action.'); *see also Brennan v. City of White Plains,* 67 F.Supp. 2d 362, 374 (S.D.N.Y. 1999) (noting that verbal abuse alone "hardly" rises to the level of actionable conduct).   As such, while Findle's unprofessional conduct is certainly inappropriate, it is insufficient to support a claim of racial harassment.

### c.    Discipline and Scrutiny.

As further evidence of his hostile work environment claim, Plaintiff alleges that "he was [more] closely scrutinized and disciplined than other employees."  However, there is no evidence of any specific events which Plaintiff contends subjected him to more discipline and/or scrutiny than other employees. Thus, in analyzing Plaintiff's hostile work environment claim, AutoZone has listed each incident which subjected Plaintiff to discipline or with which Plaintiff took issue.

During his tenure at AutoZone, Plaintiff received numerous corrective action reviews ("CARs"), but he is unable to produce any evidence indicating that white employees did not receive CARs for engaging in similar behavior.   For instance, Plaintiff received a CAR on February 2, 2000, in connection with a ten dollar overage at the register.  (A015/Washington 103.)  While Plaintiff does not dispute the overage in the register, he disputes the overage being his fault.  (A051/Washington 103.)   Indeed, he testified that Franklin Wilson, an African American male, was working on the register and Plaintiff believes he caused the overage. (A014-A015/Washington 102-103.)    Thus, it seems that Plaintiff does not contest the unreasonableness of AutoZone's response, but merely argues that a different employee, in this case an African-American, should have been disciplined.

Plaintiff also received three CARs during his employment at AutoZone in connection with his either being absent or tardy from work.  (A118/Washington Dep. Exh. 29; A121/Washington Dep. Exh. 33; A122/Washington Dep. Exh. 34.)   Even though Plaintiff

understood arriving late to work could result in an employee's receiving a CAR from a member of management, he did not believe his late arrivals or "no shows" warranted discipline. (A008/Washington Dep. Exh. 76; A031/Washington Dep. Exh. 171.)  Nevertheless, Plaintiff concedes he is unaware of any employee who called in sick to work and didn't get written up. (A031/Washington 171.)

Plaintiff also received two additional CARs from Leon Bynum on May 14, 2002 and June 22, 2002.  (A125/Washington Dep. Exh. 28; A126/Washington Dep. Exh. 38.)  Bynum wrote Plaintiff up on May 14 after Plaintiff let a customer take a part outside the store and install it on his vehicle without paying for it.  (A030/Washington 165.)  Plaintiff believes this CAR was not justified because he alleges that while the customer was outside, Bynum sent him on another task.  (A030/Wshington 168.)  However, aside from his personal disagreement with the CAR, Plaintiff has proferred no evidence indicating that Bynum's actions were based on Plaintiff's race, and he even admits that it is a violation of AutoZone policy for an employee to allow a customer to install parts without paying for them first.  (A031/Wshington 169.)

Plaintiff received another CAR from Bynum in June 2002 in connection with his accepting a check from a customer for the wrong amount as well as registering the warranty information incorrectly.  (A038/Washington Dep. Exh. 212.)  However, Plaintiff does not dispute his accepting the check or his improper registering of the warranty information. (A038/Washington 212.)  Nor does Plaintiff point to other employees who engaged in similar acts and received different treatment.

Finally, Plaintiff received two evaluations during his AutoZone tenure with which he disagreed with.  Plaintiff disagreed with the contents of a performance evaluation he received from Findle on March 11, 2000.  (A014/Washington 97.)  In connection with his disagreement,

he voiced his displeasure in a letter to Dennis Carruth.  (A014/Washington 98.)  After receiving his letter, Carruth met with Plaintiff and made substantive changes to his evaluation. (A014/Washington Dep. Exh. 98.)  Plaintiff testified that these changes were to his satisfaction. (A014/Washington Dep. Exh. 98.)

On April 20, 2001, he received a performance evaluation from Bynum, which he disagreed with based on his opinion that he should have received "achieves requirements" in all categories.  (A084/Washington 182.)  However, Plaintiff has no evidence that his failure to receive "achieves expectations" was based on his race, and he admitted he has no idea why Bynum failed to evaluate him properly.  (A034/Washington Dep. Exh. 183 [sic].)

