**In The Matter Of:**

*Washington v.
AutoZoners*

---

*Melvert Washington
May 12, 2005*

---

*Corbett & Associates
1400 N. French Street
P.O. Box 25085
Wilmington, DE  USA  19899
(302) 571-0510    FAX: (302) 571-1321*

*Original File 050512D.ASC, 250 Pages
Min-U-Script® File ID: 1519035646*

**Word Index included with this Min-U-Script®**

Page 45

[1] Q: Okay. So how much before did you quit?
[2] A: How much before? Probably — restate that
[3] question one more time.
[4] Q: Yes. I'm just trying to figure out how much
[5] before when you said that you quit Delaware State
[6] University before you left AutoZone?
[7] A: Yes.
[8] Q: And I'm just trying to figure out how much
[9] before?
[10] A: I can't remember how much before. Probably
[11] three, four months, six months, 30 days, 60 days. I'm
[12] not sure.
[13] Q: Okay. Because you left AutoZone at the
[14] beginning of August 2002?
[15] A: Okay. I said July/August AutoZone.
[16] Q: Yes.
[17] A: Mm-hmm.
[18] Q: And you think that you left Delaware State
[19] University a month or so before that?
[20] A: Maybe two or three months before that.
[21] Q: And you left because you just didn't want to
[22] be a janitor anymore?
[23] A: That's right.
[24] Q: You weren't asked to leave?

Page 46

[1] A: No.
[2] Q: Did you have anything lined up at the time
[3] that you left Delaware State University?
[4] A: Yes.
[5] Q: What did you have lined up?
[6] A: I wanted to become a full-time employee with
[7] AutoZone.
[8] Q: In addition to the fact that you didn't want
[9] to be a janitor anymore. Is that correct?
[10] A: That is correct.
[11] Q: All right.
[12] A: That was my job at the University.
[13] Q: Right.
[14] A: A janitor.
[15] Q: Right.
[16] Did you receive any promotions at
[17] Delaware State University?
[18] A: Yes, I got letters of appreciation,
[19] certificates from my supervisor, different supervisors in
[20] recognition from supervisors I worked for. Mm-hmm.
[21] Q: Did you receive any promotions?
[22] A: You mean from a worker to a supervisor?
[23] Q: Yes.
[24] A: No.

Page 47

[1] Q: I don't know if there is any promotional
[2] opportunities there.
[3] Do you know whether there were in the
[4] capacity in which you were working?
[5] A: I believe it went on seniority. And there
[6] were many, many people that had become employed with the
[7] University leaving high school, and they had been there
[8] for 20, 25, 30 years, so they had a lot more seniority
[9] than I did. So it was, you know, you are in line, so
[10] stay there.
[11] Q: Fairly good benefits at Delaware State
[12] University?
[13] A: Yeah, they have real good benefits.
[14] Q: You got health insurance through Delaware
[15] State University?
[16] A: Yes.
[17] Q: Were you working 40 hours a week or more than
[18] that?
[19] A: It was 40 hours a week.
[20] Q: What was your hourly wage when you left
[21] Delaware State University?
[22] A: I believe it was around $21,000 a year.
[23] Q: And I am assuming your children were on your
[24] health insurance plan through Delaware State University?

Page 48

[1] A: Yes.
[2] Q: Had you been offered a full-time position at
[3] AutoZone and had you secured that when you left Delaware
[4] State University?
[5] A: I had spoken to management.
[6] Q: Did you have an offer in your pocket for full
[7] time when you left Delaware State University?
[8] A: I had talked to management, and they had —
[9] they had told me, yes, that I would be hired full time
[10] when the next available position came open.
[11] Q: The next available position, was it open and
[12] did you have the job before you quit Delaware State
[13] University?
[14] A: There was no available position open.
[15] Q: So why would you quit your full-time job at
[16] Delaware State University if there was no full-time
[17] position open at AutoZone?
[18] A: I had two jobs, I had Delaware State
[19] University and I was supplementing that income with
[20] AutoZone.
[21] Q: I understand that.
[22] A: And I was financially okay. There was no
[23] problems. And we had probably, in addition to myself,
[24] maybe two or three other AutoZoners working at AutoZone.

