Page 85

[1] had happened between you and Mr. Findle up to the point
[2] of April 29, 2000. Correct?
[3]    A: Basically, yes.
[4]    Q: Okay.
[5]    A: I mean, I don't want to read the whole letter
[6] and go through it paragraph by paragraph by paragraph.
[7] But pretty much this is my signature, I wrote the letter,
[8] and whatever I said Mr. Findle did or said or indicated
[9] is in this letter.
[10]   Q: Okay. That's fair.
[11]   And I'm not going to go through the
[12] letter line by line either, but I do have a couple
[13] questions about it.
[14]   A: Sure.
[15]   Q: In the second paragraph you indicate that
[16] Mr. Findle really began showing a dislike for me as a
[17] result of one occasion when he failed to show up to work
[18] to open the store on time. Correct?
[19]   A: Yes.
[20]   Q: All right. Was that the first incident that
[21] you had with him? You indicate it's when he really began
[22] showing a dislike?
[23]   A: Well, you are asking me to explain this second
[24] paragraph?

Page 86

[1]    Q: Yes.
[2]    A: All right. Well, I think the store was to
[3] open at 8 o'clock in the morning. We have to arrive 30
[4] minutes prior to opening. Nobody was at the store. I
[5] think Ralph and I were scheduled Ralph Findle and I were
[6] scheduled to open the store. He wasn't there at 7:30,
[7] and I don't have a key. Only managers have keys to open
[8] the store.
[9]    Q: Understood.
[10]   A: So I didn't know what to do, so I contacted
[11] the assistant manager, Mr. Wilson, Frank Wilson, and
[12] asked him what to do. He told me to contact the Dover
[13] store, okay. And I believe it was Debbie who was the
[14] manager of the Dover store. She in turn took the ball
[15] and she contacted Antonio Farley, okay. And then shortly
[16] after that, somewhere between 7:30 and 8:00, Mr. Findle
[17] arrived, or he arrived right at 8:00 or later, but we
[18] were supposed to be there at 7:30. That was the
[19] understanding that I had.
[20]   Q: Was there any particular reason why you didn't
[21] try to contact Mr. Findle as opposed to Mr. Wilson when
[22] he was late?
[23]   A: I didn't have Mr. Findle's telephone number.
[24]   Q: How was it that you had Mr. Wilson's?

Page 87

[1]    A: He gave it to me.
[2]    Q: Frank did?
[3]    A: Yes, he did.
[4]    Q: Okay. So was this the first incident with
[5] Mr. Findle where you said, oh, I think he doesn't like
[6] me?
[7]    A: Let's move on to the third paragraph. The
[8] second paragraph refers after I think I contacted
[9] management to say no one is here to open the store, I
[10] needed someone to come here to open the store so we can
[11] get in the store, what am I going to do because there is
[12] certain duties that we have to perform prior to opening
[13] the store.
[14]   Q: Understood.
[15]   A: And I don't think that went very well with
[16] Mr. Findle that I contacted the other store, that his
[17] boss, Antonio Farley, was contacted.
[18]   Q: So you think that he started to dislike you
[19] because you got him in trouble with his boss?
[20]   A: Well, I don't know that I got him in trouble.
[21] I was just trying to get the store open. I mean, I
[22] didn't even go that far.
[23]   But I'm just stating that on occasion he
[24] would make unprofessional comments to me about my ability

Page 88

[1] to perform my duties in front of customers, okay. He
[2] would do things in front of customers. That's pretty
[3] much what we are talking about in the third paragraph.
[4]    Q: Okay. All right. Then you also indicate that
[5] there was another time when you arrived at work and
[6] Mr. Shehorn and Findle were waiting outside the store?
[7]    A: Correct.
[8]    Q: And you asked him if he was going to open the
[9] door so that you could clock in?
[10]   A: Yeah. They were standing outside the door, I
[11] guess smoking a cigarette, and the three of us had
[12] arrived. Tom Shehorn and Ralph I guess had arrived
[13] first. And I said, Ralph, I guess it's time to go in.
[14] Are you going to unlock the door so I can go in and, you
[15] know, do my 3030, which 3030 is where you basically greet
[16] customers after they come into the store.
[17]   And Ralph said, yeah, right, in a
[18] sarcastic manner as if he didn't believe me or he didn't
[19] feel I was sincere. And I just asked him, I said, Ralph,
[20] you know, why are you always messing with me, just like I
[21] said here. And Ralph looked directly at me and he said
[22] in a ridiculing way, because I like it, just like that.
[23]   And then I didn't say another word. And then I just
[24] remembered that, I mean, I asked him a simple question,

Page 89

[1] why are you always messing with me, and he looked at me,
[2] because I like it, just like that.
[3] Q: All right. Well, you indicate that he also
[4] showed some disrespect to Mr. Shehorn referring to him as
[5] goofy?
[6] A: Yeah, he would do that. He would do that. He
[7] would call Mr. Shehorn goofy in front of the other
[8] co-workers. And whenever he referred to him, he didn't
[9] refer to him by name, he would call him as goofy.
[10] Q: You consider that as disrespectful?
[11] A: The man was a manager.
[12] Q: Do you consider that disrespectful?
[13] A: Yes, I do.
[14] Q: Was Mr. Shehorn black or white?
[15] A: He was white.
[16] Q: Were there any other employees, to your
[17] knowledge, that were disrespected by Mr. Findle other
[18] than obviously Mr. Shehorn being addressed as goofy and
[19] yourself, him saying I like messing with you? Is there
[20] any other employees that came to you and said, man,
[21] Mr. Findle is a real jerk or anything like that?
[22] A: I don't think Jimmy particularly cared for
[23] him, because I think the first day that I started Jimmy
[24] quit. He went home for lunch and he never came back. So

Page 90

[1] that just left myself and Ralph to run the store that
[2] day.
[3] Q: You believe that Jimmy left because of Ralph?
[4] A: Yes.
[5] Q: Did he tell you that?
[6] A: Yes.
[7] Q: Did he tell you why he was leaving because of
[8] Ralph? Had Ralph done something?
[9] A: He said Ralph was messing with his hours or
[10] his money or something.
[11] Q: And what race was Jimmy?
[12] A: He was white.
[13] Q: All right. You indicate that —
[14] A: I think his name was Jimmy Beavers.
[15] Q: You indicate that Mr. Findle referred to you
[16] as a little boy.
[17] A: Yes.
[18] Q: And what exactly did he say; do you remember?
[19] A: I don't — he had made a comment to me — I
[20] think we were talking about personal phone calls, looking
[21] at the letter I think we were talking about the use of
[22] the store phone to make personal phone calls. And I
[23] needed to make a personal phone call. I think it's in
[24] this last paragraph. And I don't believe Mr. Findle

