Page 177

[1] Q: I understand the information that you gave
[2] him. But wouldn't you agree with me that not being able
[3] to work at all on Tuesdays and Wednesdays, which were
[4] your days off — I mean, they weren't conflicting with
[5] your other job. Correct?
[6] A: Yes.
[7] Q: Okay. You can't work at all all day Tuesday
[8] or Wednesday. You can't work at all on Sunday. You
[9] can't work Monday or Wednesday night. Correct?
[10] A: I was requesting Sunday off, but that's
[11] correct.
[12] Q: Okay. So wouldn't you agree that your
[13] schedule was pretty limited when it came to AutoZone?
[14] A: Yes.
[15] Q: And Mr. Kitchen assured you during the
[16] conversation you had with him that he and Mr. Bynum were
[17] not trying to fire you, but they were just trying to find
[18] out when you were available to work. Correct?
[19] A: Yes.
[20] Q: And Mr. Kitchen, in fact, said, okay,
[21] Mr. Washington, we can accommodate a 5:00 p.m. to 8:30
[22] p.m. schedule for you Thursday, Friday, and Saturday. Is
[23] that right?
[24] A: Yes. Is that what you have on your statement?

Page 178

[1] Q: Yes, it is.
[2] A: Okay.
[3] Q: Were you appreciative of that?
[4] A: Yes.
[5] Q: All right. Then where it says "concerning my
[6] full-time job," it looks like there was another change in
[7] your schedule in January of '01, where your shift changed
[8] from 11:00 p.m. to 7:00 a.m. to 7:30 to 4:30. Correct?
[9] A: Yeah, they got — did away with the third
[10] shift, which was the 11:00 to 7:00, and everybody was
[11] going to be working 7:00 a.m. to 4:30 p.m. Thursday
[12] through Monday.
[13] Q: Okay. So that would take you out of the
[14] running as far as working on the weekends at AutoZone all
[15] day, correct, because you were working at the University?
[16] A: Yes.
[17] Q: All right. You told Mr. Kelston on
[18] February 23rd that you would love to work additional
[19] hours, but at the present you were only available 5:00 to
[20] 8:30 Thursday through Saturday. Correct?
[21] A: Where are you reading again?
[22] Q: I'm reading it, concerning my full-time job
[23] right here.
[24] A: Okay, yes.

Page 179

[1] Q: Which would be 10.5 hours a week. Correct?
[2] A: Yes.
[3] Q: Not 15?
[4] A: Is that how you calculate it?
[5] Q: 3.5 plus 3.5 plus 3.5 is 10.5.
[6] A: Okay.
[7] Q: All right. Now, there was also a problem
[8] which you brought up with your supervisors at AutoZone
[9] that Delaware State University with little or no notice
[10] would require you at times to work past 4:30. Correct?
[11] A: What page are you reading from?
[12] Q: I'm reading the next page.
[13] A: What paragraph?
[14] Q: (Indicates.)
[15] A: Oh, where it says "Further"?
[16] Q: Yes. So now instead of being able to work
[17] from 5:00 to 8:30, you can only work 5:30 to 8:30.
[18] Correct?
[19] A: This paragraph is basically stating, trying to
[20] bring attention if they schedule me to come in at, say,
[21] 4:30 in the evening, I couldn't be there at 4:30 because
[22] I couldn't be in two places at once. If I was working
[23] from 7:00 to 4:30, I couldn't be at AutoZone for 4:30.
[24] Q: All right.

Page 180

[1] A: That's what I was saying here.
[2] Q: I understand.
[3] And that there would be times on very
[4] short notice that you would be required to work overtime,
[5] which would cause you perhaps to be late to AutoZone on
[6] occasion. Correct?
[7] A: And I mentioned this to AutoZone, correct,
[8] Leon Bynum.
[9] Q: Because, in fact, you were late at least once
[10] at AutoZone because of that, were you not?
[11] A: I believe I may have been late once or more.
[12] Q: It says Mr. Pilar was contacted because he was
[13] the supervisor on duty and was informed I will be at
[14] least 10 minutes late?
[15] A: That's true.
[16] Q: Which would be worthy of a corrective action,
[17] would it not?
[18] A: I disagree.
[19] Q: Well, if you are late, you're late, aren't
[20] you?
[21] A: True.
[22] Q: But you think if you have a valid excuse you
[23] don't get a corrective action review?
[24] A: Well, this one would be different. And please

