Page 233

[1] Q: And how long did you have that job?
[2] A: Thirty days.
[3] Q: And what happened there?
[4] A: I decided I didn't want to die in the back of
[5] one of those trucks so I quit.
[6] Q: You didn't want to what?
[7] A: Die in the back of one of those trucks, so I
[8] quit.
[9] Q: What do you mean?
[10] A: It was too hard.
[11] Q: It was what?
[12] A: Too hard, too physically exerting.
[13] Q: You were moving merchandise?
[14] A: Loading the back of trucks with anything that
[15] you see in a Walmart store.
[16] Q: So after a month you quit there, and what did
[17] you do?
[18] A: The Department of Labor called me up and said,
[19] if you want to come to work for us, we have a job for you
[20] for the State. So I went to work in the Department of
[21] Public Health.
[22] Q: Doing what?
[23] A: Pulling charts.
[24] Q: Oh, that was the — I thought we already

Page 234

[1] talked about that. Okay. And that lasted not that long?
[2] A: Thirty days.
[3] Q: And you were let go there. What did you do
[4] after that?
[5] A: What I'm doing now.
[6] Q: What are you doing now?
[7] A: Working for Schwan's home food delivery.
[8] Q: You drive little trucks down neighborhood
[9] streets and people buy food like popsicles and stuff?
[10] A: Yes.
[11] Q: And what are you earning there?
[12] A: Annually?
[13] Q: Yes.
[14] A: $38,000 a year.
[15] Q: Are you salaried or hourly?
[16] A: It's half and half.
[17] Q: I'm sorry?
[18] A: It's 50/50; half salary, half commission.
[19] Q: Oh, half commission. Okay. Have you got
[20] benefits?
[21] A: Yes.
[22] Q: Do you intend on staying there for a while?
[23] A: Until I find something better.
[24] Q: I just want to go back to your charge for a

Page 235

[1] minute, your charge of discrimination. And I don't
[2] remember what exhibit number it is, but it shouldn't be
[3] too buried in that pile. And then I think I'm almost
[4] done.
[5] A: Which one?
[6] Q: Your charge of discrimination that you filed,
[7] the complaint with the Department of Labor.
[8] A: Okay, I have it.
[9] Q: Now, did you understand that that statement
[10] that you gave was a statement under oath?
[11] A: Yes.
[12] Q: And so you obviously were very careful when
[13] you filled the charge out?
[14] A: Yes.
[15] Q: Okay. And you read it, probably reread it
[16] before you signed it. Is that correct?
[17] A: Yes.
[18] Q: Is there any particular reason — well, are
[19] you making a claim for race discrimination in this case?
[20] A: Retaliation.
[21] Q: Just retaliation?
[22] A: Yes.
[23] Q: Are you seeking from AutoZone any damages for
[24] emotional distress?

Page 236

[1] A: No.
[2] Q: Now, who do you intend at this point to
[3] testify on your behalf? Obviously, Shane Treesh?
[4] A: Yes.
[5] Q: Anybody else?
[6] A: Anyone else that the law firms representing me
[7] thinks would be good witnesses to testify on my behalf.
[8] Q: I'm asking you what witnesses do you
[9] believe —
[10] MR. REED: We're going to pose an
[11] objection to this line of questioning. It's going into
[12] matters that are confidential communication between
[13] attorney and client at this point.
[14] MS. HIDALGO: I didn't understand the
[15] objection.
[16] MR. REED: My objection is that you are
[17] asking for matters that's included in confidential
[18] communication from the client. And, furthermore, of
[19] course, there will come a time when we will list a
[20] witness list when we have one. At the moment we don't
[21] have one, it's still being considered.
[22] BY MS. HIDALGO:
[23] Q: To the best of your knowledge, who has
[24] information regarding what happened to you at AutoZone?

