Page 137

[1] introducing myself to the man.
[2] Q: Okay. And you wanted him to know exactly what
[3] your restrictions were as far as what hours you could
[4] work and what hours you could not work at AutoZone.
[5] Correct?
[6] A: Yes.
[7] Q: And it appears that you could actually open
[8] the store Monday through Friday. Correct?
[9] A: Yes.
[10] Q: But you couldn't close the store Monday
[11] through Friday?
[12] A: Yes.
[13] Q: All right. And you could open on Saturdays
[14] and Sundays, but you couldn't close. Is that correct?
[15] A: Yes.
[16] Q: And how did Mr. Robinson receive this letter?
[17] A: He was fine.
[18] Q: You indicate at the bottom — and I am
[19] assuming, Mr. Washington, this is your handwritten note
[20] here at the bottom?
[21] A: Yes.
[22] Q: That Mr. Robinson asked you to reconsider your
[23] transfer request because Mr. Findle at that point was
[24] gone?

Page 138

[1] A: Yes.
[2] Q: So that the supervisor that was causing the
[3] problems no longer existed?
[4] A: Yes.
[5] Q: And that he was short on employees?
[6] A: Yes.
[7] Q: Do you recall that conversation that he had
[8] with you?
[9] A: Yes.
[10] Q: Did you agree at that point, okay, yes, I will
[11] stay at the store?
[12] A: Yes.
[13] Q: Then five days later it looks like you sent
[14] the same memo as Exhibit 21 to Mr. Brian Paduano?
[15] A: Pa-du-do. That's how I pronounce it.
[16] Q: Can we call him Brian?
[17] A: Sure.
[18] MS. HIDALGO: And I'm marking that as
[19] Exhibit 22. It's a note to Brian P. from Mr. Washington
[20] dated September 25, 2000.
[21] (Washington Deposition Exhibit No. 22
[22] was marked for identification.)
[23] BY MS. HIDALGO:
[24] Q: And what was the purpose, Mr. Washington, of

Page 139

[1] giving this memo to Brian?
[2] A: I do believe that in the difference of, what,
[3] 17 days Brian Paduano was introduced to the store as
[4] well. So he was another incoming manager, and we were
[5] still experiencing a lot of change. So the managers
[6] always told us, voice your desires to me as far as when
[7] you are available to work, because I make my schedule,
[8] give me enough notice so I know when you are available so
[9] when I make my schedule it won't cause any conflicts.
[10] Q: Got you.
[11] And I see that actually Richard Robinson
[12] was no longer your DM, it was now Emanuell Kitchen?
[13] A: Yes. Well, Greg, Greg Antzell was the — he
[14] was another manager. Richard Robinson and Greg Antzell
[15] were different managers that were coming in from
[16] different regions to run the store because we really
[17] weren't sure who the manager was going to be.
[18] Q: Well, they hadn't selected a permanent
[19] replacement?
[20] A: They hadn't selected a permanent replacement.
[21] And Brian Paduano was in the same category of
[22] Mr. Robinson and Mr. Antzell, but I do believe Emanuell
[23] Kitchen was the replacing district manager that replaced
[24] Dennis Carruth.

Page 140

[1] Q: Who was that? I'm sorry.
[2] A: Dennis Carruth.
[3] Q: No, who replaced him?
[4] A: Emanuell Kitchen.
[5] Q: Did you have any problems with Mr. Kitchen?
[6] A: No.
[7] Q: What about Brian, did you have any problems
[8] with him?
[9] A: No.
[10] Q: A couple months later you had occasion to sit
[11] down again with Mr. Wertz, I believe in October of 2000.
[12] October of 2000. Do you recall that?
[13] A: Yes. I think I recall meeting with him in the
[14] store later that year. I just don't know what it was
[15] about.
[16] Q: I'm going to show you a statement. Hopefully
[17] that will jog your memory.
[18] I'm marking as 23 Mr. Washington's
[19] statement to Mr. Wertz taken —
[20] MR. REED: Wouldn't that be 25, Counsel?
[21] This will be 23?
[22] MS. HIDALGO: I think so. 23 is your
[23] statement to Mr. Wertz given 10/13/2000.
[24] (Washington Deposition Exhibit No. 23

Page 141

[1] was marked for identification.)
[2]   THE WITNESS: Okay.
[3]           BY MS. HIDALGO:
[4]   Q: Do you know why Mr. Wertz came to you in
[5] October of 2000 to take this statement? Did he explain
[6] to you why he was there?
[7]   A: I think I remember this now.
[8]   Q: Okay.
[9]   A: I think somebody, if I'm not mistaken, I think
[10] somebody had mentioned or said something, or there was
[11] some hearsay that I had discussed the incident or the
[12] investigation or contents of it after the fact.
[13]   Q: The investigation involving Mr. Findle?
[14]   A: Yes.
[15]   Q: Okay. Is that what Mr. Wertz told you as his
[16] reason for being there?
[17]   A: Yes. And that he had heard, I think, that —
[18] let me read this statement a little bit.
[19]   Q: Sure.
[20]   A: Okay. Now I remember, looking at the second
[21] page.
[22]   Q: Uh-huh.
[23]   A: And it was in reference to this question.
[24] This is why I think Mr. Wertz and I got together, it was

