Page 233

[1]   Q: And how long did you have that job?
[2]   A: Thirty days.
[3]   Q: And what happened there?
[4]   A: I decided I didn't want to die in the back of
[5] one of those trucks so I quit.
[6]   Q: You didn't want to what?
[7]   A: Die in the back of one of those trucks, so I
[8] quit.
[9]   Q: What do you mean?
[10]  A: It was too hard.
[11]  Q: It was what?
[12]  A: Too hard, too physically exerting.
[13]  Q: You were moving merchandise?
[14]  A: Loading the back of trucks with anything that
[15] you see in a Walmart store.
[16]  Q: So after a month you quit there, and what did
[17] you do?
[18]  A: The Department of Labor called me up and said,
[19] if you want to come to work for us, we have a job for you
[20] for the State. So I went to work in the Department of
[21] Public Health.
[22]  Q: Doing what?
[23]  A: Pulling charts.
[24]  Q: Oh, that was the — I thought we already

Page 234

[1] talked about that. Okay. And that lasted not that long?
[2]   A: Thirty days.
[3]   Q: And you were let go there. What did you do
[4] after that?
[5]   A: What I'm doing now.
[6]   Q: What are you doing now?
[7]   A: Working for Schwan's home food delivery.
[8]   Q: You drive little trucks down neighborhood
[9] streets and people buy food like popsicles and stuff?
[10]  A: Yes.
[11]  Q: And what are you earning there?
[12]  A: Annually?
[13]  Q: Yes.
[14]  A: $38,000 a year.
[15]  Q: Are you salaried or hourly?
[16]  A: It's half and half.
[17]  Q: I'm sorry?
[18]  A: It's 50/50; half salary, half commission.
[19]  Q: Oh, half commission. Okay. Have you got
[20] benefits?
[21]  A: Yes.
[22]  Q: Do you intend on staying there for a while?
[23]  A: Until I find something better.
[24]  Q: I just want to go back to your charge for a

Page 235

[1] minute, your charge of discrimination. And I don't
[2] remember what exhibit number it is, but it shouldn't be
[3] too buried in that pile. And then I think I'm almost
[4] done.
[5]   A: Which one?
[6]   Q: Your charge of discrimination that you filed,
[7] the complaint with the Department of Labor.
[8]   A: Okay, I have it.
[9]   Q: Now, did you understand that that statement
[10] that you gave was a statement under oath?
[11]  A: Yes.
[12]  Q: And so you obviously were very careful when
[13] you filled the charge out?
[14]  A: Yes.
[15]  Q: Okay. And you read it, probably reread it
[16] before you signed it. Is that correct?
[17]  A: Yes.
[18]  Q: Is there any particular reason — well, are
[19] you making a claim for race discrimination in this case?
[20]  A: Retaliation.
[21]  Q: Just retaliation?
[22]  A: Yes.
[23]  Q: Are you seeking from AutoZone any damages for
[24] emotional distress?

Page 236

[1]   A: No.
[2]   Q: Now, who do you intend at this point to
[3] testify on your behalf? Obviously, Shane Treesh?
[4]   A: Yes.
[5]   Q: Anybody else?
[6]   A: Anyone else that the law firms representing me
[7] thinks would be good witnesses to testify on my behalf.
[8]   Q: I'm asking you what witnesses do you
[9] believe —
[10]  MR. REED: We're going to pose an
[11] objection to this line of questioning. It's going into
[12] matters that are confidential communication between
[13] attorney and client at this point.
[14]  MS. HIDALGO: I didn't understand the
[15] objection.
[16]  MR. REED: My objection is that you are
[17] asking for matters that's included in confidential
[18] communication from the client. And, furthermore, of
[19] course, there will come a time when we will list a
[20] witness list when we have one. At the moment we don't
[21] have one, it's still being considered.
[22]  BY MS. HIDALGO:
[23]  Q: To the best of your knowledge, who has
[24] information regarding what happened to you at AutoZone?

