## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MELVERT WASHINGTON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-320 (SLR) |
| | ) | |
| AUTOZONERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF
## <u>MOTION FOR SUMMARY JUDGMENT</u>

PHILLIPS, GOLDMAN & SPENCE, PA
Joseph J. Farnan, III (Bar No. 3945)
1200 N. Broom St.
Wilmington, DE 19806
TEL: (302) 655-4200
jjf@pgslaw.com

and

Thomas J. Reed (admitted *Pro Hac Vice*)
Widener University School of Law
Delaware Volunteer Legal Services, Inc.
Veterans Assistance Program
4601 Concord Pike
P.O. Box 7474
Wilmington, DE 19803-7474

DATE:     January 5, 2006

## TABLE OF CONTENTS

TABLE OF CITATIONS ................................................................................. ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS .............. 1

SUMMARY OF ARGUMENT .......................................................................... 2

FACTS ....................................................................................................... 4

ARGUMENT

    A.    WASHINGTON HAS ESTABLISHED A PRIMA FACIE CASE
        OF FAILURE TO PROMOTE ................................................................ 17

    B.    WASHINGTON HAS ESTABLISHED A PRIMA FACIE CASE
        OF RETALIATION .......................................................................... 20

    C.    WASHINGTON HAS DEMONSTRATED THAT HE WAS
        SUBJECTED TO A HOSTILE WORK ENVIRONMENT IN
        VIOLATION OF HIS RIGHTS ............................................................. 24

    D.    WASHINGTON HAS ESTABLISHED A CLAIM FOR
        CONSTRUCTIVE DISCHARGE ......................................................... 26

    E.    DEFENDANT CANNOT ARTICULATE A
        NON-DISCRIMINATORY REASON FOR FAILURE TO
        PROMOTE OR TO JUSTIFY RETALIATION, A HOSTILE WORK
        ENVIRONMENT, OR CONSTRUCTIVE DISCHARGE AND
        SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR
        OF PLAINTIFF ............................................................................. 27

CONCLUSION ......................................................................................... 32

## TABLE OF CITATIONS

### CASES

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3ʳᵈ Cir. 1996) ............... 24, 26, 27

Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175 (3ʳᵈ Cir. 1985) ................. 27

Bennun v. Rutgers State Univ., 941 F.2d 154 (3d Cir. 1991),
  cert. denied, 117 L. Ed. 2d 124, 112 S. Ct. 956 (1992) ................................ 17

Della Santi v. CNA Ins. Co., 88 F.3d 192 (3ʳᵈ Cir. 1996) ............................... 21

Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F2d 509 (3ʳᵈ Cir. 1991) ........... 17

Goss v. Exxon office Systems Co., 747 F.2d 885 (3ʳᵈ Cir. 1984) ...................... 26

Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Cr. 367,
  126 L.Ed.2d 295 (1993) ............................................................ 24

Holsey v. Armour & Co., 743 F.2d 199 (4ᵗʰ Cir. 1984) ................................ 21

Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) ............................... 21

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668,
  93 S. Ct. 1817 (1973) .......................................................... 17, 20

Quiroga v. Hasbro, Inc., 934 F.2d 497 (3d Cir. 1991) ................................ 21

Roebuck v. Drexel Univ., 852 F.2d 715, 726-27 (3d Cir. 1988) .................. 17, 28

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248,
  67 L.Ed 2d 207, 101 S.C.t. 1089 (1981) ................................ 17, 20, 27, 28

Weiss v. Parker Hannifan Corp., 747 F. Supp. 1118 1129 (D. N.J. 1990) ............ 21

Woodson v. Scott Paper Corp., 109 F.3d 913 (3ʳᵈ Cir. 1997) ......................... 21

### STATUTES

42 U.S.C. § 2000e-2 .............................................................. 21

I.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiff, Melvert Washington, Jr. ("Washington" or "Plaintiff"), filed an employment

discrimination complaint with the Delaware Department of Labor on May 29, 2002 (the "DDOL

Complaint").   He alleged that Defendant, AutoZone, Inc. ("AutoZone" or "Defendant"),

intentionally discriminated against him on account of his race by denying him the opportunity to

take a full-time position with Defendant and a promotion to Parts Service Manager   In his

DDOL Complaint, Plaintiff asserted that he was qualified for the full-time position and

promotion but white employees with less experience and education were promoted over him.

On May 31, 2003, the Department of Labor found probable cause to believe that Plaintiff's

rights were violated by Defendant.   The determination of the Department of Labor was

forwarded to the Equal Employment Opportunity Commission who issued a Notice of Right to

Sue letter on February 26, 2004.    On May 19, 2004, Washington filed a Complaint with this

Court (D.I. 1) alleging among other things that Defendant had intentionally failed to promote

him on account of race, had retaliated against him for making a race-discrimination complaint

against his manager Ralph Findle, and had created a hostile work environment that led to

constructive discharge.

Discovery has closed in this matter. The Court's Amended Scheduling Order directed

that summary judgment motions be filed after the close of discovery but not later than December

21, 2005.  (D.I. 40).  On December 23, 2005, the Court granted an additional extension

permitting summary judgment motions to be filed on January 5, 2006.  (D.I. 42).

1

## II.    SUMMARY OF ARGUMENT

1.    Washington was unlawfully denied a promotion and full-time employment with Defendant AutoZone, Inc. on the basis of his race and because Washington had previously filed a complaint against a store manager for racial discrimination. Washington was otherwise qualified for the requested promotion and full-time position. Instead of promoting Washington, Defendant promoted other white employees who were not as qualified as Washington.

2.    Washington was retaliated against for filing a complaint of racial discrimination against Ralph Findle, manager of Defendant's Store #1157. The filing of a complaint is a protected activity and, following this protected activity, Washington was unlawfully denied equal treatment as compared to white employees who had not filed complaints. As a direct result of Washington's protected activity, Defendant retaliated against Washington by denying him a promotion that he was otherwise qualified to receive.

3.    Washington was subjected to a hostile work environment following the filing of a complaint of racial discrimination against Ralph Findle. Following the filing of the complaint, Washington was forced to work with white employees who were hostile to Washington because of his race and who worked together to try to get Washington fired, despite the fact that Washington was otherwise qualified for a full-time position.