Finally, Plaintiff alleges that Bynum told other employees AutoZone wanted to "get rid of him."  However, no evidence supports this claim.  In fact, Plaintiff's evidence proves the contrary.   Throughout his tenure, AutoZone always accommodated Plaintiff's scheduling requests to avoid any conflicts he may have encountered with his full time job.  Plaintiff informed AutoZone that he was only available to work nine hours a week due to his full time job.  AutoZone accommodated Plaintiff's limited availability.  Once Plaintiff resigned from his full time job, and a full time job became available at AutoZone, AutoZone offered Plaintiff a full time job. However, Plaintiff turned down the offer because it did not include increased compensation and a PSM position.  Plaintiff's refusal of a full time position lends no viable credence to Plaintiff's hostile work environment claim.

Taken in its entirety, the complained of conduct, as a matter of law, is not sufficiently severe or pervasive enough to alter the conditions of Plaintiff's employment and to create an abusive racially hostile working environment.   While the alleged comments may have been inappropriate, ill-mannered and rude, no actions claimed by Plaintiff are pervasive enough to

alter the conditions of Plaintiff's employment or to create an abusive working environment. *See Saxe v. State College Area School Dist.,* 240 F.3d 200, 205 (3d Cir. 2001) (mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" so as to create a hostile work environment). Moreover, Plaintiff's allegations that he was subject to more discipline and scrutiny than white employees is unsubstantiated and based on his self- serving testimony. *Lexington Ins. Co. v. Western Pennsylvania Hosp.,* 423 F.3d 318, 333 (3d Cir. 2005) (speculation and conjecture cannot forestall summary judgment). Plaintiff even admitted in his deposition that the conditions of his employment were in no way altered as he was able to do his job throughout his employment with AutoZone and felt that he did it well. (Exhibit A, pp. 228-229). Thus, put simply, the conduct at issue is not actionable as the alleged comments or discipline do not rise to the level of severe or pervasive and the conditions of Plaintiff's employment were not altered in any way.

C.      **AutoZone is Entitled to Summary Judgment on Plaintiff's Retaliation  Claim.**

1.      **Plaintiff Cannot Establish a Prima Facie Case of Retaliation.**

In order to state a prima facie case of retaliatory discharge, Plaintiff must put forth proof that he engaged in protected conduct, that he was thereafter subjected to an adverse employment action, and that a causal connection existed between the two. *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302, (3d Cir. 1997). The burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. It is then the plaintiff's burden to show that the proffered reason is a pretext for unlawful retaliation. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 1827, 36 L.Ed.2d 668 (1973).

In the instance case, Plaintiff has put forth no evidence establishing a prima facie case of retaliatory discharge. While it is undisputed that Plaintiff's April 29, 2000 letter constitutes

protected activity under Title VII, he has no evidence indicating he suffered an adverse employment action and thus he is unable to establish a causal connection between the protected activity and the adverse employment action. Furthermore, Plaintiff has no evidence to show that AutoZone's proffered reason is a pretext for unlawful retaliation.

###### a.    Plaintiff's Claim of Constructive Discharge Does Not Establish an Adverse Employment Ation.

Plaintiff alleges AutoZone constructively discharged him as a result of the hostile work environment and AutoZone's refusal to promote him to Parts Manager. In order to find a constructive discharge, the Third Circuit has stated a court "must find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 888 (3d Cir. 1984). In other words, the plaintiff must show that the alleged discrimination goes beyond a threshold of intolerable conditions. *Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 169 (3d Cir. 2001). The resignation is then treated as if it were an outright dismissal by the employer, rendering the resignation an "adverse employment action" which can serve as the basis for a retaliation claim. *Duffy,* 265 F.3 at 167-168. However there is also an objective threshold that must be crossed, prima facie, by the plaintiff in each case: the employer's action must work some serious and substantial tangible harm**,** which alters an employees compensation, terms, conditions, compensation or privileges of employment, and must make working conditions so unpleasant or intolerable that a reasonable person in the employee's shoes would resign. *Weston v. Commonwealth of Pennsylvania,* 251 F.3d 420 (3d Cir. 2001).