Page 49

[1] and they were in the process of hiring full-time people.
[2] They were looking to hire full-time people. They were
[3] asking for full-time help.
[4]   Q: Mm-hmm.
[5]   A: And I put my hat in the ring.
[6]   Q: So you put your hat in the ring and quit your
[7] job before you got the full-time position?
[8]   A: That's correct.
[9]   Q: Because I thought you told me just a minute
[10] ago that there were no full-time positions open at the
[11] time that you quit Delaware State University?
[12]   A: Well, what I said, to be more specific, was
[13] that it was myself, there was probably three or four
[14] other AutoZoners working at AutoZone, maybe four people
[15] at the time, and AutoZone needed full-time people, they
[16] wanted to fill full-time positions at the Smyrna,
[17] Delaware, store. And I made it known to management that
[18] I would like to be full time. I would like to go full
[19] time.
[20]   Q: You made it known to them at the time that you
[21] quit Delaware State University?
[22]   A: Yeah.
[23]   Q: Which would have been in around July of 2002?
[24]   A: In that time frame, yes. They were aware of

Page 50

[1] that.
[2]   Q: Okay. So there were openings at Smyrna, you
[3] said, when you made it known in July of 2002 that you
[4] wanted to go full time?
[5]   A: I talked to managers at the store, supervisors
[6] at the store.
[7]   Q: And what did they say, you are going to get
[8] the job?
[9]   A: I was told by management that the next
[10] available opening at the store for full time, you are
[11] next, you will be hired full time.
[12]   Q: Okay. Who told you that?
[13]   A: Kelston, the district manager. Kelston, I
[14] can't pronounce his last name, Aelong.
[15]   Q: So Kelston told you that you were going to get
[16] the next full-time position that became available?
[17]   A: And Leon Bynum.
[18]   Q: All right. So they said next full-time
[19] position that becomes available you're going to get it?
[20]   A: That's right.
[21]   Q: And so when they said that to you in July of
[22] 2002, you quit your Delaware job?
[23]   A: No. No.
[24]   Q: Okay. I don't understand.

Page 51

[1]   A: That's okay. I quit my job at the University
[2] because I didn't want to be a custodian anymore, okay,
[3] and I was in communication with supervisors and managers
[4] at AutoZone because I knew they were hiring and they
[5] needed full-time help at Store 1157 in Smyrna. And I was
[6] in touch with the managers, I was in touch with other
[7] supervisors in the store who were aware that we needed
[8] help in the store, and I made it known that I wanted to
[9] become a full-time employee with AutoZone. Kelston and
[10] Leon specifically.
[11]   Q: When was this?
[12]   A: I don't have the specific date in my head, but
[13] there is some documentation that you should have.
[14]   Q: So did you inform Kelston and Leon that you
[15] were going to quit your Delaware State job?
[16]   A: I didn't think I had to.
[17]   Q: Well, if you were working full time —
[18]   A: Mm-hmm.
[19]   Q: — at Delaware State University, how did you
[20] intend to work full time at AutoZone?
[21]   A: I believe — I believe another supervisor
[22] there, a parts manager may have known, yes, that I was
[23] leaving Delaware State College and I wanted to become
[24] full time.

Page 52

[1]   Q: But you didn't tell Leon and Kelston that?
[2]   A: Yes.
[3]   Q: I thought you said you didn't tell them you
[4] were leaving Delaware State?
[5]   A: Well, you must have misunderstood me. I did
[6] tell them.
[7]   Q: Okay. The record is going to speak for
[8] itself. But it's your testimony that you told Kelston
[9] and Leon, hey, I'm leaving Delaware State University, I
[10] don't want to be a janitor anymore?
[11]   A: That's correct. That's correct.
[12]   Q: And was it at that time that they said the
[13] next opening for full time you are going to get?
[14]   A: That's correct. And we will just go a step
[15] further and I will say Shane Treesh knew, too.
[16]   Q: Shane Treesh knew what?
[17]   A: That I had quit my job at the college and I
[18] wanted to go full time with AutoZone.
[19]   Q: So did you have this conversation with Kelston
[20] and Leon after you quit Delaware State University?
[21]   A: It may have been prior to, it may have been
[22] after, I'm really not sure. But we had the
[23] conversation.
[24]   Q: All right.

Page 57

[1] A: A lot of things don't make sense, but, no, I
[2] don't have the answer to that.
[3] Q: All right. How did you get your job at
[4] AutoZone?
[5] A: I applied for it. I went into the store to
[6] buy a battery one day at the Dover store, and I met an
[7] employee by the name of, I think, James Miller, and I was
[8] so impressed by the excellent customer service he gave me
[9] and his professionalism and how nice he was and
[10] efficient, I said, hey, I need to come work here. So he
[11] introduced me to his district manager, Antonio Farley,
[12] and set up an appointment for me.
[13] Q: When you applied to work at AutoZone, you
[14] didn't have any retail experience. Is that correct?
[15] A: Well —
[16] Q: I mean, you were a telemarketer for these
[17] various companies, but had you ever worked in retail?
[18] A: I think at the time of the interview Antonio
[19] was asking me questions, asking me did I have experience
[20] answering telephones and customer service experience, did
[21] I know anything about auto mechanics. And one thing that
[22] I did not tell you earlier, at the same time I was
[23] attending Delaware Technical Community College, this was
[24] back in, I think, '85, I went to Delaware Technical