Page 91

[1] would allow me to use the telephone. And I had said,
[2] well, why can't I use the phone to make a personal phone
[3] call? Everybody uses the phone. It's already been
[4] approved by upper management that we can use the phone as
[5] long as we limited calls and don't abuse it. Then he
[6] said, uh, you're acting like a little boy, you are acting
[7] like a boy.
[8] Q: He said little boy, didn't he?
[9] A: He said, you are acting like a little boy and
[10] a boy, is what he said, little boy.
[11] Q: Well, I'm just asking you, because your letter
[12] very clearly states he referred to you as a little boy.
[13] Not a boy, a little boy?
[14] A: That's right, a little boy.
[15] Q: Did he say, are you going to act like a little
[16] boy and pout all day?
[17] A: I recall him saying, you are acting like a
[18] little boy, exactly what I wrote here.
[19] Q: But you don't recall him saying, are you going
[20] to act like a little boy and pout all day?
[21] A: Exactly what I wrote in my statement.
[22] Q: All right. All right. So he did that on one
[23] occasion?
[24] A: Yes.

Page 92

[1] Q: And that was as a result of you all discussing
[2] the use of the phone for personal business?
[3] A: Yes.
[4] Q: And did you take this reference as little boy
[5] to be racist?
[6] A: Yes.
[7] Q: And why is that?
[8] A: Because I'm an African American male, and
[9] historically black men have been referred to as boy or
[10] little boy in past history.
[11] Q: Okay. Well, you also admit that Mr. Findle
[12] made the remark, however he may have intended it to — he
[13] may have intended its context to be taken. Do you see
[14] where it says at the very last sentence, The fact is that
[15] Mr. Findle did, indeed, make the remark, however he may
[16] have intended its context to be taken? Do you see that?
[17] A: Yes.
[18] Q: So are you conceding that he may not have
[19] intended to be racial?
[20] A: No, I'm not.
[21] Q: Oh, you're not. What does that sentence mean?
[22] A: That means that Mr. Findle made the comment.
[23] He made the comment, I did not. He did. That's all it
[24] means.

Page 93

[1] Q: AutoZone had a rule about cell phones, didn't
[2] they? You weren't supposed to bring cell phones in the
[3] workplace?
[4] A: Yes, I think AutoZone had a rule about cell
[5] phones.
[6] Q: And you did use your cell phone in the
[7] workplace, did you not?
[8] A: I used my cell phone outside of the building,
[9] the store. Outside the store, not in the store.
[10] Q: Are you denying that you used it in the
[11] restroom?
[12] A: I believe I did. I was on break, a lunch
[13] break, a 15-minute break, and I was in the restroom and I
[14] do believe, yes, I may have used my cell phone while in
[15] the restroom on break, yes.
[16] Q: Wasn't it a violation of AutoZone policy to
[17] bring the cell phone onto store premises?
[18] A: If it says that in the handbook, then I
[19] imagine, yes, that's what it means.
[20] Q: So why did you bring it into the store?
[21] A: I'm glad you asked me that. Because other
[22] members of management did the same thing, so I followed
[23] by their example.
[24] Q: So you figured if they did it, you could do

Page 94

[1] it. Is that right?
[2] A: That's correct.
[3] Q: What other managers brought their cell phone
[4] into the workplace?
[5] A: I can't be specific about what other managers,
[6] but I did see it.
[7] Q: But you can't give me any names?
[8] A: No. But I did see it.
[9] Q: All right. Then you go into a fairly lengthy
[10] commentary on your performance evaluation that you had
[11] received. Is that correct?
[12] A: Yes.
[13] Q: Because apparently you didn't agree with the
[14] performance evaluation?
[15] A: Yeah, I had spoken with Dennis Carruth and I
[16] asked him if he would take a look at that, because I
[17] didn't feel as though Ralph had been or Mr. Findle had
[18] been fair with me on the performance evaluation.
[19] Q: Okay. Then in the last paragraph on page 3
[20] you talk about Mr. Findle's intimidating you on 4/29?
[21] A: You are on the last page?
[22] Q: I'm on the third page.
[23] A: Oh, where it says "Finally"?
[24] Q: Yes.

Page 95

[1] A: Is this the page you are referring to?
[2] Q: Yes. "Finally Mr.," and I believe you meant
[3] to put Findle in there?
[4] A: Yes.
[5] Q: Attempted to intimidate me on 4/29, which is
[6] actually the date that you wrote this letter. Is that
[7] correct?
[8] A: I think that was probably the point where I
[9] just couldn't take it anymore, and that was probably the
[10] last straw. I just couldn't take it anymore. And that
[11] just made me sit down and write the letter and then write
[12] everything that I felt had occurred between Mr. Findle
[13] and myself, to the best of my knowledge.
[14] Q: Other than referring to you as a little boy on
[15] one occasion, did Mr. Findle do anything else that you
[16] believe was racist?
[17] A: Well, Mr. Findle, he never talked to me, he
[18] talked at me. And he, the last paragraph, he always
[19] attempted to, in my opinion, embarrass me in front of
[20] customers, as I stated in the last paragraph.
[21] Q: Well, he did that to Mr. Shehorn as well, did
[22] he not, by calling him goofy in front of customers? Do
[23] you think that's embarrassing?
[24] A: Well, yes, I think it's embarrassing if

Page 96

[1] someone were to call me goofy in front of my peers, in
[2] front of customers that I am a member of management.
[3] That would imply to me that I am not on the team, I'm
[4] insignificant. It would imply to me that it's sending a
[5] clear signal to anybody else, other members of management
[6] this is how I view this individual, this is my opinion,
[7] and you can follow my lead and treat him the same way.
[8] He's insignificant.
[9] Q: And that's the way he was treating
[10] Mr. Shehorn. Correct?
[11] A: Calling him goofy. And he was treating me the
[12] way I indicated he treated me in this letter. I was
[13] merely pointing out he disrespects other people in the
[14] way he disrespected me.
[15] Q: Right.
[16] In other words, you weren't the only
[17] person he disrespected. Right?
[18] A: Yes, that's correct.
[19] Q: He disrespected Mr. Shehorn. He disrespected
[20] Mr., what's his name, Miller? Who was the guy that left?
[21] Beavers? What was his name, Beavers?
[22] A: You are talking about the one who quit the
[23] same day I started? Jimmy Beavers.
[24] Q: Yes, Jim.