Page 181

[1] allow me to explain.
[2]  Q: Sure.
[3]  A: Leon Bynum and I had an agreement.
[4]  Q: What was that agreement?
[5]  A: That come on in as soon as I possibly can, he
[6] knows I'm not going to be there at 4:30. But what I
[7] didn't understand, what no one explained to me at the
[8] time, because I wasn't a member of management I didn't
[9] know is at the end of the night when you close out,
[10] a manager closes out at the end of the night and he
[11] physically logs all of the employees out of the computer.
[12] Any employee that does not clock in on time, the system
[13] requires an excuse or a reason as to why that person did
[14] not clock in on time. And at that time what I did not
[15] know was Mr. Pilar was putting in information in the
[16] computer stating that I failed to come to work on time.
[17]  Q: But you did fail to come to work on time,
[18] didn't you?
[19]  A: With Mr. Bynum's approval.
[20]  Q: Okay. So at the very end of the letter you
[21] are telling him now, all I can work is 5:30 to 8:30,
[22] Thursday, Friday, Saturday. Am I reading that correctly?
[23]  A: Where are you going?
[24]  Q: The end of the letter. I respectfully request

Page 182

[1] 5:30 to 8:30 Thursday, Friday, Saturday?
[2]  A: That's correct, that's what I have here.
[3]  Q: So you could only work nine hours a week on
[4] those three specific days. Correct?
[5]  A: That's what I was requesting, that's correct.
[6] To cause no further conflict or to get any more
[7] corrective action write-ups, I was trying my best to
[8] communicate my availability.
[9]  (Washington Deposition Exhibit No. 31
[10] was marked for identification.)
[11]   BY MS. HIDALGO:
[12]  Q: I'm going to hand you what I've marked as
[13] Exhibit 31, a performance review that you received from
[14] Mr. Bynum in April of '01.
[15]  Do you agree or disagree with
[16] Mr. Bynum's evaluation of you?
[17]  A: Disagree.
[18]  Q: In what respect?
[19]  A: The ratings.
[20]  Q: You feel like you should have gotten achieves
[21] requirement in all categories?
[22]  A: I'm sorry, repeat that.
[23]  Q: You feel like you should have gotten an
[24] achieves requirements in all categories, as opposed to a

Page 183

[1] needs improvement?
[2]  A: Yes, the categories was needs improvement to
[3] meet job expectations. I felt as though I should have
[4] received achieves job expectations satisfactory or higher
[5] in the categories as opposed to needs improvement to meet
[6] job expectations.
[7]  Q: Do you believe that Mr. Bynum was picking on
[8] you for some particular reason?
[9]  A: I believe Mr. Bynum did not evaluate me
[10] properly.
[11]  Q: Do you know why he didn't evaluate you
[12] properly?
[13]  A: No, I don't.
[14]  Q: Okay. So you just think he didn't do it
[15] properly and you don't know why?
[16]  A: That's correct.
[17]  (Washington Deposition Exhibit No. 32
[18] was marked for identification.)
[19]   BY MS. HIDALGO:
[20]  Q: Let me show you what I'm marking as 32. It's
[21] a CAR dated 8/31/01. Do you recall this document, sir?
[22]  A: No, it's the first time I've seen this.
[23]  Q: You don't recall being spoken to about this?
[24]  A: No.

Page 184

[1]  Q: Do you recall whether or not you were, in
[2] fact, late on 8/31/01? Because you had some problems
[3] with the other job, you would be a little late and didn't
[4] show up until 6:40. Do you recall that?
[5]  A: Yes, I recall possibly calling in late and I
[6] would not show up until about 6:40.
[7]  Q: So you do recall that happening?
[8]  A: I think I do recall this happening.
[9]  (Washington Deposition Exhibit No. 33
[10] was marked for identification.)
[11]   BY MS. HIDALGO:
[12]  Q: Let me show you a corrective action I've
[13] marked as 33. It's a CAR dated 10/6/01.
[14]  A: This is a different one?
[15]  Q: Yes, it is.
[16]  A: In addition to the first one you are showing
[17] me? Not these two?
[18]  Q: Yes. Do you recall this happening,
[19] Mr. Washington?
[20]  A: We are talking about the 10/6/01?
[21]  Q: I am.
[22]  A: No, I've never seen this.
[23]  Q: Do you recall failing to show up or call for
[24] work when you were scheduled?

Page 189

[1] Q: Have you all socialized, like gone to
[2] restaurants together or football games or baseball games,
[3] anything like that?
[4] A: I think one time we went over to Dover Downs
[5] and had lunch or dinner after Shane helped me work on one
[6] of my cars, one of my automobiles.
[7] Q: And you all have discussed this litigation,
[8] haven't you?
[9] A: I'm sorry?
[10] Q: You all have discussed this case, haven't you?
[11] A: No.
[12] Q: You've never discussed this case with him?
[13] A: You mean the deposition, this part of it?
[14] Q: No, I'm talking about your case in general,
[15] your case against AutoZone.
[16] A: We never got into that and discussed that.
[17] Q: You all never discussed it?
[18] A: We talked about the fact that I filed a
[19] complaint with the Department of Labor, to that degree.
[20] Q: What else have you told him about your
[21] litigation?
[22] A: That possibly I have went to Department of
[23] Labor and filed a complaint and it's going through the
[24] investigative stages. And after it goes through that