**In The Matter Of:**

*Washington v.*
*AutoZoners*

---

*Ronald Wertz*
*May 12, 2005*

---

*Corbett & Associates*
*1400 N. French Street*
*P.O. Box 25085*
*Wilmington, DE USA 19899*
*(302) 571-0510    FAX: (302) 571-1321*

*Original File 050512D2.ASC, 62 Pages*
*Min-U-Script® File ID: 3172325181*

**Word Index included with this Min-U-Script®**

A043

Page 25

[1] would call and we would talk about the families. And
[2] sometimes he would talk to me about what was going on in
[3] the store as far as his hours, and I would suggest — I
[4] told him I really had nothing to do with the hours,
[5] because my job is this, but I would tell him who to go
[6] talk to, go talk to your manager. If you can't get that
[7] response, then I would advise you to go to your district
[8] manager.
[9]     So, yes, we talked several times. Like
[10] I say, we sort of hit it off, so we exchanged phone
[11] numbers. I gave him my home phone and my cell phone to
[12] call me at any time.
[13]   Q: So you found Mr. Washington a personable
[14] person?
[15]   A: Oh, very personable. No doubt about it. And
[16] we had some teenage daughters, so we were talking, we
[17] compared notes on teenage daughters.
[18]   Q: Have you had any conversations about
[19] Mr. Washington with anybody?
[20]   A: In what time frame are you talking about? I
[21] mean, back here I did.
[22]   Q: And I'm talking any time frame, so we're going
[23] to go through any time.
[24]   A: Yeah.

Page 26

[1]   Q: With whom have you had conversations with
[2] regard to Mr. Washington?
[3]   A: Well, all these people that we talked about.
[4] That's what I'm saying, back here we talked to
[5] Mr. Washington.
[6]   Q: Aside from the people listed in these
[7] statements, have you had any other conversations?
[8]   A: I probably talked with Tim Harrison, who was
[9] the AutoZone relations person. Usually they will review
[10] these statements and ask us any questions that they need
[11] to know.
[12]   Q: Do you know when that conversation with
[13] Mr. Harrison would have taken place?
[14]   A: It would have taken place after the 8th,
[15] because I would have faxed this in as soon as I finished
[16] this. So it would have been the 8th or the 9th of
[17] August.
[18]   Q: And did you recall where those conversations
[19] took place?
[20]   A: Well, it would be on the phone, because he is
[21] in Memphis, Tennessee.
[22]   Q: Do you recall the specifics of that
[23] conversation?
[24]   A: No, I do not. And I'm not even sure it

Page 27

[1] happened. I'm just saying it would have. But if I did
[2] talk to him, it would have been about the case; did you
[3] ask this, did you ask that? Yes, look at this statement.
[4] That type of conversation.
[5]   Q: Is there any records that would refresh your
[6] recollection as to whether or not that conversation took
[7] place?
[8]   A: No.
[9]   Q: Do you know if Mr. Harrison makes any notes of
[10] those conversations?
[11]   A: I don't know.
[12]   Q: Would you have been using a cell phone or a
[13] land line for that conversation?
[14]   A: Using a land line.
[15]   Q: At your office or wherever you were located?
[16]   A: Probably a hotel.
[17]   Q: Would you have called him or would he have
[18] called you?
[19]   A: He would have called me, I'm sure.
[20]   Q: Have you created any reports with regard to
[21] Mr. Washington?
[22]   A: Just the report for this, you know, this case
[23] that says this is the people I talked to. And I have to
[24] type in each one of the headings for the — and the

Page 28

[1] information for each person that goes onto a little
[2] document that shows who I talked to. Then it goes into
[3] the database.
[4]   Q: And what database is that?
[5]   A: It's a case log. We create a case for each
[6] one of these so it will be tracked through our system.
[7] So we have a loss prevention case log.
[8]   Q: And who maintains that database?
[9]   A: That's maintained in Memphis. We put it in
[10] our computer, and once we ship it off, everything is
[11] wiped off, as far as any documentation, it's all wiped
[12] out on our computer and it's all held in a database in
[13] Memphis.
[14]   Q: And where is your report today?
[15]   A: Well, of course, back at the office. I don't
[16] think we have it.
[17]   Q: I'm going to request a copy of that report.
[18]   MS. HIDALGO: Well, I will certainly
[19] give it to you. I mean, you know, our discovery
[20] responses aren't even due yet, and we did produce these
[21] early. So, you know, I'm going to give it to you.
[22]   MR. FARNAN: I just want to make sure.
[23]   MS. HIDALGO: If it's responsive to your
[24] request, I certainly will give it to you. In fact, I