Page 142

[1] in reference to the question where somebody had made a
[2] false statement stating that I said if I have any problem
[3] with any employee, I can get you fired just by talking to
[4] someone higher up. I think that was the gist of it right
[5] there. And then Mr. Wertz contacted me and asked me is
[6] this true.
[7]   Q: Okay.
[8]   A: And I told him that it was not true, I don't
[9] know where this came from, and the first time I heard it
[10] was when he approached me with it.
[11]   Q: Okay. Did Mr. Wertz treat you with respect
[12] during this investigation?
[13]   A: Yes.
[14]   Q: Did you ever have any problems with Mr. Wertz?
[15]   A: No.
[16]   Q: Now, you worked with an individual by the name
[17] of Richard Henion. Is that correct? He was a parts
[18] manager at Smyrna. Do you recall him?
[19]   A: Richard Henion?
[20]   Q: Yes.
[21]   A: That name sounds familiar.
[22]   Q: Do you recall having any problems with
[23] Mr. Henion?
[24]   A: No.

Page 143

[1]   Q: I mean, he never did anything to cause you to
[2] question his integrity?
[3]   A: The name sounds familiar, I just don't recall
[4] anything.
[5]   Q: Did you ever say to Mr. Henion that it
[6] wouldn't take much to get someone out on the street, I've
[7] had many people taken out of here and I can do it again?
[8]   A: No. No, I never made any comments like that.
[9]   Q: Did you ever threaten Mr. Henion?
[10]   A: I'm having a hard time even remembering who
[11] Mr. Henion is.
[12]   Q: Okay. All right.
[13]       Do you recall discussing with Brian what
[14] happened with regard to Mr. Findle's being fired?
[15]   A: I believe Brian may have mentioned something
[16] to me saying something on the nature of, I guess we all
[17] have to walk around on eggshells, or something like that,
[18] now. Other than that, I don't recall discussing anything
[19] like that with him.
[20]   Q: Brian indicates that you spoke at length about
[21] your past situation involving prior management, and that
[22] he told you that he had gotten the manager fired. Do you
[23] recall telling him that?
[24]   A: No.

Page 144

[1]   Q: Did Brian ever indicate to you that he felt
[2] like he was threatened by you?
[3]   A: No. Not except one comment that he made once,
[4] and he said, well, I guess we all have to walk around
[5] here on eggshells now around you, when we are around you.
[6]   Q: Do you know why he would have made that
[7] statement but for you telling him about the prior
[8] situation?
[9]   A: I have no idea.
[10]   Q: Do you think that it's appropriate to discuss
[11] what happened with Mr. Findle and Mr. Carruth to other
[12] employees in the store that had never worked with those
[13] fellows?
[14]   A: I think it's inappropriate, yes.
[15]   Q: And if that's something that you did, that
[16] would be grounds for AutoZone to be concerned, wouldn't
[17] it?
[18]   A: Yes, exactly.
[19]   Q: Do you remember an employee by the name of
[20] James Zambrano?
[21]   A: Yes, I do.
[22]   Q: He was a PSM?
[23]   A: Yes.
[24]   Q: Okay. Did you ever have any problems with

Page 145

[1] Mr. Zambrano?
[2] A: No.
[3] Q: Did you ever tell Mr. Zambrano that you had
[4] gotten Ralph Findle fired?
[5] A: No.
[6] Q: Did you ever tell Mr. Zambrano that all you
[7] had to do was pull out your pen and paper to get somebody
[8] fired?
[9] A: No.
[10] Q: Did Mr. Zambrano ever do anything that would
[11] cause you to question his integrity while you worked with
[12] him?
[13] A: No.
[14] Q: Do you have any idea why he would give such
[15] information to Mr. Wertz?
[16] A: No.
[17] Q: Thomas Shehorn, we've talked about him
[18] earlier. He was a parts sales manager. Correct?
[19] A: Yes.
[20] Q: And you never had any problems with him?
[21] A: No.
[22] Q: Did you complain to your other co-workers that
[23] the closing team didn't do a good job?
[24] A: Can you be more specific?

Page 146

[1] Q: I understand that there are closing tasks that
[2] are to be accomplished in the stores?
[3] A: Yes, that's correct.
[4] Q: That when the opening team arrives to the
[5] store at 7:30 in the morning, the store is basically
[6] ready for business?
[7] A: Yes, that's correct.
[8] Q: And you opened a fair amount of times, didn't
[9] you?
[10] A: Yes. That's correct.
[11] Q: Okay. Did you complain to the other employees
[12] about the store recovery?
[13] A: I talked to management.
[14] Q: How often did you complain about that?
[15] A: I can't recall, but I do recall mentioning to
[16] management that certain tasks that were prerequisites and
[17] should have been done at the end of the night, they
[18] weren't done at opening the next morning.
[19] Q: Did you complain more than ten times about
[20] that?
[21] A: I don't recall how many times I complained.
[22] Q: Is it possible that you complained more than
[23] ten times?
[24] A: I don't recall.