# In The Matter Of:

*Washington    v.*
*AutoZoners*

---

*Ronald Wertz*
*May 12, 2005*

---

*Corbett & Associates*
*1400 N. French Street*
*P.O. Box 25085*
*Wilmington, DE   USA   19899*
*(302) 571-0510     FAX: (302) 571-1321*

*Original File 050512D2.ASC, 62 Pages*
*Min-U-Script® File ID: 3172325181*

# Word Index included with this Min-U-Script®

A043

Washington   v.
AutoZoners

Ronald Wertz
May 12, 2005

Page 25

[1] would call and we would talk about the families. And
[2] sometimes he would talk to me about what was going on in
[3] the store as far as his hours, and I would suggest — I
[4] told him I really had nothing to do with the hours,
[5] because my job is this, but I would tell him who to go
[6] talk to, go talk to your manager. If you can't get that
[7] response, then I would advise you to go to your district
[8] manager.
[9]     So, yes, we talked several times. Like
[10] I say, we sort of hit it off, so we exchanged phone
[11] numbers. I gave him my home phone and my cell phone to
[12] call me at any time.
[13]     Q: So you found Mr. Washington a personable
[14] person?
[15]     A: Oh, very personable. No doubt about it. And
[16] we had some teenage daughters, so we were talking, we
[17] compared notes on teenage daughters.
[18]     Q: Have you had any conversations about
[19] Mr. Washington with anybody?
[20]     A: In what time frame are you talking about? I
[21] mean, back here I did.
[22]     Q: And I'm talking any time frame, so we're going
[23] to go through any time.
[24]     A: Yeah.

Page 26

[1]     Q: With whom have you had conversations with
[2] regard to Mr. Washington?
[3]     A: Well, all these people that we talked about.
[4] That's what I'm saying, back here we talked to
[5] Mr. Washington.
[6]     Q: Aside from the people listed in these
[7] statements, have you had any other conversations?
[8]     A: I probably talked with Tim Harrison, who was
[9] the AutoZone relations person. Usually they will review
[10] these statements and ask us any questions that they need
[11] to know.
[12]     Q: Do you know when that conversation with
[13] Mr. Harrison would have taken place?
[14]     A: It would have taken place after the 8th,
[15] because I would have faxed this in as soon as I finished
[16] this. So it would have been the 8th or the 9th of
[17] August.
[18]     Q: And did you recall where those conversations
[19] took place?
[20]     A: Well, it would be on the phone, because he is
[21] in Memphis, Tennessee.
[22]     Q: Do you recall the specifics of that
[23] conversation?
[24]     A: No, I do not. And I'm not even sure it

Page 27

[1] happened. I'm just saying it would have. But if I did
[2] talk to him, it would have been about the case; did you
[3] ask this, did you ask that? Yes, look at this statement.
[4] That type of conversation.
[5]     Q: Is there any records that would refresh your
[6] recollection as to whether or not that conversation took
[7] place?
[8]     A: No.
[9]     Q: Do you know if Mr. Harrison makes any notes of
[10] those conversations?
[11]     A: I don't know.
[12]     Q: Would you have been using a cell phone or a
[13] land line for that conversation?
[14]     A: Using a land line.
[15]     Q: At your office or wherever you were located?
[16]     A: Probably a hotel.
[17]     Q: Would you have called him or would he have
[18] called you?
[19]     A: He would have called me, I'm sure.
[20]     Q: Have you created any reports with regard to
[21] Mr. Washington?
[22]     A: Just the report for this, you know, this case
[23] that says this is the people I talked to. And I have to
[24] type in each one of the headings for the — and the

Page 28

[1] information for each person that goes onto a little
[2] document that shows who I talked to. Then it goes into
[3] the database.
[4]     Q: And what database is that?
[5]     A: It's a case log. We create a case for each
[6] one of these so it will be tracked through our system.
[7] So we have a loss prevention case log.
[8]     Q: And who maintains that database?
[9]     A: That's maintained in Memphis. We put it in
[10] our computer, and once we ship it off, everything is
[11] wiped off, as far as any documentation, it's all wiped
[12] out on our computer and it's all held in a database in
[13] Memphis.
[14]     Q: And where is your report today?
[15]     A: Well, of course, back at the office. I don't
[16] think we have it.
[17]     Q: I'm going to request a copy of that report.
[18]     MS. HIDALGO: Well, I will certainly
[19] give it to you. I mean, you know, our discovery
[20] responses aren't even due yet, and we did produce these
[21] early. So, you know, I'm going to give it to you.
[22]     MR. FARNAN: I just want to make sure.
[23]     MS. HIDALGO: If it's responsive to your
[24] request, I certainly will give it to you. In fact, I

Min-U-Script®

A044

Page 29

[1] might even have a copy here. I just don't know.

[2] **BY MR. FARNAN:**

[3] **Q:** Did you create any other documents with regard

[4] to Mr. Washington?

[5] **A:** No, I did not.

[6] **Q:** Did you create any other materials with regard

[7] to Mr. Washington?

[8] **A:** No, I did not.

[9] **Q:** Do you use e-mail?

[10] **A:** Do I use e-mail? Yes.

[11] **Q:** Did you have any e-mail contact with anyone

[12] with regard to Mr. Washington?

[13] **A:** No. That's absolute.