4.    The acts complained of by Washington were known by managers of Defendant's Store #1157 and were not discouraged. As a result of the hostile conduct of both managers and employees of Store #1157, Washington was forced to work in conditions that were so intolerable that he was forced to leave. These acts constitute constructive discharge in violation of Washington's rights.

5.    The evidence presented by Washington establishes a prima facie case of failure to promote, retaliation, hostile work environment and constructive discharge and the burden, therefore, shifts to Defendant to present a rational non-discriminatory reason for the actions taken against Washington.  Because Defendant cannot present evidence demonstrating a rational reason, summary judgment in favor of Washington on all counts is warranted.

III.    **FACTS**

A.    **Background**

Washington is a 53 year old African-American male. (PA 0208). Washington earned a

Bachelor of Science in Human Resources Management from Wilmington College in 1998, an

Associates Degree in Applied Science (Human Services) from Delaware Technical &

Community College in 1990 and a diploma in auto mechanic studies from Delaware Technical &

Community College in 1985. (PA 0022; PA 0141-142; PA 0138-40; PA 0001 at 5**).**

Washington also has extensive work history in telemarketing and sales. (PA 0019-21)    In the

summer of 1999, Washington applied for and received a part time position with Defendant. (PA

0208**;** PA 0023). At that time, Washington was working as a full-time custodian at Delaware

State University. (PA 0021). He was interviewed by Defendant's District Manager, Antonio

Farley, and was hired as a part-time employee at Defendant's Smyrna, Delaware store, #1157, on

August 30, 1999. (PA 0023 at 62). At the time Plaintiff was hired as a part time employee,

Ralph Findle ("Findle"), a white male, was the Smyrna store manager and Frank Wilson, an

African-American, was the Assistant Store Manager. (PA 0209; PA 0210; PA 0024 at 76).

B.    **Findle's Actions Against Washington**

Findle first began showing a dislike for Washington after Washington contacted Findle's

boss, the district manager, because there were no managers present to open the store. (PA 0025

at 85-88; PA 0111). Washington and Findle were both scheduled to report to work at 7:30 a.m.

to prepare to open the store at 8:00 a.m. Washington arrived at the store on time but Findle, who

was scheduled as opening manager, had not arrived to open the store. (PA 0025 at 86). Because

Washington did not have Findle's number, he called the assistant manager, Frank Wilson

4

("Wilson") to determine what should be done. (*Id*). Wilson instructed Washington to call the

District Manager, who drove up from Dover to open the store. (*Id*). Findle arrived for work late.

(*Id*.; PA 0002-3). Subsequently, the relationship between Findle and Washington deteriorated

    In April 2000, Findle addressed Washington as "a little boy" in front of one or more store

customers. (PA 0026 at 91-92). Washington took that remark as a racial epithet. (PA 0026 at 92;

PA 0004). Later that month, Chuck Tucker, a frequent AutoZone customer, overheard shouting

from the rear of the store when he came in to buy merchandise. (PA 0117). Tucker gave a sworn

statement dated May 5, 2000, in which he said Findle shouted at Washington, "There it is, right

in front of your eyes, are you blind? Are you stupid?" (PA 0117; PA 0003). There is no

evidence that Findle shouted at white employees in the same manner in front of customers

    C.    **Washington Protests Racial Discrimination**

    Findle continued to harass Washington about his job performance, and, on April 29,

2000, Findle humiliated Washington in front of a customer who was exchanging a starter. (PA

0113-4). Findle took over the customer while Washington was locating a starter on the shelf

stock and kept Washington from performing his job. (*Id*.) Finally, Findle told Washington to

punch out and go home. (PA 0113). Washington, following AutoZone's employee manual,

made a formal written complaint to Dennis Carruth, who was the district manager at that

5

time.[1](PA 0188; PA 0110-14).  However, Carruth never followed AutoZone policy for

investigating the complaint.  (PA 0034).

**D.    Ron Wertz Investigates Claim**

Washington also mailed a copy of his complaint to the Memphis home office of

AutoZone.  (PA 0085; PA 0110).  Ron Wertz, the regional loss prevention manager, was

assigned to investigate Washington's complaint. (PA 0032a).  Wertz took the statements of

Melvert Washington (PA 0084-87), Ralph Findle (PA 0073-77), Thomas Shehorn (PA 0068-69),

Brandon Diaz (PA 0070-72), Franklin Wilson (PA 0081-83) and Dennis Carruth (PA 0078-80).

---

[1] Defendant's Manual states in pertinent part:

**Equal employment opportunity commitment**

AutoZone obeys all applicable laws pertaining to federal, state and local equal employment practices and complies with all applicable orders and regulations. This means there is equal opportunity for all AutoZoners without regard to race, color, religion, sex, national origin, age, physical or mental disability, military veteran status or sexual orientation.

The policy pertains to recruiting, hiring, training, promotions, compensation, benefits, transfers, education and all other aspects of employment with the company. All employment decisions are based on job-related requirements.

**Fair treatment**

There may be times when AutoZoners question or don't understand an AutoZone policy For these reasons, we've established problem-solving procedures to help you express your concerns.

Approach your manager with any concerns you have. If you and your manager are unable to solve the problem, talk with your area advisor or district manager. If questions are still unanswered, or you still have concerns or complaints, contact the AutoZoner Relations department for assistance.

AutoZone wants to hear any concerns you have about any policy or program that affects your job performance. We want to work with you to resolve problems as quickly as possible. AutoZone forbids any form of retaliation against you if you choose to use AutoZone s problem-solving procedure or if you file a charge of discrimination with any public agency or legal system.

(PA 0187-88).

In the course of Wertz's investigation, Findle admitted calling Washington "a little boy" but denied that he intended it to be a racial slur. (PA 0075). Findle also admitted telling Washington to check out and go home. (PA 0076). Wertz also interviewed Wilson, who was assistant manager of store #1157 and later manager of store #1159. (PA 0081-83). In this interview, Wilson stated that he believed Findle showed favoritism to other employees who made complaints and would barely acknowledge complaints brought to Findle by Wilson, who was an African-American. (PA 0082). Wilson also said that Findle had "the 'Archie Bunker' effect" and that he felt "that there is a bit of rasical (sic) problem with Ralph." (PA 0083). At that time, Wilson and Washington were the only African-Americans working at the Smyrna store.