In *Duffy,* the plaintiff filed an age discrimination action against her employer alleging constructive discharge as a result of the employer's continuing practice of discrimination. Specifically, the plaintiff alleged she was not considered for a promotion; her department was

consistently understaffed; management delayed in providing needed assistance; her supervisors made negative remarks about her age; she was excluded from a training seminar for managers; she was removed from work related committees; she was prevented from participating in hiring decisions even though she was the departmental supervisor; other employees and departments failed to cooperate with her; she was the only supervisor given a weekly report card, which meant increased "close monitoring;" she was reprimanded for failing to participate in company events; and other salaried employees were paid for overtime work, while she was not. *Duffy*, 265 F.3d at 167-168.

In granting summary judgment, the Third Circuit determined that while the situations described above were "certainly frustrating and stressful," the conditions that the plaintiff complained of would not render a job so unbearable that a reasonable person would be forced to resign. *Id.* Specifically, the court reiterated that "employees are not guaranteed stress-free environments and discrimination laws cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting." *Id.* (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998)). Moreover, the court found that plaintiff's testimony and evidence focused almost entirely on her subjective view that the employer discharged her. *See Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (holding the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge). Finally, as further support for its granting the summary judgment, the court opined that the employer never threatened to fire plaintiff, encouraged her to resign from her position, or involuntarily transferred her to a less desirable position. *Duffy*, 265 F.3d at 167.

Much akin to the plaintiff in *Duffy*, Plaintiff has produced no evidence indicating that conditions at AutoZone were so unbearable that a reasonable person in his position would have

no choice but to resign.  First, as discussed above in Section II(B), Plaintiff was not subject to conduct which was so sufficiently severe or pervasive that it altered an  terms or conditions of his employment.  Second, the evidence establishes that throughout his employment, AutoZone always attempted to satisfy Washington's scheduling demands.  Indeed, up until approximately his final month of employment with AutoZone, Plaintiff was employed full time at Delaware State University.  In connection with his full time employment, Plaintiff testified that his availability to work at AutoZone was severely restricted.  (A034/Washington 182.)  Indeed, Plaintiff was only available to work **nine hours a week on Thursdays, Fridays and Saturdays**. (A034/Washington 182.)  Nevertheless, shortly after Plaintiff quit his job with DSU he was offered a full time position with AutoZone.  (A039/Washington 224.)  However, Plaintiff turned down this offer, because it was not for a PSM position.  (A039/Washington 224.)

In addition to AutoZone's accommodating Plaintiff's limited work schedule, Plaintiff's own self-serving testimony indicates that he left AutoZone for personal reasons, not because of unbearable conditions.  Specifically, Plaintiff testified he left AutoZone since its offer of full time employment on July 12, 2002 did not entail additional money.  (A040/Washington 226-227.)  However, as noted by the Third Circuit in *Duffy,* an employee's subjective reasons and/or beliefs for leaving his employment are not enough to survive summary judgment.  Specifically, the Third Circuit has held that not everything that makes an employee unhappy, qualifies as retaliation, or else minor and even trivial employment actions that an irritable, chip on the shoulder employee did not like would form the basis of a discrimination suit.  *Robinson,* 120 F.3d at 1303 (finding plaintiff's allegations that she was subjected to unsubstantiated oral reprimands and derogatory comments following her complaint do not rise to the level of the adverse employment action required for a retaliation claim).  Moreover, there is no evidence

upon which one can even base a good faith argument that AutoZone altered Plaintiff's compensation, terms, conditions, compensation or privileges of employment.  To the contrary, AutoZone actually offered Plaintiff a full time position, but he refused to accept this offer due to his disagreeing with its terms.  As such, Plaintiff's retaliation claim must fail since he cannot establish an adverse employment action.