Page 58

[1] Community College in Georgetown and obtained a diploma
[2] for a one-year certification in auto mechanics.
[3] Q: Do you know what the name of the certification
[4] was?
[5] A: It was a one-year diploma given to people that
[6] complete the auto mechanics course. Basically it
[7] entailed tune-ups, brakes, air conditioning, spark plugs,
[8] overhauling engines, tuning up engines.
[9] Q: All right. So a one-year certification in
[10] automotive parts?
[11] A: Automotive certification from Delaware
[12] Technical Community College in Georgetown. I believe I
[13] completed that in November of 1990.
[14] Q: Do you still have that certificate?
[15] A: I have a — I have a transcript that would
[16] bear that out.
[17] Q: You do?
[18] A: Yes. Or someone could get it from the
[19] Registrar.
[20] Q: Why did you take that course? Were you
[21] interested in cars?
[22] A: I've always been interested in cars.
[23] Q: Any other — and I don't think you answered my
[24] question. I asked you, you didn't have any retail

Page 59

[1] experience when you came to apply at AutoZone. Is that
[2] correct?
[3] A: With the exception of the other stuff I told
[4] you, I don't believe so.
[5] Q: Telemarketing and —
[6] A: I don't believe so. Retail meaning retail?
[7] Q: Right. Working in stores, waiting on
[8] customers?
[9] A: I don't think so.
[10] Q: You certainly didn't have any automotive
[11] retail experience. Is that correct?
[12] A: Before?
[13] Q: AutoZone. I understand you have —
[14] A: No. No.
[15] Q: All right. So you had an interview with
[16] Mr. Farley?
[17] A: Antonio Farley.
[18] Q: All right. Tell me what happened when he
[19] interviewed you; do you remember?
[20] A: Well, he shared his background with me. He
[21] was in the Army, he boxed in the Army. I explained to
[22] him that I was in the Air Force, and I told him what I
[23] did as an inventory management specialist in the Air
[24] Force.

Page 60

[1] Q: Did you tell him that you had been convicted
[2] for soliciting marijuana?
[3] A: No, I did not.
[4] Q: Any particular reason why you didn't tell him
[5] that?
[6] A: He didn't ask me that.
[7] He told me that he was going to get all
[8] my information, take the application and run a credit
[9] check and a background check, and he would call me back
[10] in 30 to 45 days and let me know whether or not I would
[11] be employed. I said okay.
[12] Q: Do you recall filling out an application for
[13] employment with AutoZone?
[14] A: Yes, I do. I filled it out in the Dover
[15] store.
[16] Q: Okay. Is there any particular reason why on
[17] that application you didn't disclose that you had a prior
[18] conviction?
[19] A: Without looking at the application, I
[20] really — it's been such a long time since I filled out
[21] the application, I can't answer the question.
[22] Q: So you don't know whether or not you disclosed
[23] it or not on the application. Is that correct?
[24] A: If it asked the question, I believe I would

Page 61

[1] have answered the question correctly.
[2] Q: But it's your testimony you do remember that
[3] Mr. Farley did not ask you about your criminal
[4] convictions. Is that your testimony?
[5] A: You mean as far as my bad conduct discharge
[6] from the military?
[7] Q: Yes.
[8] A: No.
[9] Q: All right. You were working at Delaware State
[10] University full time when you applied to work at
[11] AutoZone. Correct?
[12] A: That's right.
[13] Q: All right. Did you have a certain shift at
[14] Delaware State at that time?
[15] A: I was working at Delaware State College, I
[16] believe it was full time.
[17] Q: I understand you were working full time, but
[18] I'm asking you what your shift was? Did you work from
[19] 9:00 to 5:00? Did you work from 4:00 to 11:00? What was
[20] your shift; do you remember?
[21] A: I think it was 11:00 to 7:00 initially, when I
[22] started working at the — at AutoZone, 11:00 at night to
[23] 7:00 in the morning.
[24] Q: You said you were impressed with Mr. Miller's