Page 97

[1] A: Jimmy had come back in the store several times
[2] to buy merchandise after he had stopped working with
[3] AutoZone, and he just voiced his displeasure about Ralph
[4] Findle.
[5]     Q: So my point is this: Mr. Findle was not only
[6] treating you with disrespect, he was also treating
[7] Mr. Shehorn with disrespect as well as Mr. Beavers.
[8] Correct?
[9] A: Yes.
[10]    Q: And Mr. Beavers and Mr. Shehorn are white
[11] males. Correct?
[12] A: Yes.
[13]    (Washington Deposition Exhibit No. 6 was
[14] marked for identification.)
[15]              BY MS. HIDALGO:
[16]    Q: All right. I'm marking as Exhibit 6 your
[17] performance evaluation. The top date is 5/4/2000.
[18]    Mr. Washington, this is the performance
[19] evaluation that you took issue with and described in
[20] Exhibit 5. Is that correct?
[21] A: Yes.
[22]    Q: And I understand that after speaking with
[23] Mr. Carruth, there were some changes made to the
[24] performance evaluation?

Page 98

[1] A: Well, I do believe Mr. Carruth did make some
[2] changes, yes.
[3]    Q: To your satisfaction?
[4] A: Yes.
[5]    Q: Because I think that you indicate under No.
[6] 17, A and B?
[7] A: 17 or seventh?
[8]    Q: I'm sorry. I'm looking at page 3 of your
[9] letter.
[10] A: Okay.
[11]    Q: Bullet point No. 8. "Mr. Findle makes no
[12] comments, however I do agree with the rating."
[13]    So you agree with the overall rating in
[14] the performance evaluation. Is that correct?
[15] A: Oh, I see. You are looking under No. 7,
[16] Teamwork Item A and B, and you are looking at No. 8 under
[17] B.
[18]    Q: Yes. It says, "However I do agree with the
[19] rating."
[20]    Are you referring to the overall rating
[21] of the performance evaluation?
[22] A: I am agreeing with his rating, not his
[23] comments.
[24]    Q: Okay.

Page 99

[1] A: In regard to No. 7, Teamwork Item A and B.
[2]    Q: Did you receive a raise as a result of the
[3] performance evaluation; do you recall?
[4] A: No.
[5]    Q: You did not receive a raise?
[6] A: No, I don't believe as a result of the
[7] evaluation that Ralph Findle wrote, I did not get a
[8] raise.
[9]    Q: Well, you started at 7.50, did you not?
[10] A: Yes. Yes.
[11]    Q: And I think that when you left AutoZone,
[12] weren't you making $7.80?
[13] A: I think it was $7.63.
[14]    Q: All right. Well, I can pull your records and
[15] verify that.
[16]    And you asked in the letter that
[17] Mr. Carruth transfer you to the Bear, Delaware store?
[18] A: What page are you on now?
[19]    Q: The last page.
[20] A: Yes. Yes, I see that.
[21]    Q: It says the DM, which I am assuming you are
[22] referring to district manager, Carruth said it was okay
[23] if the manager of the Bear store, manager Frank Wilson,
[24] will agree to transfer?

Page 100

[1] A: Yes.
[2]    Q: Do you know whether or not Mr. Wilson agreed
[3] to the transfer or did not agree to the transfer?
[4] A: I don't know.
[5]    Q: You don't know.
[6]    Did you ever talk to Mr. Wilson about
[7] it?
[8] A: I think I may have mentioned it to Mr. Wilson.
[9]    Q: Do you recall what he said to you?
[10] A: Sure, as soon as they can work out the
[11] paperwork and do the transfer, it's okay.
[12]    Q: Did he indicate to you that there was even an
[13] opening; do you remember?
[14] A: I think that store was a new store that had
[15] just opened up on Route 40 on Pulaski Highway, and they
[16] were still in the process of getting their crew together.
[17]    Q: Okay. But as of the time that you wrote this
[18] letter, you still had your full-time job with the
[19] University working 11:00 p.m. to 7:00 a.m. Correct?
[20] A: Yes, because I think you indicated earlier
[21] that you had some letter from me where I had left the
[22] college in July, I think, or August of 2002, I think you
[23] said.
[24]    Q: Right.

Page 101

[1] A: Okay, yes.
[2] Q: So you still had some restrictions on when you
[3] could work and when you couldn't work; correct, at this
[4] time?
[5] A: Yes. No more than before.
[6] Q: Do you recall — well, up until this point,
[7] April of 2000, Mr. Carruth, was he your DM from August
[8] '99 when you were hired up to this point in April of
[9] 2000? I'm sorry, Mr. Farley was your first DM. Correct?
[10] A: Antonio Farley was district manager.
[11] Q: Had you had any problems with Mr. Carruth up
[12] to the point where you wrote this letter?
[13] A: No.
[14] Q: Do you recall Mr. Carruth — you handed this
[15] letter to him, Exhibit 5, you gave this to Mr. Carruth?
[16] A: Mr. Carruth and I had a meeting in the 1157
[17] store in Smyrna, Delaware, in the back of the warehouse.
[18] Q: Okay.
[19] A: And that's when I handed him the letter. And
[20] we also went over the performance evaluation marked
[21] Exhibit 6 at the same time.
[22] Q: Okay. And I believe that was on May 5. Does
[23] that ring a bell to you?
[24] A: I don't recall the exact date.