Page 190

[1] part of it, whether or not I can come to an agreement
[2] with the mediation process that the Department of Labor
[3] conducts. And that's it. And if I don't come to an
[4] agreement, it's quite possible that he may be talked to
[5] as a potential witness.
[6] Q: Do you recall sending a letter to Mr. Bynum
[7] January 28th, 2002?
[8] A: Yes.
[9] MS. HIDALGO: I will mark that as 34.
[10] (Washington Deposition Exhibit No. 34
[11] was marked for identification.)
[12] BY MS. HIDALGO:
[13] Q: What was the purpose of this letter?
[14] A: This letter was as a result of the
[15] conversation that I had with, I think, Leon and Kelston.
[16] Q: Okay.
[17] A: In the Smyrna store in the back of the
[18] stockroom.
[19] Q: All right. You indicate, in looking at the
[20] first page, last paragraph, that you had made several
[21] requests to go full time. Correct?
[22] A: Yes.
[23] Q: And is it fair to say that each time you made
[24] that request to go full time, you were still employed

Page 191

[1] full time at Delaware State University? Is that correct?
[2] A: I think I was asking for more hours. Is that
[3] what you are asking me?
[4] Q: Well, you indicate in your letter that you had
[5] asked for full-time status?
[6] A: Okay.
[7] Q: At the time that you were requesting full-time
[8] status, you still had a full-time job at the University.
[9] Correct?
[10] A: On this letter?
[11] Q: Yes.
[12] A: Yes. Because I had made it clear that I
[13] wanted to leave the University, did not want to stay at
[14] the University continuing working as a custodian, and I
[15] was making my availability known to go full time with
[16] AutoZone.
[17] Q: Okay. And they told you, at the present time
[18] we have four full-timers; Shane Treesh, David Sobotkin,
[19] Robert Baker?
[20] A: That's correct.
[21] Q: So there were no positions available at that
[22] time. Correct?
[23] A: Yes. And if at any time any of those
[24] full-timers leave the store, then I would be next in line

Page 192

[1] for a full-time position at AutoZone.
[2] Q: Did any of those full-timers leave the store?
[3] A: Yes.
[4] Q: Who?
[5] A: Robert Baker.
[6] Q: When did he leave?
[7] A: I don't know when he left, but I know where he
[8] went.
[9] Q: Where did he go?
[10] A: I believe he went to the Bear, Delaware store.
[11] Q: As a parts sales manager. Correct?
[12] A: I believe so.
[13] Q: Was he a parts sales manager before he left to
[14] go to the Bear store?
[15] A: He was full time. He went to the Bear,
[16] Delaware store to be trained as a parts sales manager.
[17] Q: Okay. And I know that in your complaint you
[18] said that there are three individuals that were promoted
[19] over you; Robert Baker, Deanna Brown, and Shane Treesh.
[20] Is that correct?
[21] A: Yes.
[22] Q: Do you know, have any idea what Mr. Baker's
[23] qualifications were, work experience was before he came
[24] to AutoZone?

Page 193

[1] A: No.
[2] Q: So you are not in a position to say whether or
[3] not he was more qualified or less qualified than you for
[4] a position, are you?
[5] A: No.
[6] Q: Deanna Brown, do you have any idea what her
[7] qualifications were before she came to AutoZone, or work
[8] experience?
[9] A: As far as work experience, I know she was
[10] working at the Dover store, Store 1159. She transferred
[11] from the Dover store to 1157 in Smyrna.
[12] Q: As a PSM?
[13] A: Yes, and as full time. She went from a
[14] part-time position into a full-time position.
[15] Q: Do you have an idea of what she did before she
[16] came to AutoZone?
[17] A: No, I have not.
[18] Q: So you are not in a position to say whether
[19] she is more qualified or less qualified than you for the
[20] position. Is that fair?
[21] A: Yes.
[22] Q: Shane Treesh, do you have any idea what his
[23] qualifications were?
[24] A: I believe Shane Treesh was active-duty Air