Page 29

[1] might even have a copy here. I just don't know.
BY MR. FARNAN:
[3] Q: Did you create any other documents with regard to Mr. Washington?
[5] A: No, I did not.
[6] Q: Did you create any other materials with regard to Mr. Washington?
[8] A: No, I did not.
[9] Q: Do you use e-mail?
[10] A: Do I use e-mail? Yes.
[11] Q: Did you have any e-mail contact with anyone with regard to Mr. Washington?
[13] A: No. That's absolute.
[14] Q: And when would you have created your report?
[15] A: Well, it could have been anywhere within 10 to 15 days after this. Right after — it might have been anywhere from 10 to 15 days after this is done, because you have to put everything together as a package, send it in, Fed Ex it in down to Memphis.
[20] MS. HIDALGO: Is that your report? Why don't you give that to the attorney and he can look at it.
[23] THE WITNESS: This is the subject information on each person I was telling you about.

Page 30

BY MR. FARNAN:
[2] Q: Do you know what Denny Carruth's background was?
[4] A: No, I do not. I just knew he was a district manager.
[6] Q: Do you know where he came from?
[7] A: No, I do not.
[8] Q: Do you know anything about Brandon Diaz?
[9] A: No, I do not.
[10] Q: Do you know if there is an application on file for Denny Carruth?
[12] A: I would assume there would be, but I don't get involved in any of this.
[14] MS. HIDALGO: Hang on. I'm going to object on the basis of foundation, lack of foundation.
[16] Subject to that, you can answer it.
[17] Go ahead.
BY MR. FARNAN:
[19] Q: Do you know whether or not AutoZone requires their employees to file an application before they begin employment?
[22] A: They have to fill out an application and it has to be on file, yes.
[24] Q: Does AutoZone keep those applications?

Page 31

[1] A: I assume they do. They are sent in.
[2] MS. HIDALGO: Let me make an objection. I don't want you to assume or speculate.
[4] THE WITNESS: Okay. Just to my knowledge they are sent in.
BY MR. FARNAN:
[7] Q: Do you know anything about Brandon Diaz's background?
[9] A: No, I do not.
[10] Q: But you did interview Denny Carruth?
[11] A: I did interview Denny Carruth, yes.
[12] Q: You did interview Brandon Diaz?
[13] A: Yes, I did.
[14] Q: Do you know anything about Ralph Findle's background?
[16] A: I don't know his background.
[17] Q: You did interview him, though?
[18] A: Yes, I did.
[19] Q: Do you know anything about Thomas Shehorn?
[20] A: No, not of his background.
[21] Q: Did you interview him?
[22] A: Yes, I did.
[23] Q: Do you know anything about Franklin Wilson's background?

Page 32

[1] A: No, I do not.
[2] Q: Did you interview him?
[3] A: Yes, I did.
[4] Q: I believe we heard earlier that as a result of your investigation, the first investigation —
[6] A: Yes.
[7] Q: — some people were terminated?
[8] A: That is correct.
[9] Q: Who was terminated?
[10] A: Ralph Findle was terminated and also Denny Carruth was terminated.
[12] Q: Was that as a result of your investigation?
[13] A: Yes, it was.
[14] Q: Can you tell us why on this form, and this is D0005, this is your subject information, can you tell us what the action taken on Denny Carruth is?
[17] A: No, I don't record that there. That is decided by AutoZone Relations, and then it is communicated to the regional managers, who go out. Because I have no hire or fire power. I just do the investigation and send it in. Then they make those decisions and communicate it to their regional managers to handle.
[24] Q: But that's a form that you created?

SHANE B. TREESH
November 8, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MELVERT WASHINGTON, JR.,      :
                              :
          Plaintiff           :
                              :   NO. 04-320 (SLR)
     -vs-                     :
                              :
AUTOZONERS, INC.,             :
                              :
          Defendant           :
------------------------------

VIDEOTAPE DEPOSITION of SHANE B. TREESH, taken before Henry J. Karasch, Registered Merit Reporter and Notary Public, at the law offices of Phillips, Goldman & Spence, P.A, 1200 North Broom Street, Wilmington, Delaware 19806, on Tuesday, November 8, 2005, commencing approximately at 10:40 A.M.

COPY

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689