Page 147

[1] Q: Do you recall telling Mr. Shehorn that you
[2] will have everybody's job, that you will have your lawyer
[3] contact someone higher up in the company if you don't
[4] do — if he didn't do anything about the tasks getting
[5] done? Did you make that statement to him?
[6] A: I don't recall making that statement.
[7] Q: Is it possible that you did?
[8] A: No, it's not.
[9] Q: So you are denying that?
[10] A: Yes, I am.
[11] Q: Do you know why Mr. Shehorn would tell
[12] Mr. Wertz that?
[13] A: No, I don't.
[14] Q: Did you use the word mother fucker in the
[15] workplace?
[16] A: Nope.
[17] Q: You never used the word mother fucker in the
[18] workplace?
[19] A: No.
[20] Q: So if Mr. Shehorn said that, in fact, you did,
[21] he would be lying?
[22] A: That's correct.
[23] Q: Do you know a person by the name of Shaun
[24] Permelia?

Page 148

[1] A: Yes. Yes, I do.
[2] Q: He was a co-worker of yours. Correct?
[3] A: Yes, that's correct.
[4] Q: Did you have any problems with him?
[5] A: Shaun, yes, I did, to answer your question.
[6] Yes.
[7] Q: Okay. What was the problem that you had with
[8] Shaun?
[9] A: After I believe Ralph had been terminated and
[10] the store had went through some changes, Shaun came to
[11] work at the store. And he was on the phone one day, and
[12] I believe Brian Paduano was the manager on duty, and
[13] Shaun was on the phone talking to a customer about a tie
[14] rod end or a part, and he was saying your boy has your
[15] part for you. And when he said that, you know, he looked
[16] direct at me. He was on the phone and turned around and
[17] looked directly at me and said, your boy has your part
[18] for you. And I believe I may have been looking up the
[19] part on the computer in the inventory. And that's a
[20] problem that he and I did have.
[21] Q: Did you have any other problems with Shaun?
[22] A: I'm sorry, what was that again?
[23] Q: Did you have any other problems with Shaun
[24] besides him saying your boy's got your part?

Page 149

[1] A: No.
[2] Q: And he didn't say it to you, he said it to the
[3] customer on the phone?
[4] A: He was on the phone with the customer talking
[5] to a customer when he used the word your boy has your
[6] part for you.
[7] Q: He looked at you?
[8] A: He turned around and looked directly at me and
[9] said your boy has your part for you.
[10] Q: Did you tell Mr. Permelia that you didn't
[11] appreciate that?
[12] A: Yes, I did.
[13] Q: What was his response?
[14] A: That's when he made a response, we all don't
[15] have to walk around on eggshells, I guess we have to
[16] walk around on eggshells now.
[17] Q: I thought Brian said that to you, not Shaun?
[18] A: Well, Brian said it.
[19] Q: And did Shaun have any response?
[20] A: He was still on the telephone.
[21] Q: Did you ever address him?
[22] A: After he got off the telephone.
[23] Q: Tell me what happened in that conversation?
[24] A: I told him I would appreciate if you wouldn't

Page 150

[1] use that term when referring to me because I find it
[2] offensive and it causes problems. So find another word
[3] to use other than that. Call me Mel, but don't refer to
[4] me as your boy has your part for you.
[5] Q: Did he apologize?
[6] A: No, he didn't.
[7] Q: Did he ever call you boy again?
[8] A: No, he did not.
[9] Q: Did you tell Shaun that you could take
[10] people's jobs?
[11] A: No, I did not.
[12] Q: And you never said in his presence dumb white
[13] mother fucker?
[14] A: No, I did not.
[15] Q: Do you have any idea why he would tell
[16] Mr. Wertz you did those things?
[17] A: No, I don't.
[18] Q: Did you ever stare down Mr. Permelia?
[19] A: Not to my knowledge. I don't recall.
[20] Q: Is it possible that you did and just don't
[21] recall?
[22] A: It's possible that I did not do that.
[23] Q: But is it possible that you did do it?
[24] A: No, it's not.

Page 151

[1] Q: So you are denying it?
[2] A: Yes, I am.
[3] Q: Robert Baker, do you have any problems with
[4] Mr. Baker?
[5] A: Yes.
[6] Q: What were the problems you had with Mr. Baker?
[7] A: Mr. Baker was a parts sales manager, and when
[8] he and I were assigned to work on the same register, cash
[9] register during the day, the register would come up short
[10] of money at the end of the night.
[11] Q: You suspected that Mr. Baker was stealing
[12] money from your register?
[13] A: I suspected somebody was stealing money, but
[14] the only two people that ran the register that day was
[15] Mr. Baker and myself.
[16] Q: So obviously you suspected Mr. Baker?
[17] A: Yes. And Mr. Baker on another occasion had
[18] said that he found $25 under the drawer inside the
[19] register that he and I had been running one day, or the
[20] register that I had been running, and he was pulling the
[21] register down for reconciliation or recount or closing it
[22] out at the end of the day. He said he found money and
[23] the money could not be accounted for where it came from.
[24] Q: So was it an overage or was there a shortage