[14] **Q:** And when would you have created your report?

[15] **A:** Well, it could have been anywhere within 10 to

[16] 15 days after this. Right after — it might have been

[17] anywhere from 10 to 15 days after this is done, because

[18] you have to put everything together as a package, send it

[19] in, Fed Ex it in down to Memphis.

[20] **MS. HIDALGO:** Is that your report? Why

[21] don't you give that to the attorney and he can look at

[22] it.

[23] **THE WITNESS:** This is the subject

[24] information on each person I was telling you about.

Page 30

[1] **BY MR. FARNAN:**

[2] **Q:** Do you know what Denny Carruth's background

[3] was?

[4] **A:** No, I do not. I just knew he was a district

[5] manager.

[6] **Q:** Do you know where he came from?

[7] **A:** No, I do not.

[8] **Q:** Do you know anything about Brandon Diaz?

[9] **A:** No, I do not.

[10] **Q:** Do you know if there is an application on file

[11] for Denny Carruth?

[12] **A:** I would assume there would be, but I don't get

[13] involved in any of this.

[14] **MS. HIDALGO:** Hang on. I'm going to

[15] object on the basis of foundation, lack of foundation.

[16] Subject to that, you can answer it.

[17] Go ahead.

[18] **BY MR. FARNAN:**

[19] **Q:** Do you know whether or not AutoZone requires

[20] their employees to file an application before they begin

[21] employment?

[22] **A:** They have to fill out an application and it

[23] has to be on file, yes.

[24] **Q:** Does AutoZone keep those applications?

Page 31

[1] **A:** I assume they do. They are sent in.

[2] **MS. HIDALGO:** Let me make an objection.

[3] I don't want you to assume or speculate.

[4] **THE WITNESS:** Okay. Just to my

[5] knowledge they are sent in.

[6] **BY MR. FARNAN:**

[7] **Q:** Do you know anything about Brandon Diaz's

[8] background?

[9] **A:** No, I do not.

[10] **Q:** But you did interview Denny Carruth?

[11] **A:** I did interview Denny Carruth, yes.

[12] **Q:** You did interview Brandon Diaz?

[13] **A:** Yes, I did.

[14] **Q:** Do you know anything about Ralph Findle's

[15] background?

[16] **A:** I don't know his background.

[17] **Q:** You did interview him, though?

[18] **A:** Yes, I did.

[19] **Q:** Do you know anything about Thomas Shehorn?

[20] **A:** No, not of his background.

[21] **Q:** Did you interview him?

[22] **A:** Yes, I did.

[23] **Q:** Do you know anything about Franklin Wilson's

[24] background?

Page 32

[1] **A:** No, I do not.

[2] **Q:** Did you interview him?

[3] **A:** Yes, I did.

[4] **Q:** I believe we heard earlier that as a result of

[5] your investigation, the first investigation —

[6] **A:** Yes.

[7] **Q:** — some people were terminated?

[8] **A:** That is correct.

[9] **Q:** Who was terminated?

[10] **A:** Ralph Findle was terminated and also Denny

[11] Carruth was terminated.

[12] **Q:** Was that as a result of your investigation?

[13] **A:** Yes, it was.

[14] **Q:** Can you tell us why on this form, and this is

[15] D0005, this is your subject information, can you tell us

[16] what the action taken on Denny Carruth is?

[17] **A:** No, I don't record that there. That is

[18] decided by AutoZone Relations, and then it is

[19] communicated to the regional managers, who go out.

[20] Because I have no hire or fire power. I just do the

[21] investigation and send it in. Then they make those

[22] decisions and communicate it to their regional managers

[23] to handle.

[24] **Q:** But that's a form that you created?

A045

SHANE B. TREESH
November 8, 2005

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE

2

3

MELVERT WASHINGTON, JR., :

4                                 :

                Plaintiff    :

5                                 :   NO. 04-320 (SLR)

        -vs-                 :

6                                 :

AUTOZONERS, INC.,            :

7                                 :

                Defendant    :

8    --------------------------------

9

10

11   VIDEOTAPE DEPOSITION of SHANE B. TREESH, taken before

12   Henry J. Karasch, Registered Merit Reporter and Notary

13   Public, at the law offices of Phillips, Goldman &

14   Spence, P.A, 1200 North Broom Street, Wilmington,

15   Delaware 19806, on Tuesday, November 8, 2005, commencing

16   approximately at 10:40 A.M.

17

18

19                      COPY

20

21

22

23              KARASCH & ASSOCIATES
          REGISTERED PROFESSIONAL REPORTERS

24            PENNSYLVANIA and DELAWARE
                 (800) 621-5689

25