Carruth and Findle were terminated by AutoZone as a result of Wertz' investigation. (PA 0032d-33). In addition, Wertz testified that Carruth was terminated because he failed to report the complaint letter sent by Washington and, instead, tried to handle it locally. (PA 0034). Wertz also testified that he believed the statements in Washington's letter because they were all admitted to in the course of his investigation. (PA 0035).

Following the racial incident with Findle, Washington requested a transfer to the Dover store. (PA 0086). Richard Robinson, the District Manager, asked him to reconsider his transfer request. (PA 0124). Washington agreed and continued working at the Smyrna store. (PA 0027 at 137-38; PA 0124).

Defendant changed managers at the Smyrna store three times following Findle's departure. (PA 0027 at 137-40). Greg Antzell, an interim manager, was replaced by Brian Paduano, another interim manager, in the fall of 2000. (PA 0027 at 139). Leon Bynum, an

7

African-American, replaced Paduano on December 3, 2000. (PA 0211). Washington's work schedule at Delaware State limited his availability and Washington informed Paduano in a memo in September 2000, that he was free to work on Saturday and Sunday and mornings Monday through Friday. (PA 0027 at 138-9; PA 0212).

### E.    Retaliation & Hostile Work Environment

In the fall of 2000, AutoZone managers and employees at the Smyrna store tried to drive Washington out of AutoZone because he had made a complaint of racial discrimination that was investigated and resulted in the discharge of both Findle and Carruth. The retaliation against Washington began with the actions of a group of employees in the Smyrna store.

On September 19, 2000, Richard Henion ("Henion"), parts manager at store #1157, rewrote a statement for Shawn Parmelia ("Parmelia") concerning alleged issues with Washington. (PA 0086). This statement was also signed by Paul Zambrano (PA 0214) and joined with statements by Thomas Shehorn (PA 0215) and Robert Baker. (PA 0216). Prior to Findle and Carruth being fired, neither Parmelia nor Henion complained about Washington. As a result of Henion's September 19, 2000 complaint on behalf of Shawn Parmelia, Ron Wertz conducted an investigation and interviewed a number of employees. In each of these interviews, employees and managers of store #1157 made numerous allegations regarding Washington. While the employees made these statements in the course of the investigation, none of the employees had previously taken advantage of the procedures at AutoZone for filing a complaint.

### 1.    Henion Statement

In his September 29, 2000 statement to Wertz,  Henion accused Washington of threatening to have him and other employees fired. (PA 0088-92). According to Henion,

Washington said "It wouldn't take much to get someone on the street." (PA 0091). Henion also said that Washington had complained to him on numerous occasions that other employees were not pulling their weight and that they were leaving all the work for Washington. (PA 0089). Henion also claimed that Washington started arguments with Parmelia and other managers about the way the store was managed. Henion said, "Shaun [Parmelia] had approached me numerous times telling me about how Mel would come up to him and start arguing with him about how he needs to do something around here and stop putting all the work on him." (PA 0090-91). Henion wrote that Washington told him "I've had people taken out of here and I can do it again," which Henion said made him feel threatened by Washington. (PA 0091-92).

      2.    <u>Parmelia Statement</u>

Full-time employee Shaun Parmelia told Wertz that he directed Richard Henion to write a statement on September 19, 2000. (PA 0101). In his statement, Parmelia recounted an incident that took place in front of Brandon Diaz, a former employee. (PA 0102). According to Parmelia, Washington said that "I can take people (sic) jobs and take them (sic) the streets." (PA 0102). Parmleia also said that Washington called him "You dumb white motherfucker." (PA 0102). In addition, Parmelia wrote in his statement that "When Mel stares at me I feel like he wants to come and beat me to death or come after and kill me!" (PA 0103).

      3.    <u>Paduano Statement</u>

Brian Paduano, who had become manager of store #1157 on September 24, 2000, gave a statement to Wertz on October 3, 2000. (PA 0093-95). Paduano's statement confirmed that Washington had complained that other part-time employees were not working hard. (PA 0093). Paduano also stated that Washington had called him three times at home to ask about getting

extra work hours and avoiding a potential store layoff. (*Id.*). Paduano said that Washington told him about his role in the grievance against Findle and Carruth. Paduano said that this disclosure "made him feel awkward." (PA 0094). Paduano complained that Washington's presence in the store was "uncomfortable." (PA 0095).

        4.    <u>Baker Statement</u>

Robert Baker, the Commercial Service Representative, also gave a statement on October 3, 2000. (PA 0096-98). In his statement, Baker admitted that he contributed to a statement by Rick Henion on September 19, 2000 because "[t]hinking of what comments Mel had made in the past made me want to say something about it." (PA 0096). Baker also stated that the employees got together and had the idea to write the statements. (PA 0096). Baker also complained to Wertz that he felt threatened because Washington stated he would alert the manager if work was not completed. (PA 0096). Baker accused Washington of using foul language while on the telephone in front of customers. Baker added that " . . . while I would be doing some mid day fronting or helping a customer, he would be standing across from me somewhere staring at me. This was a very stern stare that might be considered scary." (PA 0097).

        5.    <u>Zambrano Statement</u>

Part Sales Manager James Zambrano told Wertz that he heard Washington "say that all he had to do is pullout his pen and paper to get someone fired." (PA 0100). Zambrano couldn't recall to whom Washington's alleged statement was made because he was in ". . . one of the isles (sic) didn't see who he was talking to." (PA 0100). Zambrano also said, however, that he signed the September 19, 2000 Parmelia statement but that he had not personally had any problems like those written in the statement. (PA 0099).