<strong>b. Plaintiff Has No Evidence Establishing a Causal Connection.</strong>

Even if Plaintiff can establish that his resignation is an adverse employment action, he cannot establish a causal connection between his alleged protected activity and his constructive discharge.  Aside from his April 29, 2000 letter, Plaintiff has not presented any evidence indicating any other events which occurred during his employment with AutoZone which he believes constitute a protected activity.  Assuming arguendo that Plaintiff's April 29, 2000 letter constitutes a protected activity, Plaintiff's alleged constructive discharge did not occur until some 27 months after he engaged in his protected activity.  Moreover, aside from Plaintiff's own unfounded speculation and conjecture, he has no facts supported by record evidence which demonstrate the injection of retaliatory animus into his allegations that AutoZone failed to promote him to PSM, based on his April 29, 2000 letter.  Specifically, Plaintiff concedes he has no evidence or idea about who retaliated against him.  (A036/Washington 195.)  As such, there is simply no evidence of retaliatory animus on the part of AutoZone.  Therefore, AutoZone is entitled to summary judgment on Plaintiff's retaliation claim as Plaintiff is unable to establish a causal connection between his protected conduct and an adverse employment action.

**D. <u>Plaintiff is Unable to Prove that AutoZone's Non-Discriminatory Reasons Give Rise to Pretext.</u>**

In the event Plaintiff had established a *prima facie* case of retaliation, summary judgment would still be appropriate.  Once the plaintiff establishes a *prima facie* case of retaliation, the

burden shifts to the defendant to produce a nondiscriminatory reason for the adverse employment action. *Sheridan v. E.I. Dupont de Nemours and Co.,* 100 F.3d 1061 (3d Cir. 1996). Upon the defendant's production of a nondiscriminatory reason, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual. *Id.* However, ultimately the plaintiff must prove that the employer's adverse action was based on intentional discrimination. *Fuentes v. Periske,* 32 F.3d 759 (3d Cir. 1994).

In connection, with his complaint of "failure to promote," Plaintiff alleges that Robert Baker ("Baker"), Treesh, and Deanna Brown ("Brown") received promotions over him. (A035/Washington 192.) Nevertheless, Plaintiff conceded he is not in a position to say if <u>any</u> of these individuals were more or less qualified than him. (A036/Washington 193-194.) Also, Mr. Treesh, Plaintiff's key witness, testified that both he (Treesh) and Robert Baker possessed greater qualifications than Plaintiff. Moreover, Plaintiff is unaware as to who made the decision to promote these individuals. (A036/Washington 194.) Further, Plaintiff held a full time job for another employer, up until his final month with AutoZone.[5] At the time of his resignation, he conceded a full time position was not available for him to be transferred into. (A002/Washington 48). Moreover, Plaintiff never expressed an interest in full time employment until January 2002. (A035/Washington 190). Upon receiving his request, Plaintiff testified members of AutoZone management promised to promote him into the next full time position when it became available. (A002/Washington 48). At the time of this agreement, Plaintiff conceded there was no full time position available. (A035/Washington 191-192). Nevertheless, in July 2002, AutoZone offered Plaintiff a full time position, which he promptly refused.

---

[5] Plaintiff is unsure when exactly he resigned from DSU, however, according to plaintiff's testimony he resigned sometime around July 2002. (A002/Washington 45.)

Although plaintiff may be disappointed, he cannot simply show that AutoZone's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated AutoZone's decision, not whether AutoZone is wise, shrewd, prudent or competent. *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1008 (3d Cir. 1997). In other words, Washington must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence. In this case, Plaintiff is unable to establish an iota of pretextual animus to support his unfounded allegation that AutoZone failed to promote him. Rather, Plaintiff's claims are based on unfounded allegations which do not establish that discriminatory animus motivated AutoZone's decision. As such, Plaintiff's retaliation claim must be dismissed.

## CONCLUSION

As the foregoing demonstrates, there is no material dispute of fact at issue in this case and AutoZone is entitled to judgment as a matter of law.  Accordingly, AutoZone respectfully requests that the Court grant summary judgment in its favor and dismiss Plaintiff's claims with prejudice.

_____/s/___Timothy M. Holly_____
Matthew F. Boyer, Esq. (Del. Bar No. 2564)
Timothy M. Holly, Esq. (Del. Bar No. 4106)
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Tel: (302) 884-6585

Tracy K. Hidalgo, Esq. (admitted *Pro Hac Vice*)
James P. Waldron, Esq. (admitted *Pro Hac Vice*)
Frilot, Partridge, Kohnke, & Clements
1100 Poydras St.
3600 Energy Centre
New Orleans, La 70163
Tel: (504) 599-8358
Fax: (504) 599-8100

*Attorneys for Defendant, AutoZone, Inc.*