Page 62

[1] service that he gave you and said this might be a place I
[2] might like to work, you spoke with Mr. Farley, and you
[3] were hired in a part-time capacity. Is that correct?
[4] A: Yes.
[5] Q: Okay. When you interviewed with Mr. Farley,
[6] did you tell him I would like a part-time job?
[7] A: Yes.
[8] Q: What store were you hired at?
[9] A: I'm sorry?
[10] Q: What store were you hired into?
[11] A: I was hired into the 1157 store in Smyrna.
[12] Q: Is that where you wanted to go?
[13] A: You mean during the interview, or period?
[14] Q: Well, I understand, didn't you meet Mr. Miller
[15] over at the Dover store?
[16] A: Yes, I did.
[17] Q: Would you rather have been at the Dover store?
[18] You got placed in Smyrna. I'm trying to figure out how
[19] that happened.
[20] A: Well, when I interviewed with Antonio Farley
[21] at the Dover store, the 1159 store, I asked him could I
[22] work at the Dover store. And what Antonio Farley told me
[23] in the interview, he said, I don't have any available
[24] positions right now for anyone in the Dover store, and he

Page 63

[1] verbally gave me his word, he said, however, if you will
[2] go ahead and take the position in the Smyrna store, 1157
[3] right now, the first available opening in the Dover store
[4] I will transfer you from the Smyrna store back up to the
[5] Dover store, but I need people desperately in the Smyrna
[6] store because I'm short of help down there.
[7] Q: How far was Smyrna from your home?
[8] A: It's probably about five miles, six miles, I
[9] imagine, from Dover to Smyrna.
[10] Q: Who was the store manager at Smyrna when you
[11] were hired?
[12] A: Ralph Findle.
[13] Q: All right. And my records indicate you were
[14] hired August 30, 1999, as a part-time salesperson earning
[15] 7.50 an hour. Does that sound about right to you?
[16] A: Yes.
[17] Q: During the course of your employment with
[18] AutoZone, you received a copy of AutoZone's handbook?
[19] A: Yes.
[20] MS. HIDALGO: Let me mark this as
[21] Exhibit 1.
[22] (Washington Deposition Exhibit No. 1 was
[23] marked for identification.)
[24] (Discussion held off the record.)

Page 64

[1] BY MS. HIDALGO:
[2] Q: Mr. Washington, do you recognize what I've
[3] handed to you as Exhibit 1?
[4] A: Yes.
[5] Q: And I believe this was — you had kept your
[6] AutoZone handbook after you left AutoZone's employment.
[7] Is that correct?
[8] A: I had a copy of a handbook. I think I
[9] produced it to one of my attorneys.
[10] Q: Right. I mean, that's where I got this from.
[11] I think that that's your handwriting above AutoZone
[12] Handbook. Do you see that?
[13] A: Mm-hmm. Yes, I do.
[14] Q: All right. So while you were employed by
[15] AutoZone, you understood that this handbook was something
[16] that you needed to read?
[17] A: Yes.
[18] Q: And understand?
[19] A: Yes.
[20] Q: And you did that?
[21] A: Yes. To the best of my ability.
[22] Q: Okay. I mean, you can read, can't you? You
[23] did get a Bachelor's degree.
[24] A: It says AutoZone Handbook. Yes, I can.

Page 65

[1] Q: And you understood that you were bound by the
[2] policies in the handbook?
[3] A: Yes.
[4] Q: And that if you had any questions about the
[5] handbook, that you could contact management and ask them
[6] about it. Did you know that?
[7] A: Yes.
[8] Q: Okay. And I'm not going to go through the
[9] whole handbook, believe me. But let's turn to the third
[10] page of the handbook. And it says Important phone
[11] numbers. And I see that AutoZoner Relations Hotline. Do
[12] you see that?
[13] A: Yes, I do.
[14] Q: And then under it Memphis number. Did you
[15] write in that 1-901 next to Memphis number?
[16] A: I don't recall.
[17] Q: Okay. Did you ever call the 1-800 number when
[18] you were employed at AutoZone?
[19] A: The AutoZone Relations hotline number?
[20] Q: Yes.
[21] A: I believe I did.
[22] Q: Okay. And when did you do that?
[23] A: I believe I called that number to determine
[24] whether or not some documentation that I had sent

Page 66

[1] certified mail/return receipt had been received into the
[2] mail room and if it had gotten to the people that I
[3] intended it to get to.
[4] Q: Okay. And what was the response that you
[5] received?
[6] A: Nobody really knew for certain.
[7] Q: If the letter had been received?
[8] A: Well, whatever I had sent, yeah. No one knew
[9] for sure if anything had been received because the people
[10] that I talked to weren't familiar with the mail room.
[11] Q: Okay.
[12] A: They needed to talk to the people in the mail
[13] room to get some information and have them get back to
[14] me.
[15] Q: Okay. Did they get back with you?
[16] A: I think I eventually had to get an attorney
[17] and go to the Post Office and trace some stuff.
[18] Q: I mean, I have some documentation from you
[19] that you had to resend this two or three times?
[20] A: Yeah.
[21] Q: So you don't know whether or not they actually
[22] ever received it. Is that correct?
[23] A: They got it eventually.
[24] Q: Through your attorney?