Page 102

[1] MS. HIDALGO: I'm going to mark as 7 a
[2] Recon Report dated 1/26/2000. Attached to it is a
[3] corrective action dated 2/2/2000.
[4] (Washington Deposition Exhibit No. 7 was
[5] marked for identification.)
[6] THE WITNESS: Okay.
[7] BY MS. HIDALGO:
[8] Q: Did you look at the second page of that?
[9] A: (Witness complies.) Okay.
[10] Q: Do you recall being shown Exhibit 7? And, in
[11] fact, those are your comments on the first page of
[12] Exhibit 7, are they not?
[13] A: Yes.
[14] Q: And apparently there was an overage of $10 in
[15] your register?
[16] A: Yes.
[17] Q: And you felt like the corrective action wasn't
[18] justified because perhaps it wasn't your fault that there
[19] was an overage. Am I summarizing this accurately?
[20] A: Yes.
[21] Q: Because there was some integrity problems that
[22] you weren't in total control of your cash register?
[23] A: Yes.
[24] Q: Do you know whether or not Mr. Wilson received

Page 103

[1] a corrective action as well for this incident?
[2] A: I have no idea.
[3] Q: I mean, he was a member of management, wasn't
[4] he?
[5] A: He was assistant manager.
[6] Q: So members of management, unless you are in an
[7] isolated position on a register, members of management
[8] can use your register throughout the day, can they not?
[9] A: Yes, that's correct.
[10] Q: So if there was an overage in the register
[11] that both he used and you used, he probably should have
[12] gotten a corrective action as well, or do you know?
[13] A: I don't know.
[14] Q: You don't know whether or not he got a
[15] corrective action?
[16] A: That's correct.
[17] Q: All right. So you are not disputing that your
[18] register was over $10, you are just disputing whether or
[19] not it's your fault?
[20] A: Correct.
[21] (Washington Deposition Exhibit No. 8 was
[22] marked for identification.)
[23] BY MS. HIDALGO:
[24] Q: Exhibit 8 is a handwritten note by you. And

Page 104

[1] just for the record, it's 00042, because there is not a
[2] date on it.
[3] Take a look at that. Is this your
[4] handwriting on Exhibit 8?
[5] A: Yes, it is.
[6] Q: Okay. It says people to call, John — I can't
[7] read that name.
[8] A: Okay. This, all this information over here is
[9] personal. It's things that pertain to my life outside of
[10] AutoZone. It has nothing to do with AutoZone. I just
[11] happened to, in dealing with this matter pertaining to
[12] AutoZone, grabbed this piece of paper to write
[13] information down about Alison Smith and the address 123
[14] South Front Street. None of these people have anything
[15] to do with —
[16] Q: What was the issue you have with NCB
[17] Management?
[18] A: NCB Management?
[19] Q: Yes.
[20] A: I don't know. I think it was probably a
[21] collection letter or something.
[22] Q: That you had received?
[23] A: Mm-hmm.
[24] Q: What about the next, it talks about probation,

Page 109

[1] A: I don't see a notary stamp on Exhibit 9.
[2] Q: Okay. So did you solicit this letter from
[3] Mr. Turner?
[4] A: No. As I stated, I was working at the store
[5] ringing up a customer's merchandise when they were
[6] leaving the store, and Mr. Turner came through my line
[7] and he asked me, he says, how is it working for this guy?
[8] And I said, well, what do you mean? He says, well, I
[9] heard what happened the other day. I was in the store.
[10] He says, I was buying a steering wheel wrap or something.
[11] And he said, I know how that feels personally because
[12] that's happened to me before, and I can tell you that's
[13] not right, that's not the way a manager is supposed to
[14] treat their employees. You don't have to take that. So
[15] if you need me for anything, to write you a letter or to
[16] help you address this problem, then let me know.
[17] Q: And you said I would like for you to do a
[18] letter?
[19] A: I said, would you put something in writing,
[20] then, so someone will believe me so they won't think I'm
[21] making this up. And he wrote the letter for me. And at
[22] the time he was running a tattoo shop or something in
[23] Smyrna.
[24] Q: Did he used to work for AutoZone?

Page 110

[1] A: No, I don't think he ever worked for AutoZone.
[2] Q: Was he a regular customer?
[3] A: Yes, I saw him come in there sometimes.
[4] Q: When is the last time you have seen or spoken
[5] with Mr. Turner?
[6] A: I remember seeing this man over — probably
[7] the last time I saw this man was probably a
[8] year-and-a-half to two years ago.
[9] Q: All right. And looking at Exhibit 9, the
[10] bottom of the letter has Mr. Chuck Tucker. Do you see
[11] that?
[12] A: You mean typed in Chuck Tucker?
[13] Q: Yes. What's his name, is it Tucker or Turner?
[14] A: It's Tucker.
[15] Q: Okay. Do you know why at the beginning of the
[16] letter he says my name is Chuck Turner?
[17] A: I don't know. I guess he made a typing error.
[18] Q: In the business phone, it's scratched out, 653
[19] is scratched out and 674-3342 is written in. Who wrote
[20] that; do you know?
[21] A: Mr. Turner or Mr. Tucker.
[22]     (Washington Deposition Exhibit No. 10
[23] was marked for identification.)
[24]            BY MS. HIDALGO:

Page 111

[1] Q: Let me show you Exhibit 10. It's another
[2] statement of witness by Mr. Tucker or Turner, whatever
[3] his name is, dated May 5, 2000.
[4]     How did you come into possession of that
[5] document? It appears to be notarized now.
[6] A: Okay. He wrote this one as well, and he told
[7] me that he had a real good friend, and that if we wanted
[8] to, we could go over to this individual's business and
[9] have this notarized. So I went with him and this
[10] gentleman notarized the letter for Mr. Tucker.
[11] Q: Any particular reason why you felt the need to
[12] have the letter notarized?
[13] A: Well, Mr. Tucker suggested that if I wanted it
[14] notarized, he would do that. And I said, okay, fine.
[15] And so I think he went to Mr. Bozeman, his friend, and
[16] had the letter notarized.
[17] Q: So did he give Stephen a clean copy of the
[18] letter and Stephen notarized that, or did he give him,
[19] did he give Stephen Exhibit 9?
[20] A: Did Mr. Tucker give Mr. Bozeman a clean copy
[21] of the letter or did he give him Exhibit 9?
[22] Q: Yes.
[23] A: I guess he gave him what he notarized.
[24] Q: What did you do with this letter?

Page 112

[1] A: What did I do with it?
[2] Q: Yes.
[3] A: I believe this is one of the letters that I
[4] gave Mr. Carruth, and eventually this is the letters that
[5] went to Memphis, Tennessee, or through my attorney.
[6] Q: Well, there were problems, you said that you
[7] mailed your 4/29/2000 letter to Memphis. Is that right?
[8] A: I tried to mail that information to Memphis.
[9] However, I mailed it certified mail/return receipt. And
[10] for some reason that green card that you get back from
[11] the Post Office, it never came back to me.
[12] Q: Okay.
[13] A: It wouldn't come back. So basically I waited
[14] and waited and it never came back, and so I went to the
[15] Post Office and asked them to put a tracer on it.
[16] Q: Okay.
[17] A: Which they did.
[18] Q: Okay.
[19] A: And the first time they didn't get a response.
[20] I think they traced it again and finally they got
[21] something back that showed that the Post Office in
[22] Memphis, Tennessee had received it.
[23] Q: But you don't know whether or not Alison Smith
[24] at AutoZone had received it. Is that correct?