Page 194

[1] Force.
[2] Q: And you claim that he was promoted over you as
[3] well?
[4] A: Yes.
[5] Q: Do you believe that you were more qualified
[6] than Mr. Treesh was?
[7] A: I can't say.
[8] Q: Do you know who made the decisions to promote
[9] Mr. Baker, Ms. Brown, and Mr. Treesh?
[10] A: No, I do not.
[11] Q: You are making a claim in this lawsuit that
[12] you were retaliated against because you didn't receive
[13] promotions to AutoZone — I mean promotion to a PSM at
[14] AutoZone.
[15]   Do you understand that to be one of your
[16] claims?
[17] A: Yes. Mm-hmm. Yes.
[18] Q: And your lawsuit indicates that Mr. Baker,
[19] Ms. Brown, and Mr. Treesh were all promoted over you?
[20] A: Yes.
[21] Q: But you don't know what their qualifications
[22] were. Correct?
[23] A: Yes.
[24] Q: And you don't know who made the decision to

Page 195

[1] promote them. Correct?
[2] A: Yes.
[3] Q: So who is it that you think retaliated against
[4] you?
[5] A: I don't know.
[6] MR. REED: Can we go off the record for
[7] a second, please.
[8]   (Discussion held off the record.)
[9]     BY MS. HIDALGO:
[10] Q: Were you out at some point, Mr. Washington?
[11] You were hurt or sick or something like that? There
[12] seems to be an indication in the file that you were
[13] physically unable to work for a period of time. Do you
[14] recall that?
[15] A: Yes.
[16] Q: What happened?
[17] A: I was involved in an automobile accident.
[18] Q: Okay. And do you recall when that was and how
[19] long you actually were out?
[20] A: I believe it was the first part of the last
[21] year, I believe, I worked with AutoZone up until about
[22] April or May.
[23] Q: So you were out about two months?
[24] A: Sixty, sixty to ninety days.

Page 196

[1] Q: Two to three months.
[2]   You had some pretty significant
[3] injuries?
[4] A: I was hurt.
[5] Q: How long were you in the hospital?
[6] A: Overnight.
[7] Q: But you were on bed rest or —
[8] A: I was under doctor's orders to stay in,
[9] doctor's care.
[10] Q: Did you have to do physical therapy?
[11] A: No, but I had a neck brace on, I had some
[12] spinal injuries.
[13] Q: Okay.
[14] A: Vertebrae injuries.
[15]   (Washington Deposition Exhibit No. 35
[16] was marked for identification.)
[17]     BY MS. HIDALGO:
[18] Q: Let me just show you just for time reference,
[19] I believe that you sent a letter to Billy Britt. And
[20] this is Exhibit 35, dated 2/15/02.
[21]   I'm just using that simply as a point of
[22] reference. Did you send that to Mr. Britt? Well,
[23] obviously you sent it February 15, 2002. Correct?
[24] A: Yes. This was given to Leon Bynum.

Page 197

[1] Q: Okay. And you were out from February —
[2] A: Probably the — yeah, February until about —
[3] Q: May?
[4] A: End of April, first of May, first, second week
[5] of May. I'm just recalling back.
[6] MS. HIDALGO: Why don't we go ahead and
[7] take a break right now, maybe a ten-minute break, and
[8] then we will come back and I think pretty much finish up.
[9] (Brief recess taken.)
[10] (Washington Deposition Exhibit No. 36
[11] was marked for identification.)
[12] BY MS. HIDALGO:
[13] Q: Mr. Washington, before we broke we were
[14] talking about Exhibit 35, which I believe was a letter
[15] that you had written regarding your car accident and
[16] inability to work. Correct?
[17] A: Yes. Mm-hmm.
[18] Q: All right. And you believe that you were out
[19] for 60 to 90 days, which would put us into, I guess, late
[20] April, early May. Is that fair?
[21] A: I think so.
[22] Q: Okay. Let me show you what I've marked as
[23] Exhibit 36, which is a charge of discrimination filed by
[24] you against AutoZone. And the date appears to be

Page 198

[1] 5/29/02. Is that correct?
[2] A: Yes.
[3] Q: So this charge was filed between two and four
[4] weeks from the time that you returned from your auto
[5] accident. Is that correct?
[6] A: Yes, it appears that way.
[7] Q: Okay. What happened in those two to four
[8] weeks which prompted you to file this charge?
[9] A: Well, when I came back to work, I think I was
[10] opening and closing the store sometimes working with
[11] Leon.
[12] Q: Okay.
[13] A: Leon Bynum. And one of the things that Leon
[14] and I would talk about in the morning, he would come in
[15] at 6 o'clock or 5:30 in the morning to do the matrix, and
[16] I would ask him about a conversation that I had with him
[17] and I had with Kelston about becoming full time and about
[18] becoming a parts sales manager. And he would always tell
[19] me, Leon, that he has to go to upper management and check
[20] with them and see how they want to deal with it because
[21] it's their decision, okay.
[22] Q: All right.
[23] A: So after asking him this question about five
[24] or six times, at one point Leon Bynum told me, he says,