Page 152

[1] somewhere else in the store of $25?
[2] A: I don't know. I don't know.
[3] Q: Well, what did he do with the $25 that he
[4] found under the register; do you know?
[5] A: He took the money and I guess he turned it in
[6] to the store manager.
[7] Q: So what's the problem with that? Do you have
[8] a problem with that?
[9] A: No.
[10] Q: Did you ever turn Mr. Baker in to LP?
[11] A: I don't recall if I turned Mr. Baker in to LP.
[12] Loss prevention?
[13] Q: Yes. LP is loss prevention. Did you know
[14] that?
[15] A: Yes, I do.
[16] Q: Did you know that Mr. Wertz was the loss
[17] prevention advisor?
[18] A: I thought at one time Pat Boone was loss
[19] prevention, and it moved from Pat Boone to the Human
[20] Resources Director.
[21] Q: Was it Brett Boone? Is that who you are
[22] referring to?
[23] A: Brett Boone, yes Mr. Boone.
[24] Q: You didn't know that Mr. Wertz was the loss

Page 153

[1] prevention advisor?
[2] A: I think at one point he was, but I think that
[3] they removed that function from him and gave it to
[4] somebody else.
[5] Q: Okay. Mr. Wertz had given you his phone
[6] number, did he not, so you could call him if you had
[7] problems?
[8] A: Which one were you referring to?
[9] Q: I believe he gave you his home phone number?
[10] A: Mr. Wertz gave me the 1-800 number for his
[11] voice mail with AutoZone.
[12] Q: Did he ever give you his home number?
[13] A: He gave me his business card, and on his
[14] business card I believe his home phone number may have
[15] been written on it.
[16] Q: Did you ever call him at home?
[17] A: I think I did, yes.
[18] Q: Do you recall why you called him at home?
[19] A: We had developed a certain, I guess,
[20] friendship, and I called him at home basically just to
[21] say hello, how are you today, and things like that.
[22] Q: Did you have any other problems with Mr. Baker
[23] other than there was a cash shortage when you all would
[24] be closing together and the $25 that was found under the

Page 154

[1] register?
[2] A: Mainly it was cash shortages. Cash shortages
[3] and money problems pertaining to an overage or shortage
[4] of money at night when we were closing the register. And
[5] the policy was if it was over a certain amount, then it
[6] would be called in to loss prevention.
[7] Q: Do you have any idea what Mr. Baker's
[8] qualifications were before he came to AutoZone, what his
[9] past experience was?
[10] A: No, I don't.
[11] Q: Did he seem to have a pretty good handle on
[12] automotive knowledge?
[13] A: In regards to?
[14] Q: Selling parts.
[15] A: He was average.
[16] Q: I mean, he wasn't incompetent, was he?
[17] A: I can't answer that question. I don't know.
[18] Q: I mean, you don't know what his qualifications
[19] were? In other words, you don't know what his past
[20] experience was?
[21] A: No.
[22] Q: Did you ever threaten Mr. Baker?
[23] A: No.
[24] Q: Did you ever stare him down?

Page 155

[1] A: No.
[2] Q: And did you ever say in his presence, I'll get
[3] your shit, mother fucker?
[4] A: No.
[5] Q: Any idea why he would tell Mr. Wertz that you
[6] said that?
[7] A: No, I did not.
[8] Q: Do you have any idea why six employees would
[9] make up these things about you?
[10] A: I have no idea.
[11] Q: Now, you didn't receive any discipline as a
[12] result of the statement you gave to Mr. Wertz in October
[13] of 2000, did you?
[14] A: No.
[15] Q: Who is Sandra Surman? Do you know who that
[16] is?
[17] A: Yes.
[18] Q: Who is she?
[19] A: Sandra Surman was a, or is a friend of mine.
[20] Q: What kind of friend? Girlfriend?
[21] A: When I was working on my degree, she would
[22] type papers for me, reports.
[23] Q: I mean, did you and she have a romantic
[24] relationship?

Page 156

[1] A: No.
[2] Q: It was just a social relationship?
[3] A: She just typed papers for me.
[4] Q: How long have you known Sandra?
[5] A: Probably the first time I met Sandra was when
[6] I was working at Delaware State College. I think she was
[7] one of the professor's secretaries. I was coming through
[8] the offices cleaning the office, emptying the trash can,
[9] dust mopping the floor, and she was subbing for a
[10] secretary that was out.
[11] Q: Did you ask her to write a statement on your
[12] behalf in October of 2000?
[13] A: She told me at one time she called the store
[14] and asked for me and she had a really hard time getting
[15] through and she was handled kind of rough. And she
[16] mentioned that it was Shaun Permelia and that it had
[17] happened on more than one occasion. So I said —
[18] Q: So you asked her to write the statement for
[19] you. Is that correct?
[20] A: She wanted to write a statement. She asked
[21] me, what can be done? I said, well, then, you need to —
[22] Q: Write a statement?
[23] A: Let somebody knows what's going on. Talk to
[24] management. So if you want to let someone know what's