10

**F.**    **Washington Files a Second Complaint**

During Wertz' investigation, Washington reported a racial incident involving Shaun Parmelia by sending a memo on October 12, 2000 to Mr. Azeem Sikandar, Regional HR Manager, Mr. Emmanyel Kitchen, New York City District Manager and Mr. Brian Paduano, Manager of Store #1157. (PA 0119-20). Parmelia was on the phone with a customer who Washington had helped and said "your boy has your part," referring to Washington. (PA 0119). Washington told Parmelia that he didn't want to hear anything about being anybody's boy again. (PA 0119). Manager Brian Paduano broke up the discussion and sent them back to work. (PA 0119). Later in the day, Washington approached Paduano because he was uncomfortable with Parmelia's remark. (PA 0120). Paduano told Washington that he really didn't share his feelings concerning Paremelia but that he would talk with Parmelia. (PA 0120). As of the date of the memo, Washington did not know if Paduano followed through on his promise to speak to Parmelia. (PA 0120).

Washington also used this meeting to ask Paduano for a transfer from the Smyrna store. (PA 0120). Paduano said that "nobody wants you or will take you at the Dover Store 1152" but offered to contact the Milford store. (PA 0120). Because nothing was done to accommodate Washington's request for a transfer, Washington again asked for a transfer in his October 12, 2000 memo. (PA 0120). In this memo, Washington stated: "I feel as though I'm being blackballed or labeled as a result of what happened to the last store manager and DM of store 1157. I would please like a transfer. . . . I don't feel comfortable working in the environment that Mr. Parmelia has created." (PA 0120). Washington was never given a transfer.

### G.    **Wertz Conducts a Third Investigation**

Ron Wertz was also assigned to investigate Washington's claims regarding Permilia's

"your boy" remark. He took a statement from Parmelia on October 18, 2000, in which Parmelia

admitted saying "your boy said to come in and get your part." (PA 0109). Parmelia denied that

his statement was racially motivated. (PA 0109). Defendant took no further action on

Washington's complaint. Washington did not get a transfer.

### H.    **Wertz's Conclusions**

Wertz also questioned Washington about his fellow-workers' allegations. Washington

denied making any threats against other employees that he could get them fired. (PA 0107-8;

PA 0007).

Wertz concluded after investigating the incident that there was insufficient evidence to

support the charge that Washington had threatened his superiors. (PA 0035a). He also denied

that Washington's fellow workers, all of whom were white, retaliated against Washington for

his racial discrimination complaint. (PA 0036-7).

### I.    **Failure to Promote**

Parmelia and Paduano left the Smyrna store in late 2000. (PA 0027). Leon Bynum, an

African-American, was hired as the new store manager. (PA 0211). He inherited two part-time

employees who were hired during Ralph Findle's tenure as manager, Washington and Shane

Treesh, who was also on active duty in the Air Force. (PA 0040; PA 0009). Treesh was hired in

2000 after Washington had been employed by Defendant for almost one year. (PA 0040-41).

Washington had trained Treesh, a high school graduate with no prior sales experience, in

managing the computer and handling stock items. (PA 0041). Treesh left the U.S. Air Force in

late 2000 and became a full-time AutoZone employee in early 2001. (PA 0042). Treesh did not make any written application for a full-time job. He was hired orally. (PA 0042-3; PA 0009). Within a few months' time Treesh was promoted to Parts Service Manager, creating an opening for a full-time employee at the Smyrna store. (PA 0044-45). Washington wanted to move up the ladder at AutoZone and become a full-time employee so he could get into management. (PA 0009). After Treesh became a Parts Service Manager, Washington told Treesh that he wanted to quit his custodial job at Delaware State to go full time at AutoZone. (PA 0045b). Washington believed that Treesh told Bynum, the store manager at the time, about his request to go full-time in 2001. In addition, Washington started asking Bynum about the possibility of going full-time. (PA 0045b). Bynum avoiding answering Washington's request directly. (PA 0009). Around the end of 2001, Washington and Bynum had a discussion about Washington's desire to go full-time. (PA 0045c-46). Treesh was present during this conversation. Bynum tried to discourage Washington from applying for a full time job, saying he was better off at Delaware State. (PA 0045b-46).

Throughout the course of 2001 when Washington was seeking a full-time position and being denied a full-time position, Bynum issued three Corrective Action Reviews to Washington. (PA 0127-29). Each related to tardiness in reporting to work or failure to report for scheduled work duty. (PA 0127-29). Washington understood Defendant's policy to be that no disciplinary action would be taken for tardiness if caused by sickness or other circumstances beyond Washington's control and Washington promptly notified Store #1157 that he would be late or out-sick. (PA 0027a). Washington is not aware of other employees being treated the same as he was with respect to tardiness. (PA 0027a) Washington refused to sign two of the

13

Corrective Action Reviews because he believed they were unfair to him. (PA 0027-29).

Washington had never seen the Corrective Action Review issued in February 2001 and,

therefore, did not sign that one either. (PA 0027a). Finally, in April, 2001, Bynum gave

Washington a performance review in which he received a 2.5 rating, out of a possible 4. (PA

0121-22).

On January 28, 2002, Washington made a written request for change to full-time status

and delivered the request to Bynum. (PA 0130-31). Washington stated that he had asked for a

full-time position several times and that he had been told that he would be next in line for a full-

time position when an employee leaves the store. (PA 0131; PA 0028). In February, 2002,

Washington fractured his 7th cervical vertebrae in an automobile accident and was ordered not to

go to work by his physician until April, 2002. (PA 0001). Washington notified Defendant of the

injury and delivered a copy of the physician's order to Bynum at Store #1157 within a week after

his injury. (PA 0011).

Despite Washington's written request for a full-time position, other employees were

given full-time employment status ahead of him. For example, former Part Sales Manager

Robert Baker, who had transferred to the Bear, Delaware, store in February, 2001, returned to

Smyrna as a full-time employee in early 2002. (PA 0046a-b). Deanna Brown, who previously

worked at the Dover store, was promoted to Part Sales Manager and transferred to the Smyrna

Store in early 2002. (PA 0046c-d; PA 0011).

Both Baker and Brown were less qualified than Washington but were nevertheless

promoted to full-time positions ahead of Washington. Robert Baker was a 19 year old with no

prior sales experience who had on-the-job training as a sales representative for Defendant in

1999. (PA 0146). Deanna Brown was a 22 year old who had one year of high school education and experience as a receptionist before joining Defendant in 1998 as a part time sales associate at the Dover store. (PA 0159-62). She was promoted to full-time and Part Sales Manager on transfer from the Dover store. (PA 0046c-d).