Page 67

[1] A: That's right.
[2] Q: Okay. But you called this 1-800 number to
[3] check on the status of the letter, and nobody knew what
[4] you were talking about?
[5] A: That's correct. No one was familiar with this
[6] type of material because the person that handled that
[7] type of phone call was not available. So they had to
[8] take my information and we will get back to you.
[9] Q: Okay. Did they get back to you?
[10] A: No.
[11] Q: Did you call the 1-800 number on any other
[12] occasion?
[13] A: I may have called it on another occasion. I'm
[14] not sure what the nature of the call was other than what
[15] we are speaking about specifically here.
[16] Q: You think you may have called. Do you recall,
[17] do you remember anything about the conversation you may
[18] have had?
[19] A: No.
[20] Q: I mean, the reason I ask, and we are going to
[21] go through the documents, but you wrote a number of
[22] letters to your supervisors during the course of your
[23] employment with AutoZone. Do you recall that?
[24] A: Yes.

Page 68

[1] Q: Memos to record, letters, etc.?
[2] A: Yes.
[3] Q: And nowhere in those letters was there ever an
[4] indication that you had called the 1-800 number. And
[5] that's why I'm asking?
[6] A: Okay.
[7] Q: So does that refresh your memory as to whether
[8] or not you called the 1-800 number or not?
[9] A: Yes, I called the 1-800 number.
[10] Q: I know you called that one time that you can
[11] remember when you were checking on your letter.
[12] A: Yes.
[13] Q: Sitting here today, do you recall specifically
[14] calling the 1-800 number any other time other than that
[15] one time to check on your letter?
[16] A: Yes. But I can't be specific about what I
[17] called for.
[18] Q: Do you recall who you spoke with?
[19] A: No. But I think it was somebody by the name
[20] of Alice.
[21] Q: Alison Smith?
[22] A: Okay, yeah.
[23] Q: You spoke with Alison Smith?
[24] A: No, I never did. I was told that that's the

**Page 69**

[1] person that probably worked in the human relations area.
[2] Q: Okay.
[3] A: And that's the person that would get back to
[4] me.
[5] Q: Who told you that Alison Smith —
[6] A: I can't remember the name.
[7] Q: Does Tim Harrison, does that ring a bell?
[8] A: Are you asking me did I speak with Tim
[9] Harrison?
[10] Q: Yes.
[11] A: Yes, I spoke with Tim Harrison.
[12] Q: Okay. What did Tim Harrison tell you?
[13] A: Tim Harrison couldn't tell me anything. He
[14] told me all information pertaining to this incident that
[15] we are speaking about today was confidential, and he was
[16] not — he couldn't disclose any information to me. It's
[17] company policy.
[18] Q: Okay. So you recall specifically having a
[19] conversation with Tim Harrison. What was the nature of
[20] the phone call?
[21] A: I asked him could he discuss with me the
[22] outcome of the investigation?
[23] Q: Which investigation?
[24] A: The one we are in the disposition here for

**Page 70**

[1] today.
[2] Q: The investigation involving Mr. Findle and
[3] Mr. Carruth?
[4] A: That's correct.
[5] Q: Did you call him after you gave your statement
[6] to Mr. Wertz?
[7] A: Yes.
[8] Q: And you wanted to know what the outcome was,
[9] and he said I can't discuss it, it's confidential?
[10] A: That's correct.
[11] Q: Okay. Any other conversations that you had
[12] with Mr. Harrison which you can recall?
[13] A: No.
[14] Q: Any other conversations with anyone in
[15] Mr. Harrison's department that you can recall?
[16] A: No.
[17] Q: Do you think that his response to you that the
[18] investigation was confidential was a reasonable response?
[19] A: I think he told me exactly what he could tell
[20] me, and I accepted that.
[21] Q: Were you satisfied with his response?
[22] A: No, but that was his response, and that's all
[23] I got.
[24] Q: Why weren't you satisfied with his response?