Page 113

[1] A: I don't know what happened to it after it
[2] left — after it got into the postal system.
[3]   (Washington Deposition Exhibit No. 11
[4] was marked for identification.)
[5]       BY MS. HIDALGO:
[6] Q: And I've marked as Exhibit 11, it appears to
[7] be your various attempts to get the letter to Alison
[8] Smith. Is that correct?
[9] A: Yes.
[10] Q: So you don't know whether or not she ever got
[11] the letter. Is that fair to say?
[12] A: I believe the people at the Post Office told
[13] me that they could verify that the Post Office got it.
[14] Q: But you don't know whether or not — and they
[15] obviously couldn't verify whether or not Alison Smith got
[16] it?
[17] A: That's right.
[18] Q: So you can't sit here today and say Ms. Smith
[19] got this letter in June, July, August, whatever?
[20] A: I can only sit here and say I attempted to get
[21] the letter to Alison Smith.
[22] Q: Understood. Understood.
[23]   And then I believe you had an attorney
[24] write a letter to Ms. Smith. Is that correct?

Page 114

[1] A: John Mulford?
[2] Q: Yes.
[3] A: Yes.
[4] Q: When did you retain Mr. Mulford?
[5] A: I had gone to Mr. Dennis Carruth, and I had
[6] asked him after I had given him the 4/29/2000 letter in
[7] back of 1157 store in Smyrna, I asked him, I think it was
[8] maybe 30 days after the fact that we had the meeting and
[9] we looked at the performance evaluation and the 2000,
[10] April 29th letter, had he heard from AutoZone on this
[11] matter? And he said, no, it takes a lot of time. Just
[12] continue to wait. So I continued to wait.
[13]   I think maybe 60 days went by and I
[14] didn't hear anything, and then Ralph told me he sent —
[15] not Ralph, I'm sorry, Dennis Carruth told me he had sent
[16] the letters in. And I said, okay. He said, just
[17] continue to wait until you hear from them. You will hear
[18] from them.
[19]   And then one day I came to work and
[20] Dennis told me, if you have a problem with Ralph Findle,
[21] I think you need to find someplace else to work. That's
[22] what he said. And at that point, that's when I contacted
[23] John Mulford with Mattleman, Weinroth & Miller. He works
[24] for that law firm in Milford, I believe.

Page 115

[1] Q: Was that in, I guess, late July 2000?
[2] A: It's going to be pretty close to the day that
[3] Mr. Mulford wrote the letter.
[4]   (Washington Deposition Exhibit No. 12
[5] was marked for identification.)
[6]       BY MS. HIDALGO:
[7] Q: Okay. And the letter, which I've marked as
[8] Exhibit 12, is dated 8/1/2000.
[9] A: Okay.
[10] Q: Did you have any further problems with
[11] Mr. Findle between April 29, 2000, when you wrote that
[12] letter, up to August 1st, 2000, that you can recall?
[13] A: None that I can recall.
[14] Q: So Mr. Mulford sent, it appears directly to
[15] Ms. Smith a letter on your behalf. Correct?
[16] A: Yes, I think he faxed the letter.
[17] Q: Okay. Did you read the letter before it went
[18] out?
[19] A: Yes.
[20] Q: It indicates on page 2 of the letter, "I have
[21] been informed that you have not apparently received
[22] Mr. Washington's grievance letter nor the witness
[23] statement attached to the letter which verifies the
[24] harassing treatment."

Page 116

[1]   So it was your understanding as of
[2] August 1st that Ms. Smith had apparently not received the
[3] grievance letter?
[4] A: I didn't know anything.
[5] Q: All right.
[6] A: As I indicated.
[7] Q: Now, shortly after AutoZone received this
[8] letter, your attorney got a response. Is that correct?
[9] A: Yes.
[10] MS. HIDALGO: And let me go ahead and
[11] mark this as 13, which is a letter to your attorney from
[12] Tim Harrison.
[13]   (Washington Deposition Exhibit No. 13
[14] was marked for identification.)
[15]       BY MS. HIDALGO:
[16] Q: Have you ever seen that letter before?
[17] A: Yes.
[18] Q: Okay. And Mr. Harrison indicates that the
[19] letter of August 1 was received and that there would be
[20] an investigation because they take those allegations
[21] seriously. Do you see that?
[22] A: Yes.
[23] Q: Okay. And, in fact, that letter is dated
[24] August 2, one day after your attorney sent the letter to

Page 117

[1] Ms. Smith. Correct?
[2] A: Faxed it, yes.
[3] Q: All right. And within, I guess, less than a
[4] week later Mr. Wertz was down in Delaware conducting an
[5] investigation, was he not?
[6] A: Yes, I don't remember the exact time frame,
[7] but shortly after that, that's right.
[8] Q: You must have been happy about that, that
[9] there was an investigation?
[10] A: I don't know what you mean.
[11] Q: Well, were you pleased that there was going to
[12] be an investigation at that point into your problems?
[13] A: Well, yes, I'm glad that — I was pleased that
[14] AutoZone was made aware of what was happening in one of
[15] their stores and that they were investigating it.
[16] Q: Do you know that, in fact, the investigation
[17] was actually initiated by Mr. Wertz within two days of
[18] Mr. Harrison's letter?
[19] A: No, I don't know exactly who Mr. Wertz spoke
[20] with or when he initiated. I just know when Mr. Wertz got
[21] in contact with me and asked me to meet him so we could
[22] do our investigation one on one.
[23] Q: I am assuming you have not seen any of the
[24] statements taken during the course of Mr. Wertz's

Page 118

[1] investigation. Is that correct?
[2] A: I've not seen anything.
[3] (Washington Deposition Exhibit No. 14
[4] was marked for identification.)
[5] BY MS. HIDALGO:
[6] Q: Okay. I'm going to show you what I've marked
[7] as Exhibit 14, a statement that Mr. Findle gave to
[8] Mr. Wertz during the course of Mr. Wertz's investigation.
[9] MS. HIDALGO: Off the record.
[10] (Discussion held off the record.)
[11] (Washington Deposition Exhibit Nos. 15
[12] through 19 were marked for identification.)
[13] LUNCHEON RECESS TAKEN
[14] AFTERNOON SESSION
[15] BY MS. HIDALGO:
[16] Q: Mr. Washington, could you get in front of you
[17] Exhibit 14. I believe that's the statement of Mr. Ralph
[18] Findle.
[19] MR. FARNAN: Do you want to just put on
[20] the record what the numbers are right now?
[21] MS. HIDALGO: Yes, that's fine.
[22] 14 is statement of Ralph Findle dated
[23] 8/4/2000.
[24] 15 is statement of Dennis Carruth dated