Page 199

[1] well, they are never going to give you full time or parts
[2] sales manager because you have a rather thick file in
[3] Fort Washington. And you have to check with Mike
[4] Broderick, Joe Simon, and I think he said Billy Britt, if
[5] I have that correct.
[6] And I said, what's this file you are
[7] talking about? What's this computer file you are talking
[8] about, this personnel file? I said, where is it? He
[9] says, in Fort Washington. I said, well, can you arrange
[10] something where I can see this file and look at it?
[11] And once Leon told me this, then I said,
[12] well, is that normal? Is that the way everything is
[13] supposed to go? He said, well, when you filed that
[14] complaint on them in 2000, they are never going to let
[15] you do anything. And that's when I just made my mind up
[16] and said, okay. And I remember that, because we would
[17] come in and do the matrix early in the morning, just him
[18] and I. We would count inventory.
[19] Q: Okay. We talked about the individuals who got
[20] promoted over you; Deanna and Shane and Robert. Were
[21] there any people promoted to full time over you?
[22] A: I think Shane went full time.
[23] Q: Okay. Anyone else?
[24] A: Deanna Brown.

Page 200

[1] Q: Okay. Anyone else?
[2] A: And I believe Robert Baker.
[3] Q: Okay. Anyone else?
[4] A: Not that I can think of.
[5] Q: Okay. Did you know that — well, were you
[6] given the opportunity to look at your file? I think that
[7] Melvin Wedge arranged that, didn't he?
[8] A: I saw a file that was in a safe with all the
[9] rest of the personnel files. Melvin Wedge asked one of
[10] the supervisors the day that he came to the Smyrna store
[11] to investigate a complaint that Deanna Brown had against
[12] Robert Baker and David Sobotkin. And I wanted to see
[13] Melvin Wedge, but he wasn't there, so I left to go home.
[14] They told me he wasn't coming that day, so I left to go
[15] home. Something told me to turn around. I turned the
[16] car around and went back, and there he was in the store.
[17] So I took the opportunity to talk with him.
[18] Q: At that time did he show you the personnel
[19] file?
[20] A: Yes. And he told me there was nothing there
[21] in the file that would hurt me or keep me from being a
[22] parts sales manager or full time. All it took was an
[23] okay from the store manager and his DM. That's all it
[24] took.

Page 209

[1] Dover attorney's house, and Mr. Leon Bynum wrote the
[2] statement out and the attorney notarized it and Leon
[3] signed it and he presented identification to that effect
[4] that it was him making the statement.
[5]   Q: And, of course, this was after Mr. Bynum had
[6] left AutoZone. Correct?
[7]   A: I believe it was.
[8]   Q: And you don't know why he left AutoZone?
[9]   A: No, I do not.
[10]   Q: Would it surprise you if I told you — well,
[11] do you know what the unauthorized removal of AutoZone
[12] property means?
[13]   A: It means it's property that's the property of
[14] AutoZone, like it was the property of this law firm that
[15] must remain inside these walls and cannot be removed from
[16] the property. Anything to the contrary is —
[17]   Q: Theft?
[18]   A: Theft or otherwise.
[19]   Q: Did you know that that was why he was fired?
[20]   A: No.
[21]   Q: Does it surprise you?
[22]   A: I didn't know Mr. Bynum like that. I worked
[23] for the man. After work I went home and I didn't see him
[24] until he came back to work.

Page 210

[1]   (Washington Deposition Exhibit No. 38
[2] was marked for identification.)
[3]     BY MS. HIDALGO:
[4]   Q: Do you recall receiving a corrective action
[5] from Mr. Bynum June of 2002? This is what I've marked as
[6] 38.
[7]   A: Yes, I remember this.
[8]   Q: Can you tell me what happened here?
[9]   A: Yes. A customer, Larry Watson, came into the
[10] store and he bought some brake shoes, and then I think he
[11] bought some Brake Quiet for the brake shoes. And
[12] Mr. Watson, I believe he wrote the check out, and after
[13] he wrote the check out he left the store, and the amount
[14] that I think — let me read this for a minute.
[15]   Q: Sure.
[16]   A: Okay. In this particular incident, Mr. Larry
[17] Watson came into the store and he purchased some brake
[18] shoes, but his friend actually paid for the brake shoes.
[19] So the information on the check was — the amount should
[20] have been $16.99, but it was actually 18.99. So the
[21] check was written for the incorrect amount. The
[22] difference would have been some Brake Quiet, $2. And for
[23] some reason that didn't get keyed into the register
[24] properly, which I did not do.