Page 157

[1] going on, then put down your side of what happened.
[2] Q: So you asked her to write a statement?
[3] A: She asked me what to do, and I said, write
[4] your statement if you have something to say.
[5] (Washington Deposition Exhibit No. 24
[6] was marked for identification.)
[7] BY MS. HIDALGO:
[8] Q: Exhibit 24 is the statement by Ms. Surman
[9] dated 10/11/2000. Do you recognize that?
[10] A: Yes, I do.
[11] Q: Did she give you that to give to somebody, or
[12] do you know?
[13] A: I think after she wrote the statement she may
[14] have given it to me.
[15] Q: And you delivered it to whom, if anybody?
[16] A: I think I didn't do anything with this
[17] statement after she wrote the statement. I think what I
[18] probably did was after the — after the AutoZone versus
[19] Melvert Washington got started, Professor Reed asked me
[20] to give him everything that I had as far as statements
[21] and things like that, and I think this is one of the
[22] items that I gave Professor Reed and his interns that
[23] were helping him on my case.
[24] Q: Okay. So you basically hung onto the

Page 158

[1] statement, and then when the professor asked you for your
[2] documents you gave it to him?
[3] A: I think so.
[4] Q: Okay. Now, on this particular exhibit,
[5] Exhibit 24, third paragraph she says, I was on my way out
[6] of town and I needed to speak with Mr. Washington
[7] regarding some business matters.
[8] Do you know what type of business
[9] matters she had to discuss with you?
[10] A: No, I can't — I can't recall.
[11] Q: I mean, do you all do business together or
[12] something?
[13] A: No.
[14] Q: Do you know why she would say that?
[15] A: It's been such a long time, I can't recall.
[16] Q: Were you aware, Mr. Washington, prior to today
[17] that these six employees, Mr. Baker, Mr. Permelia,
[18] Mr. Shehorn, Mr. Zambrano, Mr. — well, Brian, were you
[19] aware that all of these individuals had given statements
[20] to Mr. Wertz indicating that they felt threatened by you?
[21] A: No, this is the first time I saw the
[22] statements today.
[23] Q: You felt like you had a good working
[24] relationship with all the folks there except for perhaps

Page 159

[1] Shaun?
[2] A: Yes, and Ralph.
[3] Q: And you requested a transfer of Mr. Sikandar?
[4] Do you recall requesting of Mr. Sikandar a transfer in
[5] October of 2000?
[6] A: Yes.
[7] Q: And that was based on the fact that Shaun had
[8] referred to you or had been on the phone and said your
[9] boy has your part? Is that why you made the request?
[10] A: Well, that's one part of it.
[11] Q: What was the other part?
[12] A: The other part was I didn't see a lot of
[13] stability in the store.
[14] Q: In what respect?
[15] A: Some of the people had no cares, attitudes
[16] about the job. And then again, I think you had mentioned
[17] somebody to me earlier, had I ever complained to anybody
[18] about closing tasks not being done. And that was another
[19] factor, closing tasks not being done at the end of the
[20] night by closing managers closing AutoZones, like empty
[21] the trash, mop the floor, sweep the floor, restock the
[22] shelves, clean the restroom, things of that nature that
[23] needed to be done, and none of those things were done.
[24] The trash can would be left sitting outside of the store

Page 160

[1] full of trash, not dumped, and I would come in in the
[2] morning time to open the store with an opening manager
[3] and the manager, whoever it would be, would say, Mel, you
[4] know, we've got to get all of this stuff done before we
[5] open because if a DM or somebody comes by and sees that,
[6] we will be in trouble.
[7] Q: So basically you didn't want to work with a
[8] bunch of slackers?
[9] A: Well, yes.
[10] Q: All right. And so based on what Shaun said
[11] with the reference to boy, as well as the fact that
[12] everybody you worked with were slackers, that's why you
[13] wanted out. Is that a fair characterization?
[14] A: Yes.
[15] (Washington Deposition Exhibit Nos. 25
[16] and 26 were marked for identification.)
[17] BY MS. HIDALGO:
[18] Q: And I have marked a memo sent to Mr. Sikandar
[19] dated 10/12/200, and Exhibit 26 is a three-page fax to
[20] Mr. Sikandar from Mr. Washington.
[21] Let me show you these documents.
[22] Exhibit 25, did you actually give this
[23] to Mr. Sikandar; do you recall?
[24] A: Yes.

Page 161

[1] Q: And then Exhibit 26, what is that?
[2] A: I faxed this to Mr. Sikandar.
[3] Q: Is it the same thing as 25?
[4] A: Yes, it looks like it.
[5] Q: Okay. Well, let's look at 26. You indicate
[6] that you had been — you had the option of — look at the
[7] second page. You had the option of going to the Dover
[8] store, 1152, but you declined to exercise that option.
[9] Is that correct?
[10] A: Yes.
[11] Q: Okay. But at this point, as of October 12,
[12] 2000, you wanted to go ahead and go to Dover. Correct?
[13] A: October 16th.
[14] Q: Mm-hmm.
[15] A: That's when I indicated it is clear now I made
[16] a big mistake, I didn't exercise my option earlier after
[17] the initial investigation and Mr. Wertz was trying to
[18] arrange the transfer for me and Mr. Richard Robinson
[19] talked to me and said he was short of people, manpower.
[20] I said, okay, I will stick around because it seems like
[21] the problem has been solved, okay. And then later things
[22] went on, we got new people, new AutoZoners in the store,
[23] closing tasks weren't done, your boy has got your part,
[24] things like that, and I could see it just wasn't a