When Washington saw less qualified white people from other stores taking full-time positions at the Smyrna store, he asked to see Bynum. Washington and Bynum had a conversation about his job future at AutoZone. During that conversation, Bynum told Washington that he had a "rather thick personnel file which was located in Fort Washington, Maryland." (PA 0194). In addition, Bynum told Washington at that meeting that he would never get a full-time position because he filed the complaint against Findle in 2000. (PA 0194). In the proceedings before the Delaware Department of Labor, Bynum confirmed that Washington was qualified to be a full-time employee but that his superiors prevented it. (PA 0200).

### G.    <u>Constructive Discharge</u>

Washington filed his complaint with the Delaware Department of Labor within a few days of his conversation with Bynum. (PA 0194). After he filed the complaint, Defendant offered Washington a full-time position. (PA 0137). Washington quit his job with Defendant rather than accept the offer and return to the hostile work environment at Store #1157. (PA 0031a).

The Delaware Department of Labor investigated Washington's claim. On May 30, 2003, the Department of Labor concluded after investigation that Washington met the burden of showing that he had suffered adverse action in retaliation for complaining of discriminatory treatment. (PA 0203-205) The investigators found that Washington was regularly scrutinized

more closely than other employees, and suffered unreasonable disciplinary actions and

intentionally kept from obtaining more hours, moving up to a management position and from

transferring to another store. (PA 0204).  The Department of Labor attempted conciliation which

failed.

## IV.    ARGUMENT

### A.    Washington Has Established a Prima Facie Case of Failure to Promote

Washington has clearly met his burden of proving a prima facie case of failure to promote and is entitled to relief for the violation of his rights. In order to prove a prima facie case of failure to promote, Washington need only demonstrate that he is a member of a protected class, was qualified for and rejected for the requested position and non-members of the protected class were treated more favorably. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-56, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 522 (3rd Cir. 1991); *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 170 (3d Cir. 1991), *cert. denied*, 117 L. Ed. 2d 124, 112 S. Ct. 956 (1992); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 726-27 (3d Cir. 1988).

Washington has established that he is a member of a protected class, African-Americans. (PA 0208). Further, Washington was clearly qualified for a full-time position at AutoZone. (PA 0200). Washington earned a Bachelor of Science in Human Resources Management from Wilmington College in 1998, an Associates Degree in Applied Science (Human Services) from Delaware Technical & Community College in 1990 and a diploma in auto mechanic studies from Delaware Technical & Community College in 1985. (PA 0022; PA 0141-42; PA 0138-40). Washington also has extensive work history in telemarketing and sales. (PA 0019-21). Further, while employed at AutoZone, Washington had trained Treesh, a high school graduate with no prior sales experience, in managing the computer and handling stock items. (PA 0041).

It is also clear that Washington requested full-time employment and/or a promotion. Defendant had no policy requiring a written application to change from part-time to full-time. (PA 0045a). On numerous occasions, Washington asked for a full-time position after more than a year's service as a part-time employee. After Treesh became a Parts Service Manager, Washington told Treesh that he wanted to quit his custodial job at Delaware State to go full time at AutoZone. (PA 0045b). Washington believed that Treesh told Bynum, the store manager at the time, about his request to go full-time in 2001. In addition, Washington started asking Bynum about the possibility of going full-time. (PA 0045b-c). Bynum avoiding answering Washington's request directly. Around the end of 2001, Washington and Bynum had a discussion about Washington's desire to go full-time. (PA 0045c-46). Treesh was present during this conversation. Bynum tried to discourage Washington from applying for a full time job, saying he was better off at Delaware State. (PA 0045b-6).

Even though his request in 2001 was denied, on January 28, 2002, Washington made a written request to go full-time that he gave to Bynum. (PA 0130-31). In that January 2002, memo, Washington reminded Bynum that he had asked for a full-time job many times in the past and Bynum told him that he was next in line for a full-time position. (PA 0131; PA 0028). Despite this, Bynum brought in two full-time employees while Washington was recovering from injuries received in an auto accident and never offered Washington a full-time position. (PA 0046a-b).

Washington never received the promotion. In fact, rather than accommodate his request for a promotion to full-time or a transfer, Bynum actively discouraged Washington from seeking full-time employment and told him he would, in fact, never be employed full-time because he

18

had filed a racial discrimination complaint in 2000. (PA 0194). Bynum discouraged

Washington from seeking a full-time job, insisting that Washington was better off working as a

janitor at Delaware State than as a full-time sales representative for Defendant. (PA 0046).

Finally, with respect to the third element, at least three employees at the AutoZone store

#1157 who were not members of a protected class and had less experience than Washington

were treated more favorably than Washington and given full-time positions. The employment

records of Robert Baker, Deanna Brown and Shane Treesh indicate that these employees had

less formal education, less sales experience and less time on the job with Defendant than

Washington but that all three were white. (PA 0146; PA 0159-63; PA 0170). First, Treesh, who

Washington trained and had less education than Washington, was promoted above Washington.

(PA 0042; PA 0044-45). Second, Bynum allowed Baker, a 19-year old employee, to re-transfer

from Bear to Smyrna as a full time "red shirt" non-managerial employee early in 2002, after

Washington had requested a full -time position. (PA 0046a-b). Third, Deanna Brown does not

have a high school diploma and was promoted and transferred to Smyrna after Washington had

requested a full-time job. (PA 0159-62; PA 0046c-d). When Washington returned to work after

recuperating from his broken vertebrae, there was no full time job for him.

In addition to the evidence presented above, Bynum later admitted that his superiors had

barred Washington's transfer to full-time work and any promotion to Part Sales Manager. (PA

0200). Defendant had done everything in its corporate, collective power to prevent Washington

from becoming a full-time employee and part of its management team. This later admission

was by a manager and agent of AutoZone and demonstrates that Washington was clearly being

treated differently than all other employees and that Defendant had knowledge if this disparate

19

treatment. The record showed that white employees with less training and experience were transferred in from other stores to fill full-time positions at Store #1157. This was done while Washington recuperated from a serious injury. Therefore, the defendant is presumed to have discriminated against him.