**Page 71**

[1] A: Well, my question wasn't answered, so I wanted
[2] to know what happened. And that was that.
[3] Q: Well, you know what happened, didn't you?
[4] Mr. Findle and Mr. Carruth lost their jobs, didn't they?
[5] A: I believe they did.
[6] Q: As a result of the investigation. Correct?
[7] A: I believe they did.
[8] Q: So you knew the outcome of the investigation,
[9] did you not?
[10] A: Not entirely, but, yes, I knew.
[11] Q: All right. You testified earlier that you
[12] read the AutoZone employee handbook, so you were aware
[13] that AutoZone had a written diversity commitment in their
[14] handbook. Is that right? Which I believe is on page 37.
[15] A: What page?
[16] Q: This is copied so poorly. They cut the page
[17] numbers off when they copied it. Diversity commitment,
[18] it's on page 37. Let me see if I can find the — okay.
[19] There is numbers at the bottom of the page. Go to 00132.
[20] A: Okay. All right.
[21] Q: You see there diversity commitment?
[22] A: Yes, I do.
[23] Q: And right under that is Equal Employment
[24] Opportunity Commitment?

**Page 72**

[1] A: Yes.
[2] Q: So you were familiar with those when you
[3] worked at AutoZone. Correct?
[4] A: Yes.
[5] Q: The next page, they have the fair treatment
[6] policy?
[7] A: Yes.
[8] Q: You were familiar with the fair treatment
[9] policy when you worked at AutoZone?
[10] A: Yes.
[11] Q: As well as the harassment policy?
[12] A: Yes.
[13] Q: And AutoZone also had a corrective action
[14] policy as well, didn't they? If you violated any of
[15] AutoZone's rules, that you could be written up. Are you
[16] familiar with that?
[17] A: Yes.
[18] Q: All right. Now, you also underwent diversity
[19] training at AutoZone, did you not?
[20] A: Yes.
[21] (Washington Deposition Exhibit No. 2 was
[22] marked for identification.)
[23] BY MS. HIDALGO:
[24] Q: Do you recognize this document,

Page 73

[1] Mr. Washington?
[2] A: Yes.
[3] Q: Okay. Do you recall seeing a video in
[4] connection with that training? Tell me what you recall
[5] about that training?
[6] MR. FARNAN: I'm sorry, just because I
[7] can't see, what is that document? I take it it's Exhibit
[8] 2?
[9] MS. HIDALGO: It's a Diversity Mission
[10] Statement.
[11] MR. FARNAN: Thank you.
[12]           BY MS. HIDALGO:
[13] Q: Do you remember undergoing that training,
[14] signing this document?
[15] A: Yes, that's my signature.
[16] Q: What is the date on that document, by the way?
[17] Let me see it.
[18] A: I can't tell. It looks like it was January
[19] the 11th, 2001, but then it looks like the 11 is a zero
[20] over top of it, so I don't know.
[21] Q: Is that your signature on the document,
[22] though?
[23] A: Yes, it looks like my signature.
[24] Q: It looks like you underwent that training

Page 74

[1] again the next year. Is that right?
[2] MR. FARNAN: Have we got a second
[3] exhibit there?
[4] MS. HIDALGO: Exhibit 2 is entitled
[5] AutoZone Diversity Mission Statement, dated either
[6] January 10 or January 11, 2001.
[7] Exhibit 3 is AutoZone Diversity Mission
[8] Statement, dated — and what is the date on that Exhibit
[9] 3, Mr. Washington?
[10] THE WITNESS: It's January 25th, 2002.
[11] (Washington Deposition Exhibit No. 3 was
[12] marked for identification.)
[13]           BY MS. HIDALGO:
[14] Q: When you had your interview with Mr. Farley, I
[15] assume that you discussed with him your hours limitations
[16] in terms of, look, I've got a full-time job at the
[17] University so I can't — I am not going to be available
[18] to work Monday through Sunday, I believe the store opened
[19] at 8 o'clock, the Smyrna store?
[20] A: 8 o'clock or 9:00. I haven't been there for a
[21] while, so I'm not sure.
[22] Q: Okay. But what time did it close, 8 o'clock
[23] as well?
[24] A: I think it is 8 o'clock, yes.

Page 75

[1] Q: So if you were opening the store, you would
[2] have to be there at 7:30?
[3] A: I think it was required to be there 30 minutes
[4] prior to opening to do certain opening tasks.
[5] Q: Right.
[6] So obviously you informed Mr. Farley,
[7] I've got these limitations because I do have a full-time
[8] job, and these are the hours I can and cannot work. Do
[9] you recall telling him that?
[10] A: Yes.
[11] Q: Do you have any idea how AutoZone's scheduling
[12] works, how its schedule is written?
[13] A: How employees' schedules are created?
[14] Q: Yes.
[15] A: That was a manager function.
[16] Q: Did you understand that AutoZoners worked a
[17] rotating schedule?
[18] A: I understood that. I understood that they
[19] were a company that was very flexible, too.
[20] Q: Well, that's fine. But just answer my
[21] question.
[22] A: Yes.
[23] Q: So, in other words, Joe Smith who is working
[24] at AutoZone may have Monday and Thursday off this week,