Page 119

[1] 8/4/2000.
[2] 17 — sorry. There is a 16. 16 is
[3] statement of Thomas Shehorn, S-H-E-H-O-R-N, dated
[4] 8/4/2000.
[5] 17 is Brandon Diaz statement dated
[6] 8/9/2000.
[7] 18 is Franklin Wilson statement dated
[8] 8/9/2000.
[9] 19 is statement of Melvert Washington
[10] dated 8/8/2000.
[11] MR. FARNAN: Thank you very much.
[12] BY MS. HIDALGO:
[13] Q: Okay. Are you with me, Mr. Washington?
[14] A: Yes, I am.
[15] Q: Turn to page 3 of Mr. Findle's statement,
[16] please?
[17] A: All right.
[18] Q: Mr. Wertz had asked Mr. Findle, "Have you ever
[19] called Mel a little boy?" And he goes into an
[20] explanation as to what happened the day that he referred
[21] to you as a little boy. And at the very end of that
[22] answer he states, "That's when I said, oh, are you going
[23] to act like a little boy and pout all day."
[24] Do you see that?

Page 120

[1] A: Yes.
[2] Q: Do you recall Mr. Findle saying it that way?
[3] A: No.
[4] Q: Okay. Is it possible that he did and you
[5] don't remember?
[6] A: You mean don't remember him saying it exactly
[7] like it's written?
[8] Q: Yes. Yes.
[9] A: I think he said, you are going to act like a
[10] little boy.
[11] Q: So you think in answering this question
[12] Mr. Findle was not being truthful with Mr. Wertz?
[13] A: Yes.
[14] Q: Okay. Let's look at Exhibit 15, please.
[15] That's Mr. Carruth's statement. I'm looking at the
[16] second page of Mr. Carruth's statement. His last answer,
[17] Mr. Wertz was asking about certification tests.
[18] A: Yes.
[19] Q: And he indicated that "Part-time employees in
[20] the New York region."
[21] Did you understand that you were part of
[22] the New York region at that time?
[23] A: Yes.
[24] Q: Okay. "Are encouraged to take all of the

Page 121

[1] certification tests."
[2]    Q: At the time that you received your
[3] performance evaluation, had you, in fact, taken all of
[4] your certification tests?
[5]    A: No.
[6]    Q: Okay. Page 3 of Mr. Carruth's statement,
[7] middle of the page, Mr. Wertz asks him, "Does Mel still
[8] want to be transferred to Bear 1159?"
[9]    And I don't want to read Mr. Carruth's
[10] response into the record, but do you agree or disagree
[11] with what Mr. Carruth stated in response to that
[12] question?
[13]    A: Disagree.
[14]    Q: Okay. And in what respect?
[15]    A: I wanted to be transferred to Dover or Bear,
[16] but I just did not want to stay in the 1157 store. And
[17] if it wasn't possible to go to Dover, then let me
[18] transfer to Bear.
[19]    Q: Okay. Well, he indicates that he, in fact,
[20] contacted Mr. Farley to ask if there was a position in
[21] Dover and that Farley had indicated to him that there was
[22] not.
[23]    Do you have any reason to believe that
[24] Mr. Carruth did not, in fact, make that phone call to

Page 122

[1] Mr. Farley?
[2]    A: I never knew anything.
[3]    Q: Okay. So you don't know whether or not there
[4] was a part-time position available at Dover at that time?
[5]    A: That's right.
[6]    Q: Okay. Mr. Carruth in the same page also
[7] indicates that the reason he didn't send the letter to
[8] him was because the three of you all had an agreement
[9] that you all would work it out amongst yourselves. Is
[10] that correct or incorrect?
[11]    A: Incorrect.
[12]    Q: And what was your understanding as to what
[13] Mr. Carruth was going to do with the letter?
[14]    A: Mr. Carruth told me when I met with him that
[15] he was going to forward all of the information I gave him
[16] to the home office.
[17]    Q: Okay. All right. Let's look at Exhibit 16,
[18] please. That's Mr. Shehorn's statement. And I'm looking
[19] at his first, where it says, Answer: I witnessed that
[20] Ralph and Mel were going at each other.
[21]    Do you see that?
[22]    A: Yes.
[23]    Q: He indicates in that answer that you called
[24] him on Saturday night at about 11 o'clock?

Page 123

[1]    A: Yes.
[2]    Q: And wanted him to agree with you about the
[3] statements that Ralph had made. Is that what happened,
[4] or do you have a different version?
[5]    A: I do believe Tom Shehorn and I had a
[6] conversation and I told him that I was pretty much tired
[7] of, you know, things that happened between myself and
[8] Ralph Findle, and that he refers to you as being goofy
[9] and I'm going to, I'm going to talk to him with Dennis
[10] and see if there is something that can be done.
[11]    Q: So you wanted to see if Mr. Shehorn would back
[12] you up, basically?
[13]    A: I wanted his opinion, basically, yes. He was
[14] a parts sales manager in the store.
[15]    Q: Okay. Why did you call him so late on a
[16] Saturday night?
[17]    A: I don't have an answer for that. I don't
[18] know. I imagine that's just the time I picked to call.
[19]    Q: You must have called him at home?
[20]    A: Yes.
[21]    Q: Mr. Shehorn goes on to say, "Mel needs to
[22] quiet lying," I think he means quit lying, "that he works
[23] on Saturdays and stop trying to get Ralph in trouble."
[24]    Were you trying to get Ralph in trouble?