Page 211

[1] Leon brought it to my attention, he told
[2] me it was fraud the next morning because the check didn't
[3] go through the bank. In other words, the check did not
[4] match the register tape. So Mr. Bynum brought to my
[5] attention the next morning, he said this is fraud, he was
[6] calling it into loss prevention. And I said, well, let
[7] me see it and let's look at it. And I got on the phone
[8] and I called Mr. Larry Watson up, and I told him, listen,
[9] the check was written for the wrong amount, it was an
[10] oversight on my part, made a mistake. Would you be kind
[11] enough to come back into the store to write the check for
[12] $18.97?
[13]     Mr. Watson came back into the store with
[14] the brake shoes, with the Brake Quiet, he offered to
[15] write the check for $18.97. Mr. Leon Bynum refused to
[16] talk to Larry Watson. He said, I can't talk to you. It
[17] was between Melvin Washington and AutoZone. I can't
[18] accept your money. You can keep the Brake Quiet. So he
[19] gave it to him. And the customer just left the brake
[20] shoes on the counter. But the customer said, I want to
[21] make this right. I want to give you a check for the
[22] correct amount, 18.97. And Leon would not accept the
[23] man's check. And that's how it ended.
[24]   Q: But there is no dispute that, in fact, you did

Page 212

[1] take a check for the wrong amount. Is that correct?
[2]   A: That's right.
[3]   Q: He also indicates that you put in the wrong
[4] phone number for warranty info, which the parts was for
[5] someone other than Larry Watson. Is that correct, as
[6] well?
[7]   A: The information that I put on there was Arthur
[8] Brown's information. Mr. Larry Watson brought Mr. Brown
[9] into the store as a friend to purchase the brakes. The
[10] brakes were for Larry — for Arthur Brown. Mr. Watson
[11] just happened to be with him as a friend trying to help
[12] him get his car fixed.
[13]   Q: So the warranty information should have been
[14] put under Mr. Brown's name as opposed to Mr. Watson's
[15] name?
[16]   A: Yes.
[17]   Q: Because Mr. Brown was the recipient of the
[18] warranty product. Correct?
[19]   A: Yes.
[20]   Q: And you put in Larry's name as opposed to
[21] Arthur's?
[22]   A: Yes.
[23]   Q: Okay. Shane Treesh prepared a couple of
[24] statements, one to the Department of — let's see. One

Page 221

[1]  A: Okay.
[2]  Q: Did Kelston and Leon, in fact, offer you a
[3] full-time PSM position in the spring of 2002?
[4]  A: No.
[5]  Q: Okay. Then I don't understand what you've
[6] written here?
[7]  A: Okay. Kelston — Leon asked me if I wanted a
[8] full-time position. I responded that Kelston and
[9] yourself offered me a shot at parts sales manager
[10] position and full time. And this spring, is that what
[11] you're offering? And then Leon responded that I can't
[12] offer anything. So when I asked him for a parts sales
[13] manager full time, he said, I can't promise anything.
[14]    So, no, this was a personal note of what
[15] he said to me and what I responded and I asked him.
[16]  Q: Well, I guess I'm confused as to what they
[17] said to you in the spring?
[18]  A: Well, let me talk about this. I think
[19] probably — no, it was not probably, is. They would
[20] offer me maybe full time, but no parts sales manager.
[21] This is what I asked Leon right here, are you offering me
[22] a full-time position of the parts sales manager? And
[23] Leon says, no, I can't promise anything. I said, well,
[24] who can? He said, well, you have to talk with Billy

Page 222

[1] Britt. I said, well, Leon, you talk to him for me, then.
[2] Nobody ever got back to me on anything.
[3]  Q: All right. So on July 8th he said, Mel, or
[4] whatever he called you, I am offering you a full-time
[5] position at AutoZone. Correct?
[6]  A: No, he asked me would I like to go full time
[7] with AutoZone.
[8]  Q: Okay. That's not the same as him offering you
[9] a position? I mean, are we playing with words? I don't
[10] understand.
[11]  A: No, I am not playing semantics with you.
[12]  Q: Did you consider that a job offer of full time
[13] when he said that?
[14]  A: No, I didn't.
[15]  Q: Why not?
[16]  A: Because I said, Leon, you, I, and Kelston
[17] talked about full time as a parts sales manager. That's
[18] what they offered me in the store, in the back of the
[19] store. They said the first time a full-timer leaves, you
[20] will get the first shot at being full-time parts sales
[21] manager. And then when he asked me I said, Leon, are you
[22] offering me a shot at parts sales manager and full time?
[23] He says, I can't promise you anything. I said, well, who
[24] can, then, Leon, because that's not what we talked about.