Page 162

[1] professional attitude. People didn't care. It just
[2] wasn't there.
[3] So, yeah, I did fax a letter to Sikandar
[4] October 16. This is my fax transmittal cover sheet that
[5] I used at the time, and I faxed it to him asking for a
[6] transfer to the 1152 store.
[7] Q: Do you know whether or not 1152 had an opening
[8] for a part-time red shirt?
[9] A: I don't know. I don't know whether they had
[10] openings or not. I can't honestly say.
[11] Q: And Debbie Caulk was the manager at the Dover
[12] store. Is that correct?
[13] A: Yes.
[14] Q: Did you know that Mr. Wertz investigated your
[15] allegation regarding Mr. Permelia's use of the word boy?
[16] A: No.
[17] MS. HIDALGO: I will mark as 27 a copy
[18] of a statement from Mr. Permelia to Mr. Wertz dated
[19] 10/18/2000.
[20] (Washington Deposition Exhibit No. 27
[21] was marked for identification.)
[22] THE WITNESS: I can't read this.
[23]     BY MS. HIDALGO:
[24] Q: You can't read his handwriting?

Page 163

[1] A: The part after "what was the remark" I can't
[2] read.
[3] Q: "The customer was on the phone with me because
[4] he left a part in the store that Mel had in his
[5] possession. Then I said, yes, your boy said to come in
[6] and get it." The person I said that was — "the reason I
[7] said that was because I thought they were friends and boy
[8] I said was slang," was a slang word for friend.
[9] And he's asked, "Did you mean this
[10] racially?"
[11] And he says, "No, not at all."
[12] Do you agree with Mr. Permelia's
[13] characterization of the incident.
[14] A: No. And this is the first time I saw this
[15] statement.
[16] Q: No, I understand it's the first time that you
[17] saw it. But you don't believe it's possible that he
[18] thought you were friends with this guy and he was just
[19] using the word boy as friend?
[20] A: Said that the person —
[21] Q: Said that you were friends with the person.
[22] A: That was a customer. I didn't even know the
[23] man.
[24] Q: Have you ever heard boy used in the context of

Page 164

[1] friends?
[2] A: Yes.
[3] Q: But you're not going to give him the benefit
[4] of the doubt on that one, are you?
[5] A: Not in that context.
[6] Q: All right. When did Brian leave and Leon take
[7] over?
[8] A: I think Leon took over maybe November of that
[9] same year.
[10] Q: November of 2000?
[11] A: I think so.
[12] Q: Do you know what happened to Brian?
[13] A: I think he went back to work for Pep Boys in
[14] Bear, Delaware, I think.
[15] Q: Did you have any problems with Mr. Bynum, Leon
[16] Bynum?
[17] A: When he first came in?
[18] Q: Yes.
[19] A: No.
[20] Q: When was the first time you had a problem with
[21] Mr. Bynum that you can recall?
[22] A: The first time?
[23] Q: Yes.
[24] A: I believe Mr. Bynum was trying to write me up.

Page 165

[1] He said I had let a customer take a part outside and
[2] install it on their vehicle outside the store without
[3] paying for it.
[4] Q: That was the first problem you had with
[5] Mr. Bynum?
[6] A: Yes, I believe that was the first time.
[7] Q: Okay. Let me get that corrective action so we
[8] can talk about it.
[9]    While I'm looking for it, what was your
[10] understanding as to letting parts go out of the store
[11] without payment?
[12] A: Well, managers, parts sales managers and red
[13] shirts — managers, parts sales managers, red shirts, it
[14] was common practice from when — from my first days at
[15] AutoZone I had seen everybody take parts outside and let
[16] customers compare the parts with the area where they were
[17] going to install them on the vehicle to make sure that
[18] they were the correct parts, that they would work.
[19] Sometimes the managers were with the customers, sometimes
[20] the customers went alone.
[21] Q: Okay.
[22] A: And this was always done. The only thing we
[23] required was that the customer leave identification, a
[24] driver's license preferably, with us to make sure that if

Page 166

[1] they went outside and never came back we knew who they
[2] were.
[3] Q: But it would be a violation of AutoZone policy
[4] to — I mean, I understand a customer will come in, want
[5] a part to compare it to the old part, but it would be a
[6] violation of AutoZone policy to allow that customer to
[7] actually install the part on the vehicle before paying
[8] for it. Correct?
[9] A: Yes.
[10] Q: That's a different story, isn't it?
[11] A: Yes.
[12] (Washington Deposition Exhibit No. 28
[13] was marked for identification.)
[14]           BY MS. HIDALGO:
[15] Q: All right. Why don't you take a look at
[16] Exhibit 28, which is a correction action dated 5, I think
[17] it's 5/14/02.
[18] A: Okay.
[19] Q: Now, according to Mr. Bynum, the violation was
[20] the customer actually installed the belts before they
[21] were paid for?
[22] A: Okay.
[23] Q: Is that your recollection as to what happened?
[24] A: No.