As demonstrated above, Washington has established a prima facie case of failure to promote on account of racial discrimination. The *McDonnell Douglas* presumption, therefore, places upon the defendant the burden of producing an explanation to rebut the prima facie case -- *i.e.*, the burden of "producing evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254. "The defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action. *Id.,* at 254-255, and n. 8. Because Washington has presented evidence which proves a prima facie case and because Defendant cannot rebut the presumption, Defendant is liable for the economic harm caused by failure to promote Washington to full-time and to Parts Sales Manager.

### B.    **Washington has Established a Prima Facie Case of Retaliation**

Washington has the responsibility to establish a prima facie case of retaliation for making an in-house complaint of racial discrimination in the work place. There are two types of retaliation claims: the "pretext" claim and the "mixed motive" claim. The elements of a "pretext" retaliation claim are:

(1)    Washington was engaged in protected activity;

20

(2)    Defendant took adverse employment action during or after Washington's protected activity; and

(3)    there is a causal link between the protected activity and Defendant's adverse action.

*Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3rd Cir. 1997); *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989). Each of these elements is clearly met in this case.

First, Washington made a formal, written race discrimination complaint about his manager following the in-house procedures set up by Defendant to deal with employment issues. (PA 0111-14; PA 0188). In-house reporting of racial discrimination is a "protected conduct" because it is internal opposition to practices that arguably violate 42 U.S.C. § 2000e-2 (Section 703). See, e.g., *Holsey, v. Armour & Company*, 743 F.2d 199, 211 (4th Cir. 1984) (held defendant retaliated against probationary employee by firing the employee after the employee made a complaint of racial discrimination).

The Third Circuit has adopted the same view relating to in-house challenges to discrimination in the work-place. The District of New Jersey noted in *Weiss v. Parker Hannifan Corp.*, 747 F. Supp. 1118, 1129 (D.N.J. 1990) that "[f]iling of a civil rights complaint, intending to file a civil rights complaint, and complaining about discrimination to corporate superiors are acts protected under Title VII." This standard was validated by the Third Circuit in *Della Santi v. CNA Ins. Co.*,88 F.3d 192, 198 (3rd Cir. 1996), an age and sex discrimination case brought under New Jersey's Law Against Discrimination, the state's version of 42 U.S.C. §§2000e-2 and 3. The plaintiff, a woman over 40, complained three times to her supervisor that she was denied

21

a promotion due to age and sex. The defendant immediately began investigating her gas mileage

receipts for alleged irregularities and eventually discharged her for irregularities in reporting gas

expense in her company car. She filed her EEOC complaint and Title VII lawsuit after discharge

claiming she was the victim of retaliation. The Third Circuit overturned a directed verdict for

defendant on the retaliation claim, finding that her complaints to management constituted

protected activity. *Id.*

Washington has shown a concerted effort by Defendant's agents and employees at Store

#1157 to retaliate against him for bringing his validated internal race discrimination complaint.

Through a September 19, 2000 letter, the Parts Service Managers, the Assistant Manager and the

interim Manager joined together and wrote a letter to Defendant accusing Washington of making

threats against them. (PA 0213-16). While the employees admitted that they got together to

write the letter, at least one employee stated that he had signed the complaint but did not

personally experience any problems like those alleged in the complaint. (PA 0099). The same

group also accused Washington of using foul language, e.g., "mother-fucker" in the work-place.

(PA 0088-106). The accusations of the employees and managers were investigated by Ron

Wertz. In conjunction with that investigation, Wertz interviewed Washington who denied

making the threats alleged by the employees and managers. (PA 0107-8). Wertz concluded that

Washington had not threatened his fellow employees and prepared a report which was sent to

Wertz's supervisors. (PA 0035a). Nothing further was done to the employees who had ganged

up on Washington and falsely accused him of making threats.

In addition to the complaint filed in late 2000, Washington also received unfavorable

Corrective Action Reviews from the store manager at the time, Bynum. (PA 0127-29). These

Corrective Action Reviews were all based on instances when Washington either could not make it to work or was late.  For example, on February 8, 2001, Bynum gave Washington a corrective action review for calling in sick for work, even though Company policy was that if an employee was sick and could not work, he or she would call in and the absence would be excused.  (PA 0027a).  Other employees were not written up for violations similar to those that Washington was written up for.  Washington wrote a memo to Kelson Aleong, the District Manager at that time, explaining why he refused to sign this Corrective Action Review. (PA 0010; PA 0217-19). These Corrective Action Reviews were nothing more than a further attempt to force Washington out of AutoZone in retaliation for the racial discrimination complaint he filed against Findle in 2000.

The retaliation continued throughout 2001.  Washington got a 2.5 performance review from Bynum on April 20, 2001 without any explanation or commentary showing why he got below average marks. (PA 0121-22).  On August 31, 2001, Bynum gave Washington a second Corrective Action Review. (PA 0128).  Washington had called in on that night telling Bynum that he was suddenly assigned overtime work at Delaware State and would be late for work at Store #1157.  On October 6, 2001, Bynum put in a corrective Action Review stating that Washington did not call in or show up for work that night. (PA 0129).  Washington did not sign the Corrective Action Reviews or his Performance Review. (PA 0121-22, PA 0128, PA 0129). These reviews were for trivial matters.  Washington knew that company policy excused any absences or tardiness when the cause was beyond the Autozoner's control. (PA 0027a).

Finally, Defendant's consistent failure to allow Washington to become a full-time employee and qualify for parts sales manager and higher positions commensurate with his age,

23

experience and education were also retaliatory acts directed at Washington because he had filed

an employment discrimination complaint with Defendant's management against his store

manager. As described more fully above, Bynum admitted in the course of a Department of

Labor investigation that his superiors prevented him from promoting Washington to full-time

employment. (PA 0200). In addition to this admission, Bynum had previously told Washington

that he would never be employed full-time at AutoZone because he filed a racial discrimination

complaint. (PA 0194). Washington has proven that Defendant willfully retaliated against him

for challenging a discriminatory practice at Store #1157. Defendant is liable to Washington for

the harm done by this retaliatory behavior of its employees and managers.