Page 76

[1] and then may have Tuesday and Friday off the next week?
[2] A: Mm-hmm.
[3] Q: He may work from 7:30 until 3:30 in the
[4] afternoon on Monday of this week, and he may work
[5] 2:00 p.m. to 8:30 p.m. Tuesday of that next week. That's
[6] what you understood?
[7] A: Yes.
[8] Q: And did you understand that it was important
[9] to arrive to work on time?
[10] A: Yes.
[11] Q: For your scheduled shift?
[12] A: Yes.
[13] Q: Because customer service may suffer if you are
[14] late?
[15] A: Yes.
[16] Q: And that if you didn't arrive to work on time,
[17] you could be written up?
[18] A: Yes.
[19] Q: You said that Ralph Findle was the store
[20] manager when you were hired. Who was the assistant
[21] manager?
[22] A: Frank Wilson.
[23] Q: How did you and Frank get along? Any
[24] problems?

Page 77

[1] A: We got along fine.
[2] Q: Were there any PSM's there when you were first
[3] hired?
[4] MR. FARNAN: Just so we are all clear,
[5] when you first use an acronym, just what is that acronym?
[6] MS. HIDALGO: Parts sales manager.
[7] THE WITNESS: No, I don't think so.
[8]             BY MS. HIDALGO::
[9] Q: There were only two members of management, the
[10] store manager and the assistant store manager?
[11] A: And an employee named Jimmy.
[12] Q: What was Jimmy's position?
[13] A: Parts counter clerk.
[14] Q: So there was only two white shirts?
[15] A: Yes.
[16] Q: Ralph and Frank?
[17] A: Yes.
[18] Q: Smyrna was a pretty low-volume store, wasn't
[19] it?
[20] A: Oh, I don't know. I had just gotten to the
[21] store. I didn't know anything about it.
[22] Q: Well, you worked in the store for a while
[23] after that, didn't you?
[24] A: You are asking me pretty much —

Page 78

[1] Q: Your knowledge of Smyrna having worked there.
[2] It's a low-volume store, isn't it?
[3] A: No.
[4] Q: It's not a low-volume store?
[5] A: No.
[6] Q: What were the numbers that ran every week; do
[7] you have any idea?
[8] A: No. That was something that management dealt
[9] with. I didn't get into that.
[10] Q: Do you know volumewise how Smyrna compared to
[11] Dover?
[12] A: Again, that was a manager function.
[13] Q: Was Dover a bigger store?
[14] A: In size?
[15] Q: Yes.
[16] A: I think all the stores were exactly alike.
[17] Q: What about in foot traffic; do you have any
[18] idea?
[19] A: The traffic, I would say probably maybe Dover
[20] might have more foot traffic. But, again, these things
[21] are things that management looked at. I didn't get into
[22] those areas.
[23] Q: So you don't have any idea what formula
[24] AutoZone would look at to determine how many management

Page 79

[1] positions would be available for each store. Is that
[2] fair to say?
[3] A: Yes.
[4] Q: All right. Ralph was a manager. Frank was a
[5] manager. You said there was another person named Jimmy
[6] who was a red shirt.
[7] Were there any other people working in
[8] the store when you were hired?
[9] A: No. No, there wasn't. Ralph Pindle was the
[10] store manager, Frank Wilson was the assistant manager,
[11] and Jimmy was a parts counter clerk.
[12] Q: Okay. Anybody else work at the store at the
[13] time?
[14] A: At that time, I don't think anyone else was
[15] working there.
[16] Q: What were the limitations that you informed
[17] Mr. Farley as far as your schedule? You said that you
[18] thought you were working 11 p.m. to 7:00 a.m. at the
[19] University?
[20] A: Yes.
[21] Q: Was that a Monday through Friday?
[22] A: Yes.
[23] Q: So when did you tell him you could work, what
[24] hours?