Page 124

[1]    A: No.
[2]    Q: He says on the next page that you wanted him
[3] to write a statement that Ralph called him, and I think
[4] he probably meant to say incompetent?
[5]    A: Yes.
[6]    Q: And he was crazy. And Mr. Shehorn refused to
[7] do that for you?
[8]    A: Yes. But I don't recall anything like that.
[9]    Q: You don't recall him refusing to give you a
[10] statement?
[11]    A: No, I don't recall asking him to write a
[12] statement that Ralph called him incompetent and crazy.
[13]    Q: Okay. Do you believe that Mr. Shehorn is
[14] lying, or you just don't recall the conversation?
[15]    A: I don't recall the conversation.
[16]    Q: He goes on to say that at that point you began
[17] to question his abilities as a parts sales manager.
[18]    Did you do that?
[19]    A: No.
[20]    Q: Okay. Exhibit 17, Mr. Washington.
[21]    And had you had any problems with
[22] Mr. Shehorn in the workplace? Did he treat you fairly?
[23]    A: I thought Tom was very nice. I called him
[24] Tom. He was very nice and very fair.

Page 125

[1] Q: Did he ever do anything to you in the
[2] workplace that would cause you to question his integrity?
[3] A: No.
[4] Q: What about Brandon Diaz, did you have a good
[5] relationship with Mr. Diaz?
[6] A: No.
[7] Q: And why was that?
[8] A: Brandon, he just appeared to me whenever he
[9] and I had any conversation or any dealings to be arrogant
[10] and very abrasive. And I believe he told me at one time
[11] that, I think he said he was a supervisor, parts sales
[12] manager, and that he would have me fired so fast it would
[13] make my head spin.
[14] Q: Okay. Was that in connection with something
[15] that happened at the store which prompted him to say
[16] that?
[17] A: No I don't know.
[18] Q: He indicates in his statement that —
[19] A: Where are you reading?
[20] Q: I'm sorry, I'm on his second answer. "Ralph
[21] has never yelled at me. He has raised his voice a
[22] little." Do you see that?
[23] A: Yes.
[24] Q: Did you ever hear Mr. Findle raise his voice

Page 126

[1] to Mr. Diaz?
[2] A: I don't recall.
[3] Q: He also indicates that Mr. Findle would say
[4] things to him like how dumb can you be. Did you ever
[5] hear Mr. Findle making those remarks to him?
[6] A: To Brandon Diaz?
[7] Q: Yes.
[8] A: I don't recall.
[9] Q: Okay. On the second page, kind of halfway
[10] down the bottom, Mr. Diaz says, "I listened for a minute
[11] and it was Mel having a personal conversation on his cell
[12] phone while on the clock and while Tommy was alone to run
[13] the store. Mel had been told before not to bring the
[14] cell phone to work."
[15] Do you see where I am?
[16] A: Yes.
[17] Q: Okay. Did that, in fact, occur?
[18] A: I was in the restroom using the toilet and I
[19] was on the cell phone.
[20] Q: Okay. He indicates at the very bottom of that
[21] page that you got into his face pointing your finger at
[22] him. Did that happen?
[23] A: No.
[24] Q: He was your manager, wasn't he?

Page 127

[1] A: Yes.
[2] Q: And then he goes on to deny saying to you "I
[3] threatened to have him out of here so fast it would make
[4] his head spin." I'm on page 3.
[5] Do you think he's lying there?
[6] A: Read that again, please.
[7] Q: It says, Mel even lied and said that I had
[8] threatened to have him out of here so fast that it would
[9] make his head spin?
[10] A: Yes, he is lying. I already mentioned that
[11] earlier.
[12] Q: Okay. Frank Wilson, Exhibit 18, he was — and
[13] what is Mr. Shehorn's race?
[14] A: White.
[15] Q: And Mr. Diaz was?
[16] A: White.
[17] Q: Okay. Frank Wilson, you had a good
[18] relationship with Mr. Wilson?
[19] A: Yes, Frank and I had a working relationship.
[20] Q: He indicates that Ralph referred to you not as
[21] boy, but as little boy.
[22] Do you see that on the first page?
[23] A: Yes.
[24] Q: Is he telling the truth there?

Page 128

[1] A: Yes.
[2] Q: All right. And Mr. Wilson, is he black or
[3] white?
[4] A: He's black.
[5] Q: Did Mr. Wilson at some point transfer out of
[6] that store?
[7] A: Yes.
[8] Q: Where did he go?
[9] A: To the Bear, Delaware store.
[10] Q: Was he promoted or —
[11] A: Yes, he was promoted from an assistant manager
[12] to full manager.
[13] Q: Do you have any idea what Mr. Wilson's
[14] qualifications were?
[15] A: In terms of what?
[16] Q: Being experienced enough to be a store
[17] manager.
[18] Did he know how to run a store?
[19] A: Oh, most definitely.
[20] Q: All right. Then we have your statement,
[21] Exhibit 19.
[22] Now, when you sat down with Mr. Wertz to
[23] give this statement to him, you knew it was important to
[24] be honest with him?

Page 129

[1] A: Yes.
[2] Q: And to give him all the information that you
[3] had about the situation —
[4] A: Yes.
[5] Q: — so something could be done about it?
[6] A: Yes.
[7] Q: And you knew that he was there to talk to you
[8] about your allegations against Mr. Findle. Correct?
[9] A: Yes.
[10] Q: So you were honest with Mr. Wertz?
[11] A: Yes.
[12] Q: And you gave him all the information you had
[13] on Mr. Findle?
[14] A: Yes.
[15] Q: On the third page of your statement,
[16] Mr. Washington, you indicate, I would like my transfer to
[17] the Dover store Antonio Farley promised me when he
[18] interviewed me in the Dover store in September 1999.
[19] Do you see that?
[20] A: Yes.
[21] Q: So at this point, at least as of August 8,
[22] 2000, you wanted to go to the Dover store as opposed to
[23] the Bear store. Is that correct?
[24] A: Yes.

Page 130

[1] Q: And you also wanted Mr. Findle terminated for
[2] his behavior?
[3] A: Yes.
[4] Q: All right. The last page of the statement?
[5] A: Okay.
[6] Q: Mr. Wertz asked you, "Do you have anything
[7] else to add?" And you responded, "Yes, I do. At all
[8] times I have always tried to do my best, and if I could I
[9] would work full time, but I already have a full-time
[10] job."
[11] Do you see that?
[12] A: Yes, I do.
[13] Q: Okay. So at that point what you are telling
[14] Mr. Wertz is that you couldn't work full time for
[15] AutoZone, correct, because you already had another
[16] full-time job?
[17] A: That is correct.
[18] Q: Did Mr. Wertz treat you fairly during the
[19] interview?
[20] A: Yes, he did.
[21] Q: Okay. Now, you told me earlier that you had a
[22] conversation with Mr. Harrison inquiring about the
[23] outcome of the investigation?
[24] A: Yes.