Page 223

[1] And he said, Billy Britt. I said, Leon, talk to Billy
[2] Britt for me, then. And I never heard anything from
[3] Billy Britt or Leon again.
[4]  Q: Didn't you have a meeting with Billy Britt?
[5]  A: When?
[6]  Q: An hour-and-eighteen-minute meeting with Billy
[7] Britt on 7/10. You don't remember that?
[8]  A: Is there something to that effect of what we
[9] talked about?
[10]  Q: Yes, there is.
[11]    (Washington Deposition Exhibit No. 41
[12] was marked for identification.)
[13]              BY MS. HIDALGO:
[14]  Q: I'm marking as 41 a handwritten note undated
[15] by the plaintiff.
[16]  A: Billy Britt asked me did I want full time,
[17] yes, he did. And I said, well, Billy, I said, Leon and
[18] Kelston promised me a shot at a full-time position and
[19] PSM. That's what they promised me. And then Billy Britt
[20] told me, he says, well, no, we're not going to give you
[21] PSM.
[22]  Q: We're just going to give you full time?
[23]  A: He said, my offer is full time. He said, my
[24] offer is not PSM and full time.

Page 224

[1]  Q: So he offered you a full-time position on
[2] 7/10/02. Is that correct?
[3]  A: Yes, he did.
[4]  Q: Okay.
[5]  A: But that's not the promise that was made to me
[6] by Kelston and Leon based on these earlier statements.
[7]  Q: Okay. And I take it you turned town the
[8] full-time position?
[9]  A: I said, that's not the promise that you made
[10] me.
[11]  Q: But you didn't accept the full-time position?
[12]  A: No.
[13]  Q: You turned it down?
[14]  A: That's right.
[15]    (Washington Deposition Exhibit No. 42
[16] was marked for identification.)
[17]              BY MS. HIDALGO:
[18]  Q: Exhibit 42 is a memo of Billy Britt dated
[19] 7/15/02. Why don't you look at that.
[20]  A: Okay.
[21]  Q: Mr. Britt's explanation is that the store does
[22] less than 25,000 in sales per week. Do you see that?
[23]  A: Yes, I see that.
[24]  Q: Do you accept that explanation or not? Do you

Page 225

[1] think he's lying?
[2] A: I have to tell you again, earlier I answered
[3] your question, I don't know. That's not something that I
[4] had access to or was ever discussed with me.
[5] Q: Fair enough. All right.
[6]     Then two weeks later I believe you
[7] submitted a letter of resignation to AutoZone?
[8] A: Who did?
[9] Q: I said I believe two weeks later you submitted
[10] a letter of resignation to AutoZone, which I will mark as
[11] 43.
[12]     (Washington Deposition Exhibit No. 43
[13] was marked for identification.)
[14]                 BY MS. HIDALGO:
[15] Q: Is that your letter?
[16] A: Yes.
[17] Q: Why did you quit?
[18] A: Well, I was — it was clear to me at that
[19] point that whatever Leon and Kelston had offered me
[20] wasn't going to happen, and I asked, I think I asked
[21] Billy Britt, I said, are you just offering me full time
[22] with just a full time, from part time to full time, or is
[23] there any extra money involved in this? Do I get any
[24] increase in money? He says, no, my offer is full time.

Page 226

[1] You don't get any extra money. I said, well, so what
[2] happened to the promise that Kelston and Leon made to me
[3] that I would be the next person to go full time with
[4] parts sales manager? What happened to that? And he just
[5] kept saying, my offer is just full time and there is no
[6] extra money on the table. Take it or leave it.
[7] Q: Well, there is extra money to the extent that
[8] you are going to be getting more hours. Is that right?
[9] A: Yes, I imagine full time would guarantee more
[10] hours.
[11] Q: And were you working at the University of
[12] Delaware when this full-time offer was made to you?
[13] A: No.
[14] Q: You had already left?
[15] A: Yes.
[16] Q: Okay. So you turned down a full-time position
[17] even though you didn't have a full-time job. Is that
[18] correct?
[19] A: That's right.
[20] Q: Was there anything magical that happened on
[21] 7/29/02, or you just woke up that morning and said I am
[22] just fed up?
[23] A: I was fed up a long time ago.
[24] Q: I know. I am just asking, was there something

Page 227

[1] that happened on 7/28 that prompted you to type this out
[2] on 7/29?
[3] A: I think what happened for me was when Billy
[4] Britt said, no, no parts sales manager, no extra money,
[5] just full time, that's all. And that's not the promise
[6] that was made to me by Kelston and Leon.
[7] Q: Well, Mr. Britt didn't indicate that you would
[8] never be a parts sales manager, did he?
[9] A: He wouldn't even entertain that or discuss it.
[10] Q: Well, what he told you, wasn't it, was that at
[11] the time, because the store was such a low-volume store,
[12] he couldn't support another full-time PSM? Isn't that
[13] what he told you?
[14] A: No, that's not what he told me. Basically
[15] what he told me was my offer is full time, no extra money
[16] and no parts sales manager.
[17] Q: So you believe that that statement that he
[18] gave is incorrect?
[19] A: The part about not supporting 25.
[20] Q: He didn't say that?
[21] A: No.
[22] Q: So if he testifies he did, he would be lying.
[23] Is that your position?
[24] A: Yes.