Page 167

[1] Q: Okay. What is your recollection as to what
[2] happened?
[3] A: My recollection as to what happened, a
[4] customer came in the store, I was on the parts counter,
[5] they asked for two belts because they wanted to — they
[6] needed two belts for the car. So they told me what they
[7] needed, I gave them the two belts. The customer said he
[8] had to go outside to make a comparison to make sure these
[9] were going to fit. I asked the customer to leave his
[10] driver's license with me. I took the driver's license
[11] and placed it on the register terminal so that when the
[12] customer came back in we could — to pay for it, and if
[13] he didn't come back we could identify that the parts left
[14] and the customer stole them and never came back.
[15]    Now, when the customer was outside,
[16] Mr. Bynum came to me and asked me to do something else in
[17] the store, okay. And while I was on this other task,
[18] then Mr. Bynum came to me later and asked me where are
[19] the belts? And I said, well, the customer is comparing
[20] the belts outside. And I said, the driver's license is
[21] on the register. We went back to the register. The
[22] license was gone off of the register and I never saw the
[23] customer again. That's my recollection.
[24] Q: So the customer stole the belts?

Page 168

[1] A: I don't know. I don't know what happened to
[2] the belts. I don't know what happened to the customer.
[3] Q: And you don't believe you should have been
[4] written up for that?
[5] A: No.
[6] Q: Well, why not? I mean, you have a customer
[7] who came in and took these belts, apparently didn't pay
[8] for them. Why don't you think the corrective action was
[9] justified?
[10] A: Because I did exactly what I was trained to
[11] do.
[12] Q: Well, Mr. Washington, you didn't monitor what
[13] the customer was doing, did you?
[14] A: I could not monitor what the customer was
[15] doing because Leon Bynum pulled me away from that sales
[16] scenario and sent me on another task in the store.
[17] Q: You didn't tell Mr. Bynum at that time, hey,
[18] I'm watching this guy?
[19] A: Yes. Yes, I did.
[20] Q: Oh, you did?
[21] A: I said, I have a customer outside with two
[22] belts and the driver's license is on the register.
[23] Q: Okay. To your knowledge, has anybody else
[24] been written up for allowing people to take merchandise

Page 169

[1] out and install them in their vehicle prior to payment?  
[2]   A: Not to my knowledge.  
[3]   Q: But you have just acknowledged to me that if,  
[4] in fact, a customer is allowed to install a part before  
[5] they pay for it, that's a violation of AutoZone policy.  
[6] Correct?  
[7]   A: That's correct.  
[8]   Q: And I see it's a verbal warning. Is that  
[9] what's checked on yours?  
[10]   A: That's what's checked on here.  
[11]   Q: All right. So this corrective action, I don't  
[12] know if it's 5/14 or 5/17/02, this is the first problem  
[13] you had with Mr. Bynum?  
[14]   A: Yes.  
[15]   Q: So you all worked together from November of  
[16] 2001 to May of 2002 without incident. Is that fair?  
[17]   A: Yes.  
[18]   Q: Okay. Do you recall receiving a corrective  
[19] action from Mr. Bynum for calling out of work in February  
[20] of '01?  
[21]   A: I don't recall, but if there is some  
[22] paperwork, I can see it.  
[23]      (Washington Deposition Exhibit No. 29  
[24] was marked for identification.)

Page 170

[1]      BY MS. HIDALGO:  
[2]   Q: 29 is a corrective action dated 2/8/01 from  
[3] Mr. Bynum.  
[4]   A: The first time I saw this.  
[5]   Q: Okay. Do you recall the facts surrounding  
[6] this corrective action review?  
[7]   A: It's possible, yeah, that I called out on  
[8] February 8, 2001, called in and said I'm sick, I won't be  
[9] coming in today. It's possible.  
[10]   Q: So you are not claiming this corrective action  
[11] was unjustified, are you?  
[12]   A: I'm claiming that I called out for sick and  
[13] this is the first time I've seen this paper. But if the  
[14] company feels it's justified, then they are going to do  
[15] what they have to do.  
[16]   Q: Well, my question is: Do you feel like the  
[17] corrective action is justified?  
[18]   A: I feel as though I'm justified. I'm trying to  
[19] understand your question.  
[20]   Q: You felt it was?  
[21]   A: Unjustified.  
[22]   Q: Why, if you called out? Why would you feel  
[23] like it was unjustified?  
[24]   A: Because I did not fail to call out sick. I was

Page 171

[1] unable to come to work, I was sick, so I called out and  
[2] said I won't be in today, I am sick. And —  
[3]   Q: How do you know you were sick? You just told  
[4] me you don't remember.  
[5]   A: I'm sorry, I don't understand the question  
[6] again.  
[7]   Q: How do you know you were sick? You said you  
[8] don't remember the incident. How do you remember you  
[9] were sick and that was the reason for the call-out?  
[10]   A: Well, I do recall calling out sick.  
[11]   Q: In February of '01?  
[12]   A: Yes.  
[13]   Q: Okay. So you weren't able to work the  
[14] schedule that you were assigned that day?  
[15]   A: Yes.  
[16]   Q: And you don't believe that that's grounds for  
[17] discipline?  
[18]   A: No.  
[19]   Q: Do you know of anybody who called out sick  
[20] that did not get written up?  
[21]   A: No, I don't monitor that.  
[22]      (Washington Deposition Exhibit No. 30  
[23] was marked for identification.)  
[24]      BY MS. HIDALGO:

Page 172

[1]   Q: All right. You wrote a letter to Mr. Bynum  
[2] and Mr. Kelston not long after that, February 26th, '01,  
[3] and I've marked that as Exhibit 30. Take a look at that.  
[4]   A: Okay.  
[5]   Q: Now, what was the purpose of giving this to  
[6] Mr. Kelston and Mr. Bynum?  
[7]   A: What was the purpose of giving this to Kelston  
[8] and Mr. Bynum?  
[9]   Q: Yes.  
[10]   A: If I understand this correctly, I think my  
[11] hours were being cut.  
[12]   Q: Your hours were being cut?  
[13]   A: (Witness nods head in the affirmative.)  
[14]   Q: Okay. So you were informing Mr. Bynum exactly  
[15] the parameters of when you could work and when you  
[16] couldn't work. Is that right?  
[17]   A: This particular letter here I think I had  
[18] called out sick for work.  
[19]   Q: Okay.  
[20]   A: Okay. And then I think as a result of this  
[21] conversation when I was calling out sick for work, I  
[22] think in the middle of the conversation maybe Leon had  
[23] put Kelston, not Kelston, Emanuell Kitchen on the phone.  
[24]   Q: Okay.

Page 173

[1] A: And I think this is the letter that we are
[2] talking about that resulted in this write-up.
[3] Q: Corrective action, you're right.
[4] Well, the subject of the letter is
[5] availability and Autozone flexibility. Weren't you
[6] trying to communicate to your managers, this is when I
[7] can work, this is when I'm available? Is that —
[8] A: Yes.
[9] Q: I'm not trying to put words in your mouth, but
[10] it seems like that's what the letter says. Correct?
[11] A: I was trying to keep the lines of
[12] communication open to avoid any further corrective
[13] action.
[14] Q: Okay. I know you never did the schedule, but
[15] did you understand the schedule is done a week ahead of
[16] time?
[17] A: Yes.
[18] Q: And full-time employees are guaranteed between
[19] 36 and 40 hours. Were you aware of that?
[20] A: I don't know exactly how many hours they are
[21] guaranteed, but I know they were guaranteed some hours.
[22] Q: Were you aware that when the schedule is made
[23] those hours were first given to management and full-time
[24] employees, and then whatever is left over is given to the

Page 174

[1] part-time employees?
[2] A: Yes.
[3] Q: And then part-time employees can either work
[4] the hours if they are available or not. Was that your
[5] understanding?
[6] A: My understanding was a little different, that
[7] part-timers get at least 15 hours a week.
[8] Q: Okay. Who ever told you that?
[9] A: Ralph Findle told me that. Frank Wilson told
[10] me that. Antonio Farley told me that.
[11] Q: Have you ever seen that policy in writing?
[12] A: No.
[13] Q: You never got 15 hours a week on a continuous
[14] basis, did you?
[15] A: Continually?
[16] Q: Yes.
[17] A: Sometimes I probably got 15. Maybe sometimes
[18] I got more.
[19] Q: And sometimes you got less?
[20] A: True.
[21] Q: All right. So as of February 26th of 2001,
[22] you were requesting a 5:00 p.m. to 8:30 p.m. schedule.
[23] Right?
[24] A: Which page are we on?

Page 175

[1] Q: I'm on the first page.
[2] A: What paragraph, the last paragraph?
[3] Q: The last paragraph. "I requested a 5:00 p.m.
[4] to 8:30 p.m. schedule due to the fact I only have Tuesday
[5] and Wednesdays off on my full-time job and most of the
[6] time I would use that time to leave the state going to
[7] Virginia or conduct personal business"?
[8] A: Can I write on this?
[9] Q: No. That's an exhibit.
[10] A: During this conversation that Leon Bynum and I
[11] had on the phone, Leon Bynum gave the phone to Emanuell
[12] Kitchen and Emanuell Kitchen asked me to give him
[13] something in writing based on when I could work. This
[14] last paragraph I am talking about on the first page. So
[15] that's what this is about.
[16] Q: Okay. And it appears that you are saying that
[17] you can work 5:00 p.m. to 8:30 p.m., but you can't work
[18] on Tuesdays and Wednesdays because that's when you have
[19] time off from your full-time job and you need that time
[20] to conduct personal business. Correct?
[21] A: Yes. Yes. Going out of state. Because those
[22] were days that I had set up with my family to go out of
[23] state and take care of personal business.
[24] Q: What kind of personal business were you taking

Page 176

[1] care of?
[2] A: I was dealing with my ill mother and father.
[3] Q: All right. And you were further limited
[4] because you were attending classes two nights a week.
[5] Correct?
[6] A: What paragraph are you referring to?
[7] Q: I am on the very next page.
[8] A: First paragraph?
[9] Q: Yes.
[10] A: First paragraph or second paragraph?
[11] Q: "I answered" —
[12] A: Yeah, I am attending classes two nights a
[13] week. Monday and Wednesday.
[14] Q: So basically you couldn't work Tuesdays and
[15] Wednesdays, you couldn't work Monday night or Wednesday
[16] night. Correct?
[17] A: True.
[18] Q: And you couldn't work on Sundays?
[19] A: Yes.
[20] Q: That's a pretty limited schedule, isn't it?
[21] Would you agree with that?
[22] A: He asked me to give him days when I was off on
[23] my full-time job and days when I had to do something out
[24] of state. So I gave Kelston that information.