    C.    **Washington Has Demonstrated That He Was Subjected to a Hostile Work Environment in Violation of His Rights**

In addition to the wrongs outlined above, Washington was also forced to work in a

hostile work environment that was so severe that the condition of Washington's employment

was effectively altered in violation of his rights. In order to meet his burden of proving a prima

facie case of hostile work environment, Washington must show that he is a member of a

protected class; he was forced to work in an environment which was discriminatory, hostile and

abusive; and the intimidation, ridicule or insult was sufficiently severe or pervasive to alter the

condition of his employment and create an abusive working environment. See, e.g., *Harris v.*

*Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L. Ed.2d 295, 297 (1993); *Aman*

*v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3rd Cir. 1996).

In the spring of 2000, Washington was racially harassed by Findle who called him a

"little boy" in front of customers. (PA 0026 at 91-92). That term from Washington's perspective

was racist and demeaning, given the historical use of the word "boy" to describe African-

24

American men by racists over a long period of time. (PA 0026 at 92). The Third Circuit has

determined that the use of "code words" can constitute a hostile working environment, when a

defendant uses code words rather than overtly racist language to demean people of color. *Aman,*

85 F.3d 1082. The use of that opprobrious term didn't stop with the removal of Findle from

Store #1157. Within a month after his removal, another employee, Shaun Parmelia, also referred

to Washington as a "boy." (PA 0109).

In addition to having to endure two racist remarks, the white employees at Store #1157,

including four managers, submitted a group complaint against Washington to the District

Manager within a month of Findle's departure, alleging false accusations of threats and bad

language against Washington. *See* Section III. E. *supra.* Thereafter, the quality of the work

place for Washington deteriorated precipitously in the fall of 2000.   Washington's manager,

Leon Bynum, an African-American himself, used poor performance reviews, unwarranted

Correction Action reports and denial of promotion as weapons against Washington. (PA 0127-

29; PA 0200). All these actions were racially motivated because Washington was the only

African-American working at Store #1157 from October 2000 to July, 2002, save for Bynum, his

manager. Because of the false complaints, racist remarks and improper Corrective Action

Reviews, Washington was continually subjected to a hostile environment. In fact, numerous of

the employees indicated in their statements that after Washington filed the complaint against

Findle, they felt awkward around him and that the workplace was not the same when he was

there. (PA 0095). This work environment was not created by Washington but was rather a

hostile environment created by the other employees and managers.

25

Washington has submitted sufficient evidence to establish a prima facie case of hostile

work environment and Defendant is liable to him for the damage done by such environment.

### D.    Washington Has Established a Claim for Constructive Discharge

Washington has also shown that he was subjected to discrimination in the workplace that

was so intolerable that he was forced to leave.  In order to prove a prima facie case, Washington

must prove that he was a member of a protected class and that Defendant knowingly permitted

conditions of discrimination in employment so intolerable that a reasonable person subjected to

these conditions would resign. *Aman*, 85 F.3d 1083; *Goss v. Exxon Office Systems Co.*, 747 F.2d

885, 888 (3rd Cir. 1984).

As pointed out in the argument in support of Issues II and III above, Washington was

subjected to racially demeaning epithets at work.  Defendant retaliated against him for making a

discrimination complaint against his store manager by (a) dreaming up false charges of threats

and foul language against Washington (*see* Section III. E. *supra*); (b) deliberately giving

Washington below average performance reviews (*see* p. 24 *supra*; PA 0121-22) ; (c) giving

Washington unwarranted Corrective Action reviews for behavior that was not against company

policy (*see* pp. 23-24 *supra*); and (d) failing to give him a full-time job and to promote him,

despite his credentials (*see* pp. 18-21 *supra*).  By July 2002, Washington had had enough.  He

filed a race discrimination complaint with the Delaware Department of Labor and left AutoZone

on July 29, 2002. (PA 0194; PA 0031a).  He was driven out of his job by a two year history of

discriminatory treatment.  The Third Circuit does not require any "aggravated circumstances" or

"precipitating facts" to establish constructive discharge.  A showing that the defendant has

26

subjected the plaintiff to a two year history of racial discrimination is sufficient to establish a prima facie case of constructive discharge. *Aman*, 85 F.3d 1084.

Washington has met the requirement that he demonstrated the existence of a hostile work environment that began in the fall of 2000 and continued within 300 days of date of resignation, i.e., within the period commencing September 1, 2001 and ending on July 30, 2002. The best demonstration of the hostility of the work place during 2001-02 was the repeated failure of Defendant to give Washington a full-time job and allow him to become a manager. Washington was blocked at every turn by Defendant's store manager and District Manager from getting a full-time job. First, Defendant insisted Washington was better off as a janitor. (PA 0046). Second, when full-time openings occurred at Store #1157, Defendant brought in less-qualified white employees to take the full-time jobs. (*See* p. 20 *supra*). Third, Defendant's store manager finally told Washington that he would never get a full-time job or promotion because he had filed a racial discrimination complaint. (PA 0194). Therefore, Washington has established a prima facie case of constructive discharge.

E.    **Defendant Cannot Articulate a Non-Discriminatory Reason For Failure to Promote or to Justify Retaliation, a Hostile Work Environment, or Constructive Discharge and Summary Judgment Should Be Entered In Favor of Plaintiff**

Once Washington establishes a prima facie case of racial discrimination, Defendant is obliged to articulate a non-discriminatory reason for its actions against Washington. *Burdine*, 450 U.S. at 252; *Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 179 (3rd Cir. 1985). Since Washington has asserted claims of failure to promote, retaliation, a hostile work environment and constructive discharge, Defendant has to submit some evidence negating

27

Washington's prima facie case. *See Roebuck v. Drexel University*, 852 F.2d 715, 726 (3rd Cir.

1988); *see also Burdine*, 450 U.S. at 252-53. After the plaintiff has established a prima facie

case, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory

reason for the employee's rejection.

      1.    Failure to Promote

      Defendant cannot articulate a non-discriminatory reason for failing to promote

Washington. Washington was a college graduate with a second certificate in auto mechanics.