Page 80

[1] A: I believe I came into that position working —
[2] coming in after 7 o'clock in the morning and working
[3] probably until around 12:00 noon or 1:00 or 2:00 during
[4] the day.
[5] Q: You would come in what time in the morning?
[6] I'm sorry.
[7] A: After 7 o'clock, after I would finish up on my
[8] full-time job. And I worked until 12 o'clock, 12:30,
[9] 1 o'clock.
[10] Q: And then you would go home and sleep from like
[11] 1 o'clock to 11 o'clock?
[12] A: Yes, I would go home.
[13] Q: So initially when you were hired you could
[14] never close the store; is that correct, but you could
[15] potentially open the store?
[16] A: The store, that's correct. I probably could
[17] come in and open the store at 8 o'clock in the morning,
[18] that is correct.
[19] Q: But you couldn't close it, obviously?
[20] A: No. That's correct.
[21] MS. HIDALGO: I'm marking as Exhibit 4 a
[22] document called Realistic Job Preview, dated January 25,
[23] '02.
[24] (Washington Deposition Exhibit No. 4 was

### Page 81

[1] marked for identification.)
[2]        BY MS. HIDALGO:
[3]   Q: Is that your signature on the document,
[4] Mr. Washington?
[5]   A: Yes, it looks like my signature.
[6]   Q: Did you read the document before you signed
[7] it?
[8]   A: Yes.
[9]   Q: Did you know Mr. Findle before you were hired
[10] at the Smyrna store?
[11]   A: No.
[12]   Q: Okay. How do you believe you were treated by
[13] Mr. Findle?
[14]   A: Unprofessional.
[15]   Q: Okay. When did his unprofessional conduct
[16] start?
[17]   A: His unprofessional conduct started in the
[18] morning, sometimes when I would open the store and the
[19] two of us would be in the store together. It would start
[20] in front of customers in the store.
[21]   Q: Okay. Well, let me ask you this so we're
[22] clear.
[23]     You were hired on August 30 of 1999,
[24] okay?

### Page 82

[1]   A: Okay.
[2]   Q: And placed in the Smyrna store under Ralph
[3] Findle's supervision.
[4]     The first day that you worked with
[5] Mr. Findle, did you have a problem with him?
[6]   A: No. No.
[7]   Q: Or did it —
[8]   A: No.
[9]   Q: When was the first problem that you had with
[10] Mr. Findle that you can recall, and how long had you
[11] worked there before you started having problems with him?
[12] Let's make it a better question.
[13]   A: I think the first time I had a problem with
[14] Mr. Findle was he had asked me to go into the warehouse
[15] to look for a part. And I can't remember what the part
[16] was. I was looking for the part and I couldn't find it.
[17]   Q: Are you talking about the back office?
[18]   A: The stockroom.
[19]   Q: In the back of the store?
[20]   A: Yes. And I couldn't find the part, and I came
[21] back and told Mr. Findle I couldn't find the part. And
[22] he came back into the stockroom with me and he started,
[23] you know, talking to me in a very rude, unprofessional
[24] manner, and he started making different gestures with his

### Page 83

[1] hands pointing and things like that.
[2]     And are you still asking me when is the
[3] first experience I had with him?
[4]   Q: Yes. And do you have a date on that at all?
[5]   A: It's been too long ago. I don't know the
[6] exact date.
[7]   Q: Well, do you recall capturing the problems
[8] that you had with him in a letter?
[9]   A: Yes.
[10]   Q: Okay. And so if we look at that letter, that
[11] might refresh your memory as to the problems you had with
[12] him?
[13]   A: Yes. Yes.
[14]   MR. FARNAN: Do you want to take a short
[15] break?
[16]   MS. HIDALGO: I do.
[17]     (Brief recess taken.)
[18]     (Washington Deposition Exhibit No. 5 was
[19] marked for identification.)
[20]   MS. HIDALGO: For the record, Exhibit 5
[21] is a letter from Mr. Washington to Dennis, the AutoZone
[22] Relations Department Manager, dated 4/29/2000.
[23]        BY MS. HIDALGO:
[24]   Q: Before we took a break, Mr. Washington, you

### Page 84

[1] indicated that you had some problems with Mr. Findle and
[2] you captured those problems in a letter form, which I
[3] believe is Exhibit 5. Am I stating that correctly?
[4]   A: Yes.
[5]   Q: And I see that the letter was dated 4/29/2000?
[6]   A: Yes.
[7]   Q: So at that time you had been employed by
[8] AutoZone about seven months?
[9]   A: Yes.
[10]   Q: Tell me what precipitated this letter? Was it
[11] the — you go into detail about a performance evaluation.
[12] Is that what precipitated the letter, or was there some
[13] other reason?
[14]   A: Well, as I stated in the letter, and I guess
[15] we are looking at the second paragraph.
[16]   Q: Mm-hmm.
[17]   A: We were opening the store one morning 7:30.
[18] He came in and — the second paragraph, have you read
[19] this?
[20]   Q: I've read it. I'm very familiar with it.
[21]   A: So basically anything in this letter is pretty
[22] much what embodied everything that caused me to write the
[23] letter and send it to AutoZone.
[24]   Q: So you included in this letter everything that