Page 131

[1] Q: You wanted to know what was going to happen or
[2] what had happened. Is that right?
[3] A: Yes.
[4] Q: Okay. And AutoZone's records indicate that
[5] Mr. Findle was terminated on August 13th of 2000. Do you
[6] have any reason to dispute that date?
[7] A: No.
[8] Q: Okay. And you gave your statement to
[9] Mr. Wertz on 8/8/2000. Correct?
[10] A: Yes.
[11] Q: Now, were you present or at the store when
[12] Mr. Findle was informed that he was losing his job?
[13] A: No.
[14] Q: How did you find out that he had been fired?
[15] A: I came to work.
[16] Q: And?
[17] A: Mr. Findle was not at the store.
[18] Q: And did you ask somebody where is he?
[19] A: Yes, I said, who is closing the store? And I
[20] forgot what somebody told me, but they said that Ralph
[21] was no longer with the company. And I forgot who said
[22] that to me.
[23] Q: So was this the day after — he was fired on
[24] the 13th of August. Was this on August 14th that you

Page 132

[1] went to the store and —
[2] A: I'm not sure exactly what day it was.
[3] Q: Do you recall actually having two meetings
[4] with Mr. Wertz regarding Ralph Findle, that you all met
[5] about four days before you actually gave the written
[6] statement and went over your letter? Do you recall that?
[7] A: Having two meetings with Mr. Wertz?
[8] Q: Yes. You obviously had a meeting with him
[9] when you gave your written statement. Correct?
[10] A: That's correct.
[11] Q: Do you recall meeting with him about four days
[12] earlier where you all went over the letter together where
[13] no statement was taken? Do you remember that? Do you
[14] recall that?
[15] A: I don't recall it.
[16] Q: Mr. Wertz's recollection is that you all met
[17] on August 4th for about three to four hours and went over
[18] the April 2000 letter.
[19] A: Mm-hmm.
[20] Q: And then subsequently, a few days later, you
[21] gave a statement.
[22] Are you denying that happened or just
[23] sitting here today you don't remember?
[24] A: I don't remember. I'm not denying that it

Page 133

[1] didn't happen, I just don't remember. I know we met at
[2] the Sheraton, but I just don't remember an earlier
[3] meeting.
[4]    Q: Okay. Now, you had a telephone conversation
[5] with Mr. Harrison following the investigation inquiring
[6] about the results of the investigation. Correct?
[7]    A: Yes.
[8]    (Washington Deposition Exhibit No. 20
[9] was marked for identification.)
[10]           BY MS. HIDALGO:
[11]    Q: Let me show you what I've marked as Exhibit
[12] 20, which is a letter from Mr. Harrison to yourself dated
[13] August 30, 2000.
[14]    A: Okay.
[15]    Q: Do you recall receiving this letter,
[16] Mr. Washington?
[17]    A: Yes.
[18]    Q: Okay. So it seems to indicate that you called
[19] him on August 30th. Is that right?
[20]    A: On August 30th?
[21]    Q: Well, that's the date the letter is dated, and
[22] in his letter he says it was a pleasure speaking with you
[23] today by phone.
[24]    A: Okay.

Page 134

[1]    Q: Did you not know as of August 30th that
[2] Mr. Findle was no longer employed by AutoZone?
[3]    A: I don't know the exact day, I can't recall
[4] the exact day that he was no longer employed with
[5] AutoZone.
[6]    Q: Because he had been gone from the store at
[7] that point for two weeks.
[8]    A: Okay.
[9]    Q: So you didn't know between August 13th and
[10] August 30th that he had been fired, or did you?
[11]    A: I knew that he was no longer with the store
[12] the day that I went to AutoZone and he wasn't there.
[13]    Q: At the time that you called Mr. Harrison, did
[14] you know whether or not Mr. Findle was still employed by
[15] AutoZone?
[16]    A: Yes, I believe he was not employed with
[17] AutoZone.
[18]    Q: Then why were you calling Mr. Harrison?
[19]    A: I called Mr. Harrison to ask him if he could
[20] explain or describe to me specifically what some of the
[21] findings were in the investigation.
[22]    Q: Okay. Did you also understand that
[23] Mr. Carruth lost his job as a result of this
[24] investigation?

Page 135

[1]    A: I knew he had lost his job, I don't know
[2] whether I knew he lost his job at the same time
[3] Mr. Findle lost his job.
[4]    Q: Did you sort of speculate that perhaps it was
[5] a result of the investigation, or —
[6]    A: I speculated or surmised that, yeah, it
[7] probably had something to do with it.
[8]    Q: Were you pleased with AutoZone's response to
[9] your complaints? They conducted this investigation and
[10] fired the two individuals, at least Mr. Findle, you were
[11] having a problem with. Were you satisfied with that?
[12]    A: That Mr. Findle lost his job?
[13]    Q: Yes.
[14]    A: Yes.
[15]    Q: Were you satisfied with the fact that
[16] Mr. Carruth, the district manager, also lost his job?
[17]    A: At the time I learned that he lost his job I
[18] felt sorry for him. I didn't know why he lost his job.
[19]    Q: You don't think he should have been fired?
[20]    A: Well, that wasn't my decision.
[21]    Q: But I am just asking you for your opinion. Do
[22] you think he should have been fired?
[23]    A: I didn't have a problem with Mr. Carruth.
[24]    Q: Were you satisfied with AutoZone's response to

Page 136

[1] your complaint?
[2]    A: Yes.
[3]    Q: Were you satisfied with the way Mr. Wertz
[4] conducted his investigation into your complaint?
[5]    A: Yes.
[6]    Q: Now, Mr. Carruth was terminated, and was it
[7] Mr. Robinson who took his place; do you remember?
[8]    A: Richard Robinson?
[9]    Q: Mm-hmm.
[10]    A: I believe Richard Robinson did come to
[11] AutoZone, yes.
[12]    Q: All right. And I believe that you wrote a
[13] memo to Mr. Robinson about your schedule.
[14]    Let me show you what I'm marking as 21,
[15] a memo note to Richard Robinson from yourself dated
[16] September 8th of 2000.
[17]    (Washington Deposition Exhibit No. 21
[18] was marked for identification.)
[19]    THE WITNESS: Yes.
[20]           BY MS. HIDALGO:
[21]    Q: What was the purpose of your giving this
[22] memorandum to Mr. Robinson?
[23]    A: He was the acting manager that was taking the
[24] place of the exiting manager, and I basically was