Page 228

[1] Q: Okay. Did you work out your notice or did
[2] AutoZone just accept your notice and ask you to leave?
[3] A: I worked it out, my last two weeks.
[4] Q: Okay. Did you consider yourself to be a good
[5] employee?
[6] A: Yes.
[7] Q: Did you consider yourself to be good with
[8] customers?
[9] A: Yes.
[10] Q: Sales initiatives?
[11] A: Yes.
[12] Q: Good at tasks?
[13] A: Could you be more specific?
[14] Q: Well, putting up truck?
[15] A: Yes.
[16] Q: Getting the store ready to open, would you
[17] consider yourself —
[18] A: Closing and opening the store?
[19] Q: Mm-hmm.
[20] A: Yes.
[21] Q: You were proficient in that?
[22] A: Yes.
[23] Q: Did you consider yourself an average employee,
[24] above average employee, below average employee?

Page 229

[1] A: Above average.
[2] Q: Above average?
[3] A: Yes.
[4] Q: Okay. And you were able to do your job
[5] throughout your employment at AutoZone in an above
[6] average rate?
[7] A: Yes.
[8] Q: What did you do when you left AutoZone? Did
[9] you start trying to find another job, or did you have one
[10] lined up before you quit?
[11] A: When I left AutoZone?
[12] Q: Yes.
[13] A: I'm not sure what I did when I left AutoZone.
[14] Q: You must have felt the need to support
[15] yourself?
[16] A: Yes.
[17] Q: One would hope.
[18] Did you look for a job?
[19] A: Yes.
[20] Q: Where did you look?
[21] A: On the Internet, Monster.com, the newspaper,
[22] the State. I'm just trying to remember what did I do
[23] when I left AutoZone. I can't remember. It just alludes
[24] me right now. I can't remember what I did.

Page 230

[1] Q: Well, obviously you still had your two girls
[2] living with you. Correct?
[3] A: Mm-hmm.
[4] Q: And they were on your insurance through the
[5] University of Delaware?
[6] A: Yes.
[7] Q: Did you go on Cobra through the University?
[8] A: No.
[9] Q: So what happened to your insurance benefits?
[10] A: They lapsed.
[11] Q: So you didn't have any insurance coverage for
[12] you or your children?
[13] A: I think they went on their mother's insurance.
[14] Q: Okay. So do you know how long it took you to
[15] find a job?
[16] A: Probably about 60 days, a couple months.
[17] Q: And do you recall where you started working
[18] when you did get a job?
[19] A: I can't recall off the top of my head.
[20] Honestly, I can't.
[21] Q: Okay. Because I know that you worked at
[22] Outten Brothers in the summer of 2004. Do you recall
[23] where you worked before you went to Outten Brothers?
[24] A: I think I may have worked at — I can't

Page 231

[1] remember the name of the place. It's right in Rodney
[2] Village. I think it's a place called Just Wood or
[3] something. I think it was a furniture store.
[4] Q: And how long did you have that job and why did
[5] you leave?
[6] A: I left that job probably about a year, a year
[7] after that.
[8] Q: Why did you quit?
[9] A: The manager asked me to leave.
[10] Q: Why?
[11] A: He said I wasn't a team player.
[12] Q: I'm sorry, I didn't catch the name of this
[13] place. What was it called?
[14] A: It's in the Rodney Village Shopping Center. I
[15] think it's Just Cabinets, Just Cabinets.
[16] Q: Just Cabinets?
[17] A: Just Cabinets.
[18] Q: Okay. And you were there, and after a year
[19] the manager said you need to leave because you are not a
[20] team player?
[21] A: That's right.
[22] Q: Did you ask him what he meant by that?
[23] A: No.
[24] Q: So you were, in effect, fired?

Page 232

[1] A: Yes.
[2] Q: So where did you work next?
[3] A: I think that's when I went to Outten Brothers.
[4] Q: And you were fired from that job because you
[5] were allegedly talking bad about the owners?
[6] A: I think so.
[7] Q: Okay. And then was your next job the
[8] Department of Public Health?
[9] A: After Outten Brothers?
[10] Q: Yes.
[11] A: I think it was, I think it was the Department
[12] of Public Health.
[13] Q: And you were asked to leave that job as well?
[14] A: Yes.
[15] Q: Okay. So where did you work after the
[16] Department of Public Health?
[17] A: I don't think I worked.
[18] Q: For how long?
[19] A: Probably two or three months.
[20] Q: Okay.
[21] A: And then I think I went to work for the
[22] Walmart Distribution Center in Smyrna.
[23] Q: Doing what?
[24] A: Loading trucks.