(PA 0022; PA 0141-2; PA 0138-40). He had prior direct sales experience. (PA 0019-21) None

of the managers at Store #1157 had Washington's academic qualifications when he started as a

part-time employee in 1999. Washington knew that he could not be promoted unless he became

a full-time employee. He repeatedly asked to go full-time starting early in 2001 without success.

*See* Section III. I. *supra*. Whenever a full-time position opened up at his store, someone else

who was not a member of a protected class got the position, despite inferior credentials.

      Any claim that Washington's performance reviews or Corrective Action Reviews were

the cause for failure to promote him is a pretext. Washington's three Corrective Action Reviews

during 2001 were for minor infractions, or for no infraction of the Defendant's rules of

employment. (PA 0127-29). Washington's Performance Reviews were average, and no worse

than those given to white employees at Store #1157. Notably, the majority of Washington's

Corrective Action Reviews and his evaluation score of 2.5 were received after he filed a

complaint of racial discrimination. (PA 0127-29; PA 0121-22), and after the employees of store

#1157 made a concerted effort to get Washington out of AutoZone.

28

Additionally, white employees were promoted who had less education and an equivalent number of Corrective Action Reviews during the same time period. Robert Baker, the 19 year old, had two adverse Corrective Actions through 2001. The first was given for allowing his girlfriend to hang around the store (PA 0149) and his second was given for a poor store recovery at the Bear store on April 19, 2001. (PA 0150). Deanna Brown, who had one year of high school and a background as a receptionist, was promoted, and made a Parts Sales Manager at Store #1157, had two Corrective Action Reviews from September 20, 2001 through January 21, 2002 for failure to report to work on time. (PA 0166-67). In addition, Brown received a mediocre performance review on March 1, 2002 which she did not sign. (PA 0165).

Defendant also should not be permitted to seek shelter under the two Corrective Action Reviews issued to Washington after Defendant failed to promote him, especially because one was issued after Washington filed his DDOL Complaint. Washington received the first of these two Corrective Action Reviews on May 14, 2002 in which he was accused of allowing a customer to steal two belts. Washington did not sign this review. (PA 0133). Washington received the second adverse Corrective Action Review on June 22, 2002 for failing to follow store policy. (PA 0134). Washington took a check for an incorrect amount from a customer ($2.00 less than the price of an item) by mistake. The part was purchased for someone other than the check writer. The write-up was unclear, but Bynum accused Washington of failing to get proper identification from Watson before taking the check. (PA 0030; PA 0134). This Corrective Action review was filed when Defendant knew that Washington had filed a racial discrimination charge against Defendant with the Delaware Department of Labor. (PA 0193) Additionally, Baker, who was promoted over Washington, received two Corrective Action

29

reviews during the same time period and after being promoted and transferred back to Store #1157. The first was on July 28, 2002 (late to work) (PA 0151) and the second one was issued on August 8, 2002 (poor job performance truck not put up) (PA 0152).

More importantly, whatever credibility might have attached to Defendant's refusal to promote Washington on account of Corrective Action Reviews was destroyed on July 8, 2002. Bynum asked Washington on that date if he wanted to go full-time. (PA 0135). Bynum offered to talk to the District manager about a full-time job and promotion to Parts Service Manager. (PA 0135). Further, Bynum later gave a sworn statement to the Department of Labor stating that Washington was qualified to get a full-time position. (PA 0200).

It is clear that Defendant's repeated refusal to promote Washington was based on race, rather than objective conditions such as education, experience and quality of work for Defendant. Even worse, Defendant refused to promote Washington because Washington had filed a complaint of racial discrimination. Defendant can invoke nothing better than pretexts for refusing to promote Washington. Therefore, Plaintiff is entitled to judgment as a matter of law on the issue of failure to promote.

      2.   <u>Retaliation</u>

Defendant has no explanation for the actions of Richard Henion and the employees and managers at Store #1157. The group decided to attack Washington after he had filed his racial discrimination complaint against Findle with the District Manager. Their charges were investigated and were found to be without merit. (PA 0035a). The group that joined Henion in filing the fabricated complaint consisted of the store manager and other individuals who were

Defendant's agents for purposes of employment decisions, putting Defendant on notice of their attack from the outset. *See* Section III. E. *supra*.

Defendant's failure to promote Washington when he was obviously qualified and asked for promotion informally and formally was another series of retaliatory actions continuing into 2002. *See* pp. 18-21 *supra*. Defendant cannot claim that all retaliation occurred more than 300 days prior to Washington's Department of Labor Complaint. Defendant's retaliatory acts continued almost to the day Washington finally quit.

3.    Hostile Work Environment and Constructive Discharge

Defendant has no evidence demonstrating that the hostile work environment at Store #1157 and Washington's constructive discharge were not due to actions by Defendant's employees, which were known by individuals who could affect employment relations and decisions. Defendant cannot put on any non-discriminatory excuse for its actions. Defendant cannot even argue from the facts adduced in discovery that its Regional Human Relations office, Loss Control investigator, District Managers and Store Managers acted out of personal malice and spite directed toward Washington for some non-racial cause. As demonstrated repeatedly above, both the hostile work environment and Washington's constructive discharge resulted from (i) racial epithets directed at Washington (i.e. "boy" comments) (PA 0026 at 91-92; PA 0109); (ii) white employees ganging up on Washington and filing meritless complaints against him (*see* Section III. E. *supra*); (iii) unwarranted Corrective Action reviews (pp. 15; 23-24 *supra*); and (iv) Defendant's failure to promote Washington because of his race and prior discrimination complaints. *See* pp. 18-21 *supra*. In sum, Defendant is powerless to defend against Washington's complaint.

31

## V.    CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff's Motion for

Summary Judgment on liability for failure to promote, retaliation, hostile work environment and

constructive discharge and for all other relief as the Court deems just and proper.

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, PA

Joseph J. Farnan, III (Bar No. 3945)
1200 N. Broom Street
Wilmington, DE 19806
TEL: (302) 655-4200
jjf@pgslaw.com

and

Thomas J. Reed (admitted *Pro Hac Vice*)
Widener University School of Law
Delaware Volunteer Legal Services, Inc.
Veterans Assistance Program
4601 Concord Pike
P.O. Box 7474
Wilmington, DE 19803-7474


DATE:    January 5, 2006